# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LANELL PIERCY, WILLA G. WARD, THOMAS L. MAZZEO, and SUE RUSH, individually and as representatives on behalf of a class of similarly situated persons, <br><br> Plaintiffs <br><br> v. <br><br> AT&T INC. <br> P.O. Box 132160 <br> Dallas, Texas 75313-2160, <br><br> AT&T SERVICES, INC. <br> P.O. Box 132160 <br> Dallas, Texas 75313-2160, <br><br> -and- <br><br> STATE STREET GLOBAL ADVISORS TRUST CO. <br> 1 Iron Street <br> Boston, Massachusetts 02210-1641, <br><br> Defendants. | Case No. |

## CLASS ACTION COMPLAINT

Plaintiffs LaNell Piercy, Willa G. Ward, Thomas L. Mazzeo, and Sue Rush, individually and as representatives on behalf of a class of similarly situated persons, by and through counsel, sue Defendants AT&T Inc. ("AT&T"), AT&T Services, Inc. ("AT&T Services"), and State Street Global Advisors Trust Co. ("State Street"), for violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.* Plaintiffs complain and allege as follows.

## NATURE OF THE CASE

1.      This case is about a venerable American business, AT&T—a Fortune 15 corporation with roots dating to the 19th Century—which lost its way and turned its back on its retired workers, choosing to put the pensions of almost 100,000 AT&T retirees in peril, to secure AT&T an enormous profit. Although AT&T is worth more than $100 billion, and is the world's fourth-largest telecommunications company, the company decided to fatten its wallet by placing its retirees' futures in the hands of a risky new insurance company that is dependent on its Bermuda-based subsidiary and which has an asset base far riskier than AT&T's. AT&T's plan was assisted by State Street, itself the offshoot of a financial institution of long standing. AT&T stood to gain—and did gain—more than $360 million in profit from this scheme, and State Street profited handsomely as well. The only losers in the transaction were AT&T's retirees, who face the danger—now and in the future—that their lifelong pensions will go unpaid while they have lost all the protections of federal law. Plaintiffs seek to right this wrong, and to restore AT&T's pensioners to their rightful places of financial security by recouping AT&T's ill-gotten gains and otherwise ensuring the safety of Plaintiffs' retirements.

## BACKGROUND

2.      AT&T and AT&T Services sponsor and operate the AT&T Pension Benefit Plan (the "Plan"). The Plan is a defined benefit plan protected by ERISA.

3.      In April 2023, AT&T offloaded over eight billion dollars of its Plan pension liabilities—retirement money it had promised to pay 96,000 Plan participants and beneficiaries—to Athene Annuity and Life Company and Athene Annuity & Life Assurance Company of New York, subsidiaries of Athene Holding Ltd. (collectively, "Athene"). In doing so, it removed those

Plan participants and former employees from the Plan and placed them beyond ERISA's protections.

4.      As a consequence, AT&T enjoyed an immediate profit that the company valued at $363 million and which is only a small portion of the financial advantage that will be enjoyed by AT&T from the transaction.

5.      AT&T accomplished this result by purchasing group annuity contracts ("GACs") from Athene in exchange for Athene assuming the obligation to pay the Plan's participants and beneficiaries their retirement benefits outside of ERISA's protective regime. Pension industry insiders refer to such transactions as "de-risking" or "Pension Risk Transfers."

6.      Only the latter term, however, is accurate. AT&T's transaction with Athene was a "de-risking" from AT&T's perspective. But in truth it was a massive risk transfer from AT&T to Plan participants and beneficiaries, designed to secure more than $360 million in profit to AT&T.

7.      Before the transaction, Plan pension benefits were guaranteed by AT&T—a Fortune 15 business and one of the world's largest telecom companies—which was responsible for paying the benefits as they came due, even if Plan investments fell short of expectations. AT&T was also obliged by ERISA's funding requirements to protect the Plan's financial health by making additional contributions to the Plan when necessary. And the benefits were further assured by the Pension Benefit Guaranty Corporation ("PBGC"), the federal agency charged with insuring pension benefits, because AT&T funded and the Plan paid premiums to the PBGC for each of the 96,000 participants.

8.      After the 2023 transfer, none of this is true. AT&T no longer guarantees payment of the retirement benefits. AT&T is no longer subject to ERISA's funding requirements as to these liabilities. The 96,000 annuitants are no longer Plan participants; they have been ejected from the

federal pension regime, so the PBGC no longer provides a backstop to ensure that participants and beneficiaries receive their retirement benefits. And the Plan need no longer pay PBGC premiums associated with the 96,000 participants.

9.     The ejected Plan participants and beneficiaries are now entirely reliant on the solvency of Athene for their retirement benefits.

10.     But Athene is not an entity to be trusted with the retirement income of tens of thousands of Americans. Athene is one of a new class of private equity-backed insurers ("Risk-Taking Insurers") engaged in the dicey "shadow banking" sector, and it is a highly risky annuity provider for the 96,000 Plan participants.

11.     Whatever place insurers like Athene have in the financial system, that place is not the American retirement sector given Athene's high-risk, low transparency strategies.

12.     The 96,000 Plan participants and beneficiaries whom AT&T unloaded to Athene had no say in the transaction. And they bear all of the transaction's risk while enjoying none of the profits that AT&T reaped through its purchase of a much less expensive, but far riskier, annuity than was available and that AT&T could have purchased.

13.     Thus, the upside of the transaction was enjoyed by AT&T, which profited more than $363 million; by State Street, an "independent fiduciary" of the Plan which was paid to recommend, assess, and bless the transaction; and by Athene, which was paid to assume the liabilities and is now gambling with retirees' livelihoods.

14.     Congress has, through ERISA, imposed strict fiduciary duties and other obligations upon plan sponsors, administrators, and others to regulate their ability to transfer workers' benefits from the federally regulated pension system to private annuity providers.

15.    To satisfy that duty, AT&T, AT&T Services, and State Street were obliged to act solely in the Plan participants' best interests and to select a safe and reasonable annuity provider.

16.    Athene is anything but.

17.    AT&T, AT&T Services, and State Street did not select Athene because it was the best annuity provider for Plan participants; rather, they selected Athene because it was cheaper *for AT&T* than safer, traditional annuity providers that have a proven record of the financial strength necessary to shoulder such large and important obligations over a period of many decades.

18.    AT&T, AT&T Services, and State Street, all of whom are fiduciaries by virtue of their discretionary authority over plan management and administration and control of Plan assets, have thus breached their fiduciary duties under ERISA, and the transaction was prohibited by ERISA.

19.    Plaintiffs LaNell Piercy, Willa G. Ward, Thomas L. Mazzeo, and Sue Rush bring this action, individually and on behalf of the 96,000 participants and beneficiaries whose pensions are no longer guaranteed by AT&T or afforded the protections of ERISA, to remedy those violations.

20.    The pensions of these individuals were a guaranteed lifetime income meant to support them through the later years of their lives and to compensate them for decades of faithful work.

21.    AT&T and State Street have profited at the retirees' expense to the tune of more than $360 million. At the same time, the fiduciary breaches of AT&T, AT&T Services, and State Street have caused Plaintiffs massive financial injury:  their retirement benefits, which were once triply guarded—by Plan assets, AT&T, and the PBGC—are now in Athene's hands alone, and there is thus a substantial risk that Plaintiffs will not receive their full retirement benefits.

22.     Plaintiffs seek injunctive relief requiring AT&T to guarantee the retirement benefits that were part of workers' employment bargain with AT&T and which those workers earned through their service to AT&T.

23.     Plaintiffs also seek monetary relief from AT&T and State Street including the profit those entities earned from the unlawful transaction and losses resulting from their illegal conduct.

## PARTIES

24.     Plaintiff LaNell Piercy was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7) at all relevant times. She resides in Marseilles, Illinois. Ms. Piercy started working for Western Electric, which played an essential role in the Bell System, in 1973 when she worked in a manufacturing plant that produced telephones. She then worked in Operator Services at Illinois Bell until the AT&T divestiture. She retired in 2007 with 31 years of eligible service under the Plan. Her work included years as a rate and route operator, a directory assistance operator, a Traffic Service Position System and Operator Service Position System operator, and finally as a senior office clerk until 2007. She often commuted as much as two hours each way to ensure she could fully protect her pension in retirement. Ms. Piercy believed that "when you had a job with the telephone company you had a job for life." Many of Ms. Piercy's colleagues over the years were women, including single mothers, who struggled to find safe public transportation at night from the facilities they commuted to in order to vest in their pension benefits. She has firsthand knowledge of the struggle and sacrifice that many women endured to collect a fully vested pension. In addition to her work in many facilities, Ms. Piercy was a collective bargaining team member for many years and bargained for increases in pension benefits for employees. She was a member of the Communications Workers of America  ("CWA") Bargaining Committee in 2002, 2004, 2005, 2009, 2012, 2015, 2018, and 2022. The CWA is a private and public sector

6

union that represents more than 150,000 workers at AT&T. Her bargaining efforts frequently involved efforts to increase pension bands for employees so they would receive more in retirement. Ms. Piercy relies upon her pension to support herself in retirement. She was both surprised and disappointed to learn that AT&T had kicked her and similarly situated retirees out of the Plan. Before the transaction, she knew her pension was safeguarded because AT&T stood behind it. That is no longer the case.

25.     Plaintiff Willa G. Ward was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7) at all relevant times. She resides in Waterford, Michigan. She started working for Michigan Bell, one of the entities that comprised the Bell System, in 1946. She retired in 1983 after 37 years of continuous work. When she started her career she worked as an operator, connecting telephone calls manually through a switchboard. She transitioned into customer education when there was a need to introduce customers and the general public to the rotary dial phone. Ms. Ward used a large model dial phone simulator to teach members of the public the proper way to use dial phones, explaining how the letters and numbers worked. She often gave presentations in high school auditoriums and other community centers. As technology evolved, Ms. Ward's responsibilities shifted to telephone line assignment, which consisted of ensuring that the commercial department was supplied with telephone numbers so a telephone could be installed for a customer. Ms. Ward relies upon her pension to support herself in retirement. She too was dismayed to learn that AT&T had ejected her and other similarly situated retirees from the Plan.

26.     Plaintiff Thomas L. Mazzeo was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7) at all relevant times. He resides in Camilus, New York. Mr. Mazzeo began working for AT&T in 1996 in the outbound marketing group. His responsibilities included sales of calling plans, working with incoming call centers, customer service work with large customers,

and other services related roles. Over his 19-year career with AT&T he worked in sales, billing, claims, and adjustments handling multiple claims for large business customers. Mr. Mazzeo relies upon his pension to support himself in retirement and, like Ms. Piercy and Ms. Ward, was troubled to learn that AT&T has kicked him and other similarly situated retirees from the Plan. Mr. Mazzeo is concerned about the safety and security of his pension benefits now that they have been offloaded to Athene. He is adversely affected by the diminished security of his pension benefits and the substantially increased risk that he will not receive the retirement benefits for which he worked.

27.     Plaintiff Sue Rush was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). She resides in Syracuse, New York. Ms. Rush began working at AT&T in 1987. She was employed as an operator for over seven years until the AT&T Operator Services Office in Utica, New York closed in 1994.  Ms. Rush then obtained her associate's degree before moving to Syracuse and returning to AT&T in 1996. She spent a year working as a receptionist before becoming a Customer Sales and Service Representative working on large business accounts. Her responsibilities were diverse and included billing for very large corporations, 800 services, conference services, and later internet and virtual private networks. She was also responsible for taking calls from dissatisfied AT&T customers. She investigated customer complaints that they had been sold products inappropriate for their needs and issued credits where they had been overbilled. While working full time at AT&T she earned a bachelor's degree in organizational management. She retired from AT&T after more than 27 years of service. Like Ms. Piercy, Ms. Ward, and Mr. Mazzeo, she has been adversely affected by the annuity transaction.

28.     Defendant AT&T Inc. ("AT&T") is a global telecommunications company whose subsidiaries and affiliates operate worldwide in technology industries. It is one of the most valuable

companies in the world, with a market capitalization of $118.83 billion. It is the Plan's sponsor and one of its fiduciaries with respect to the transaction with Athene because it approved the selection of Athene as the annuity provider and elected to enter into the transaction with State Street and Athene. According to its securities filings, AT&T entered into the transaction with Athene, agreed to purchase the group annuity contracts, transferred the billions of dollars' worth of liabilities, and enjoyed at least hundreds of millions of dollars' worth of profit from the transaction.

29.     Defendant AT&T Services, Inc. ("AT&T Services") is a wholly-owned subsidiary of AT&T and the Plan's administrator. It is responsible for the general administration of the Plan and is one of the Plan's named fiduciaries.

30.     Defendant State Street Global Advisors Trust Co. ("State Street") is a company formed to facilitate State Street Bank and Trust Company's asset management business and State Street Global Advisors' U.S. institutional investment management business. It was at all relevant times a Plan fiduciary with respect to the annuity transaction at issue.

## JURISDICTION AND VENUE

31.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under ERISA, 29 U.S.C. §§ 1001, *et seq.*

32.     The Court has personal jurisdiction over each Defendant.

33.     State Street was formed under Massachusetts law by State Street Bank and Trust Company, a Massachusetts state-chartered trust company and subsidiary of State Street Corporation, itself a Massachusetts bank holding company. State Street's principal place of business is 1 Iron Street, Boston, Massachusetts 02111. Upon information and belief, State Street's conduct giving rise to Plaintiffs' claims occurred in Massachusetts.

34.     AT&T and AT&T Services are amenable to personal jurisdiction under Federal Rule of Civil Procedure 4(k)(1)(C) and 29 U.S.C. § 1132(e)(2). AT&T and AT&T Services have minimum contacts with the nation and exercising jurisdiction over them in this case would be fair and reasonable. AT&T and, upon information and belief AT&T Services, also conduct substantial business in Massachusetts and took actions in Massachusetts that give rise to Plaintiffs' claims for relief in this action, including engaging State Street to assist AT&T with the unlawful transaction.

35.     Venue is proper under 29 U.S.C. § 1132(e)(2) because State Street resides and may be found in this District, and because it is a creature of Massachusetts law, is a resident of Massachusetts, conducts business in Massachusetts, and operates from its Massachusetts headquarters.

## FACTS COMMON TO THE CLASS

### *Background on the Transfer of Pension Benefit Responsibilities to Insurance Companies*

36.     In a defined benefit pension plan, the plan sponsor (typically the employer) agrees to pay monthly pension benefits to retirees as they come due for the rest of the participants' lives, and it funds those benefits through assets contributed both initially and over time by the employer that are invested and held in trust for plan participants.

37.     The employer must pay the pension benefits, even if investment performance falls short of expectations.

38.     The employer must also make additional contributions to the Plan in accordance with ERISA's funding requirements, which demand additional plan contributions in certain circumstances, including if investment returns fall short of expectations and are insufficient to satisfy obligations to plan participants. Thus, the investment risk—the possibility that the plan's

investments will generate insufficient returns to cover the plan's pension obligations and the expenses of operating the plan—is borne entirely by the plan sponsor.

39.     If the sponsor goes bankrupt or otherwise lacks the resources to continue to fund the Plan and pay required benefits, the PBGC steps in as a backstop to pay benefits due.

40.     These features of defined benefit plans make them both valuable and predictable for retirees. Such plans once dominated the American retirement system because they were correctly seen as a way to attract and retain the best workforce.

41.     But because these plans are so valuable to employees, they are conversely expensive for employers. Consequently, as part of a recent trend by employers that sponsor defined benefit plans to improve their bottom lines, numerous sponsors have chosen to shift their liability for monthly pension payments to some or all of the plan participants, to an insurance company through the purchase of GACs.

42.     The upside of such transactions—enjoyed by plan sponsors—is increased profits; the downside—borne by plan participants—is the increased risk of losing promised retirement benefits, because the annuity provider is unable to perform and the benefits are no longer guaranteed by their former employer and the PBGC.

43.     Although these transactions are now a common way for employers to diminish their defined benefit liabilities (and to profit from such transactions) or to dispense with defined benefit plans altogether, they are not new.

44.     In the 1980s, hundreds of employers terminated their well-funded, federally insured defined benefit pension plans and bought retirement annuities from a variety of insurance companies, including Executive Life Insurance Company ("Executive Life"), which was then one

of the country's largest insurers, but which had embarked on a disastrous "junk bond" investment strategy.

45.      The pension benefits of approximately 84,000 workers and retirees were transferred from the federally regulated pension system to Executive Life.

46.      Executive Life was often selected by employers because it offered the lowest bid on GACs. Rather than choose a safer, more expensive annuity, employers placed their own financial interests over plan participants' needs.

47.      Those decisions proved disastrous when, in 1991, Executive Life became insolvent. A significant portion of its assets had been invested in high-risk, high-yield bonds procured through the Drexel Burnham Lambert ("Drexel") investment bank, which then failed due to its risky bond strategy.

48.      The failure of Drexel led to Executive Life defaulting on its annuity contracts, thereby failing to make good on its obligations to tens of thousands of pension annuitants. State regulators were required to seize the company in April 1991 to prevent a run. The debacle resulted in massive losses to pensioners.

49.      Members of Congress were outraged by Executive Life's implosion and its impact on retirees. In response, they enacted the Pension Annuitants Protection Act of 1994, Pub. L. No. 103-401 (Oct. 22, 1993) ("PAPA"), as an amendment to ERISA in order to prevent similar crises and ensure that plan participants would have legal recourse against risky pension transfers by plan fiduciaries. Through this amendment, ERISA now provides expressly that plan participants and beneficiaries ejected from the federal pension regulatory system by a plan sponsor's purchase of annuities may sue for relief to, *inter alia*, assure the receipt of the benefits to which they are entitled. 29 U.S.C. § 1132(a)(9).

50.     And in 1995, the Department of Labor promulgated Interpretive Bulletin 95-1, 29 C.F.R. § 2509.95-1 ("IB 95-1"), which—like PAPA—aimed to prevent the irresponsible transfer of pension liabilities to insurance companies that are not sufficiently secure to guarantee retirement benefits, a principal animating force behind the enactment of PAPA and indeed ERISA itself. IB 95-1 has since been updated consistent with that purpose.

51.     IB 95-1 provides courts, regulated entities, and the public with the Department of Labor's expert guidance on the fiduciary standards that apply under ERISA to the selection of an annuity provider when a fiduciary transfers defined benefit pension liabilities to an annuity provider. *See* IB 95-1(a).

52.     It explains that selecting an annuity provider is a fiduciary decision under ERISA, 29 U.S.C. § 1104(a), and that employers therefore must act solely in the interest of the plan's participants and beneficiaries and in accordance with ERISA's strict prudence standard when selecting an annuity provider. IB 95-1(b) (citing 29 U.S.C. § 1104(a)).

53.     Thus, to meet their loyalty and prudence obligations in selecting an annuity provider, fiduciaries must "take steps calculated to obtain the safest annuity available, unless the interests of the participants and beneficiaries demand otherwise." Fiduciaries must also, at a minimum, "conduct an objective, thorough and analytical search for the purpose of identifying and selecting providers from which to purchase annuities." IB 95-1(c).

54.     In performing that analysis, plan fiduciaries must consider, among other things:

    i.   the quality and diversification of the annuity provider's investment portfolio;

    ii.  the size of the insurer relative to the proposed contract;

    iii. the level of the insurer's capital and surplus;

    iv.   the lines of business of the annuity provider and other indications of an insurer's exposure to liability;

    v.   the structure of the annuity provider and other indications of an insurer's exposure to liability;

    vi.   the availability of additional protection through state guaranty associations and the extent of their guarantees.

### *Athene: A Paradigmatic Example of a Risk-Taking Insurer*

55.    Since Executive Life's collapse, the pension risk transfer market had been dominated by traditional annuity providers, including household names such as MassMutual and New York Life.

56.    But more recently a new class of annuity providers, backed by private equity, has entered the market. These are the "Risk-Taking Insurers."

57.    These new Risk-Taking Insurers are more likely than traditional annuity providers to become insolvent now and in the future. Many (i) have not been tested through a full economic cycle and have never weathered a recession; (ii) re-insure annuities with offshore insurance companies that are not required to set aside as much capital as the traditional U.S.-based insurance companies; and/or (iii) invest in assets that are riskier, less liquid and more opaque than those invested in by traditional providers, such as collateralized loan obligations ("CLOs"), asset-backed securities, private fixed-income placements, subordinated debt, and even the stock of affiliated companies.

58.    Independent industry experts, scholars, and journalists have begun to sound the alarm that these new Risk-Taking Insurers are unstable and even threaten the wider financial system.

59.   For example, a paper authored by two economists, Natasha Sarin, of Yale Law School, and Divya Kirti, of the International Monetary Fund, found that "PE [private equity]-backed insurance firms take on greater asset risk [than non-private equity backed firms] by moving out of highly rated corporate bonds and into poorly rated private-label asset backed securities, increasing their holdings of private-label asset-backed securities by two-thirds of the industry average." This risk-taking is nearly instantaneous: according to Professor Sarin, "[w]ithin days of a P.E. acquisition of an insurance company, they tilt their bond portfolios to riskier assets."

60.   Three economists at the Board of Governors of the Federal Reserve System have also recounted how such insurers have, since 2009, developed "a new shadow banking business model that resembles investment banking in the run up to the 2007–09 financial crisis. These life insurers profit by lending to highly-leveraged firms. In particular, they originate risky loans, hold them, and securitize them in [collateralized loan obligations]." By extending credit to "risky projects," these insurers "earn a sizeable spread over the cost of their fixed-annuity liabilities." The paper "show[s] that these life insurance companies hold some of the riskiest portions of the CLOs issued by their own affiliate asset managers against virtually no capital." It also shows that "[t]he shadow banking business of life insurers exponentially increases the industry's vulnerability to aggregate corporate-sector shocks." In short, certain insurers have, since the 2008 financial crisis, "filled a void left by banks in risky corporate loan markets." In doing so, they have "create[d] and become vulnerable to run risk," the likelihood that such insurers could see their assets shrink quickly and irreversibly when markets turn down.

61.   The paper identifies Athene as an example of one insurer that has a shadow banking business.

62.   Athene is, in fact, a paradigmatic example of a Risk-Taking Insurer.

63.     Athene was purchased in 2022 by the "private equity giant," Apollo Global Management ("Apollo"), which was founded by Drexel alumni Leon Black, Josh Harris, and Marc Rowan in 1990, the year Drexel collapsed and entered bankruptcy (and thereby caused the collapse of Executive Life).

64.     Apollo had "found a way to make money off the retirement savings of millions of everyday Americans" by buying out corporate retirement obligations cheaply and then backing up their resulting annuity obligations through collateralized loans and other risky assets.[1]

65.     Today, approximately one-fifth of Athene's portfolio is invested in risky asset-backed securities and leveraged loans made to companies highly in debt, and approximately 80% of its "Pension Risk Transfer" liabilities are reinsured through Bermuda affiliates owned by Athene's parent, Apollo.

66.     Apollo collects asset management fees on all of the investments that it manages for Athene.

67.     Athene and Apollo pioneered much of the risky conduct characteristic of the Risk-Taking Insurers. Athene is today a prime example of an insurer that has grown its shadow banking business by assuming an organizational structure that allows it to engage in risky conduct with former pension plan assets. As with other insurers engaging in such shadow banking, a central feature of Athene's organizational structure today is the location of its captive reinsurer in Bermuda to take advantage of Bermuda's favorable regulatory regime.

68.     The reinsurance of "Pension Risk Transfer" liabilities in Bermuda poses unique risks to pensioners. Bermuda reinsurers report under Bermuda accounting principles rather than United States Statutory Accounting Principles ("U.S. SAP"), which is the required reporting

---

[1]  https://www.nytimes.com/2023/10/04/business/private-equity-insurance.html.

16

regime for all U.S.-based insurance companies. Under U.S. SAP, insurers must file detailed statutory financial statements that report all individual purchases and sales of securities. For fixed income investments, U.S.-based insurers report all individual stock and bond purchases and sales, including CUSIP numbers, which are unique identifiers assigned to stocks and registered bonds.

69.     By contrast, under Bermuda standards, Athene's affiliated reinsurers today report only in the aggregate with no individual stock and bond level purchase or sale information. Further, Bermuda standards allows for investments in assets that would not qualify as suitable under U.S. SAP.

70.     The lack of transparency in the reporting by Athene's Bermuda reinsurers is stark. To illustrate, Athene's current statutory financial statements for its principal U.S. insurer, Athene Annuity and Life Company ("Athene Iowa"), is 3,939 pages long, whereas the Athene Bermuda entities' consolidated report filed under Bermuda accounting standards is 59 pages long.

71.     In addition, Athene's excessive reliance on affiliated offshore reinsurance today is troublesome for those whose retirement benefits are affected by "Pension Risk Transfers" for numerous reasons.

72.     Whereas arm's length reinsurance, with pricing set by the marketplace, can improve policy holder security by diversifying and sharing fully transparent risk with strong, independent financial partners, reinsurance with a commonly owned affiliate is regulatory arbitrage, at best, as pricing is not set by the marketplace. That is the case with respect to Athene because both it and the reinsurer are today owned by Apollo.

73.     For example, for the year ending in 2022, Athene took credit for reinsurance with its Bermuda affiliates in the amount of $15.2 billion, whereas traditional insurers like New York

Life had no offshore affiliated reinsurance whatsoever and took a total of $3.58 billion in credit for reinsurance with third party arm's length reinsurance companies.

74.    Moreover, the ratio of Athene's surplus to liabilities is also quite low when compared to other life insurance companies, as evidenced by the chart reproduced below:



75.    Athene also reports a very large amount of modified co-insurance ("Modco") arrangements with its Bermuda affiliates: $104 billion as of year-end 2022 versus only $2 billion in surplus as reported by Athene Iowa. Modco arrangements are those in which an insurer that is transferring risk to a reinsurer retains assets related to the reinsured policies, and they are particularly risky for pensioners severed from ERISA plans by "Pension Risk Transfers."

76.    Such arrangements allow Athene to remove risky assets from its own reported Risk Based Capital ("RBC"), which has the effect of artificially inflating RBC ratios, which in turn allows Athene to hold a substantially lower amount in minimum required surplus. Other insurers, including New York Life, Pacific Life, Nationwide Life, and TIAA, reported zero in Modco with offshore affiliates as of year-end 2022.

77.    Thus, although Athene's total liabilities increased by more than 150% from 2018–2022, the amount of surplus maintained to support its liabilities has not kept pace. Upon

information and belief, if Athene were to reverse or back out of its $104 billion in Modco it would be required to increase its minimum required surplus by 400%. Athene's excessive use of offshore affiliated reinsurance, including Modco, therefore obscures its true financial condition and exposes pensioners, including Plaintiffs, to substantial risk.

78.     Put simply, Athene's use of financial alchemy makes it dramatically under-reserved today.

79.     Athene also has a very high concentration of risky assets relative to its surplus. For example, Athene reports $21 billion in "other loan-backed and structured securities" as of year-end 2022 against only $2 billion in surplus—ten times its surplus. New York Life, on the other hand, reported $11.7 billion in that category—*less than half of its surplus*, which stood at $23.88 billion as of year-end 2022. All of Athene's other loan-backed and structured securities were originated by Apollo.

80.     Athene also held $18 billion in "Deposit Type Contracts" as of year-end 2022 versus $2 billion in surplus. Deposit Type Contracts are essentially funding agreement-backed notes which are callable by institutional investors. In the event of a liquidity stress environment, like that which existed during the March 2023 collapse of Silicon Valley Bank and during the 2008 financial crisis, it is certain that sophisticated investors in these funding agreement-backed notes would request their money back long before "de-risked" pensioners would even suspect that a liquidity crisis was looming. Funding agreement-backed notes are not reported as debt as they are considered an insurance product. As a result, Athene's actual liquidity is dramatically overstated, and the Plaintiffs are at substantial risk of not receiving their pensions.

81.     And today Athene's affiliated transactions are, upon information and belief, also dramatically understated. It is publicly known that Apollo has had a long-term practice of bundling

asset-backed notes and selling those notes to Athene in exchange for upfront cash and future management fees.

82.     At least one set of independent analyses (the "NISA Reports") has thus explained why an ERISA plan sponsor cannot, consistent with its fiduciary duties and the risk factors outlined in IB 95-1, offload pension liabilities to Athene. The NISA Reports found that industry-wide "Pension Risk Transfers" to lower quality insurers, like the transfer at issue here, harm pensioners by as much as $5 billion annually through uncompensated credit risk.

83.     And the NISA Reports even quantify the extent to which Athene is neither a safe nor a reasonable annuity choice for ERISA fiduciaries.

84.     The reports conclude that Athene is substantially riskier than multiple traditional annuity providers and approximately 14% riskier than, for example, New York Life.

85.     They reach that conclusion by using the bond market as a measure of risk—a necessity given the NISA Reports' finding that insurance company balance sheets are exceedingly complex and opaque, especially given the use of Bermudian reinsurers.

86.     The bond market provides a market-based measure of creditworthiness because a bond's spread over U.S. Treasuries is the additional compensation an investor demands to accept the credit risk of holding a bond from a particular issuer as compared to the U.S. government. The market price of Athene's bond risk is 21.4% higher than U.S. Treasuries, as compared to the safest annuity provider analyzed by the NISA Reports (New York Life), whose market price is 7.4% higher than U.S. Treasuries—a 14% gap.

87.     In fact, this analysis *understates* the true risks to beneficiaries of a plan offloading benefits liabilities to Athene. The market spread on bonds is set by the marginal buyer, a buyer who by definition would have bond holdings that represent only a small portion of that buyer's

overall, diversified portfolio. By contrast, the pension of a typical retiree receiving an annuity is a significant portion of their net worth and might represent close to 100% of their retirement income. Such retirees would, if they had a choice (which Plaintiffs did not have in this case), demand additional compensation for Athene's riskiness.

88.     The AT&T Plan participants whose benefits have been offloaded to Athene receive none of the upside of Athene's inherently risky "value proposition." The risk posed by Athene could be worthwhile to Plan participants, at least theoretically, if they were to enjoy increased benefits that compensated them for Athene's risk of failure. But that is not the case for Plan participants, and it is never the case for defined benefit plan participants, because their benefits are fixed.

89.     Put simply, Athene today is, according to objective measures, the least safe annuity provider of those analyzed in the NISA Report—even among the category of least safe annuity providers.

### *The AT&T-State Street-Athene Transaction*

90.     In or around April 2023, AT&T and AT&T Services engaged State Street to assist AT&T in offloading its pension liabilities.

91.     Specifically, AT&T and AT&T Services sought assistance from State Street's "Independent Fiduciary Services team."

92.     A key service offered by the Independent Fiduciary Services team—and, according to State Street, "often one of the reasons why companies decide to hire" supposedly independent

fiduciaries like them—is that hiring State Street, as a third-party and purportedly neutral advisor, "may help in the event of litigation."[2]

93.     According to State Street, it is "[b]lazing the trail into the mega-pension transfer market."

94.     In assisting AT&T's offloading of pension liabilities, State Street was in fact acting as a fiduciary of the Plan—a fact that AT&T and State Street have affirmed multiple times in public representations and in securities filings.

95.     State Street received financial compensation for the services that it provided to AT&T.

96.     Based on a decision made by AT&T, AT&T Services, and State Street, AT&T, with State Street's assistance, entered into an agreement with Athene on April 26, 2023. By that agreement, AT&T purchased GACs from Athene in exchange for Athene assuming over $8 billion of the Plan's defined benefit pension obligations.

97.     Although AT&T has not been forthcoming about the amount of money it paid Athene to assume the pension benefit obligations, AT&T's securities filings reveal that it paid Athene an unusually low percentage of the value of the pension benefits being transferred.

98.     AT&T's purchase of the GACs was funded directly and exclusively by Plan assets, requiring no cash or contribution from AT&T.

99.     The purchase closed on May 3, 2023.

100.    The GACs cover approximately 96,000 Plan participants and beneficiaries, none of whom had a say in the transfer of their benefits to Athene.

---

[2] https://www.ssga.com/us/en/institutional/ic/insights/how-independent-fiduciary-services-evolved.

101.    Athene is now solely responsible for paying the pension benefits; Plan participants covered by the transfer have been terminated as participants in the Plan; and such participants no longer enjoy any of the benefits intended by Congress under ERISA, including the protections and backstop provided by the PBGC.

102.    AT&T closed the transaction because the transaction was expected to allow AT&T to recognize a gain of approximately $350 million in the second quarter of 2023.

103.    In fact, the transaction allowed AT&T to recognize a $363 million gain on its financial statements.

104.    And the $363 million worth of profit that AT&T has recognized is only a small portion of the financial advantage that AT&T has reaped and will reap from the transaction.

105.    AT&T will, in addition, enjoy administrative cost savings due to the elimination of the 96,000 participants from the Plan. Because the benchmark range of such costs is $50–100 per participant per year, AT&T will save $4.8–9.6 million per year. Over an 18.8 year life expectancy for an average 70-year-old retiree, which is a reasonable estimate under current IRS guidance, the transfer will net AT&T between $90–180 million in administrative cost savings.

106.    AT&T may also enjoy substantial reductions in investment management fees given the Plan's smaller pool of assets.

107.    AT&T will also profit from the transaction by saving on flat-rate and variable-rate premiums that it previously paid the PBGC to insure its retirees' benefits.

108.    Because of the transaction, AT&T and the Plan are no longer required to pay annual flat-rate PBGC premiums for the 96,000 participants terminated from the Plan, which will save AT&T more than $9.6 million annually. AT&T will enjoy over $182 million in additional profits

from the transaction over the lives of the 96,000 retirees, using the IRS life expectancy of 18.8 years for an average 70-year-old retiree.

109.    And the amount of variable-rate premiums over the lives of the retirees is also substantial, measuring in the hundreds of millions of dollars. That is because variable-rate premiums are linked to interest rates, and AT&T had historically paid significant amounts of this additional premium.

110.    All told, AT&T's additional profits from the avoided premiums likely measure in the multiple hundreds of millions of dollars, if not more.

111.    Based on these and other advantages to AT&T from the annuity transaction, the transfer will have a positive effect on the bonuses and long-term stock incentive value for AT&T executives.

112.    And changes in the interest rate environment in the year leading up to the transaction gave AT&T a financial incentive to move quickly. Annuity pricing and interest rates are inversely related; interest rates rose by 200–250 basis points in the year preceding the transfer; and the Plan's discount rate increased from 3.0% at the beginning of 2022 to 5.2% at the time of the transaction in 2023. Those conditions mean that if AT&T had undertaken the transaction a year earlier it would have paid approximately $1 billion more for the annuities than it in fact paid.

113.    Put simply, AT&T was eager to offload the liabilities in 2023 after interest rates had climbed because that is when the conditions for maximizing its own profit became favorable.

114.    Although State Street was nominally engaged by AT&T to provide compliance advice to AT&T to ensure that AT&T selected an annuity provider in satisfaction of its fiduciary obligations, State Street's true role was to give the appearance of legitimacy to AT&T's selection of Athene as an annuity provider.

115.    On information and belief, AT&T and State Street did not conduct an independent, impartial investigation aimed at identifying and selecting an annuity provider in Plan participants' best interests.

116.    The risk posed by Athene as of 2023 and in the years immediately prior is and was publicly known and widely reported.

117.    In the pension plan liability transfer industry, it is customary for plan fiduciaries to solicit bids and information from insurers to ensure that the transfer is in the plan participants' best interest. AT&T and State Street either did not solicit bids and other information that would have revealed that Athene was not a safe or reasonable selection, or they ignored or unreasonably disregarded such bids and information.

118.    When AT&T and State Street selected Athene as the entity to which they would transfer billions of dollars' worth of pension liabilities, they made a choice that was neither safe, reasonable, nor prudent.

119.    Nor did AT&T and State Street make the safest available choice or the choice that was in the best interest of Plan participants; in fact, they did the opposite.

120.    Indeed, Athene today flunks multiple tests for whether an annuity provider is a safe or reasonable choice, including because (i) Athene lacks a sufficient track record to be entrusted with guaranteeing such a massive amount of pension liabilities; (ii) Athene today is, compared to traditional providers, invested in riskier assets to support participants' payments, (iii) Athene's risk is increased by its reinsurance of annuities with offshore companies affiliated with Athene which are not as transparent or required to set aside as much capital as U.S.-based insurers; (iv) Athene employs questionable accounting strategies to overvalue its assets; and (v) the risks inherent in Athene's strategies are magnified by unstable economic conditions.

121.    It should come as no surprise that State Street—ignoring the public red flags attached to Athene—has routinely rubber-stamped Athene as an annuity provider to displace retirees' longstanding, valuable rights to ERISA-protected pension benefits.

122.    Since 2018, State Street has recommended Athene for no fewer than ten "Pension Risk Transfers," shifting more than $30 billion in pension liabilities outside the federally regulated pension system.

123.    State Street thus has a history of being hired by companies to act as a so-called "independent fiduciary," performing a process which—to the surprise of no one—identifies Athene as the annuity provider of choice.

124.    And State Street has at least one apparent financial incentive to recommend Athene to serve as the annuity provider in "Pension Risk Transfers." State Street offers a financial product backed by Athene.

125.    Before the AT&T-Athene-State Street transaction, the risk that Plaintiffs would not receive the pension benefits to which they were entitled was negligible. There was no realistic probability that the Plan would not be sufficiently funded to pay the benefits *and* that AT&T would fail *and* that the PBGC would fail to pay Plaintiffs' benefits. There was no safer place for their pension benefits.

126.    After the transaction, the risk that Plaintiffs will not receive the benefits to which they are entitled is large.  Because of the transaction, Plaintiffs are no longer members of the Plan, and their retirement benefits are thus backed by only Athene—not the Plan, AT&T, or the PBGC.

127.    Based on Athene's current and likely future financial position, there is a substantial probability that it will fail to make good on its obligation to pay Plaintiffs' retirement benefits, and

the profit realized by AT&T is at least a rough proxy for the harm to retirees from being terminated as plan participants and having their pension benefits secured through a risky annuity with Athene.

128.    The risk imposed upon Plaintiffs by the transaction exceeds even the difference in risk between Athene and a traditional annuity provider. Plaintiffs were safer in the hands of the Plan, AT&T, and the PBGC than they would be in the hands of a traditional annuity provider. And Athene is, in fact, one of the least safe annuity providers in the market.

129.    The transaction thus greatly increased the risk—and indeed created a substantial risk—that Plaintiffs will not receive the retirement benefits that they have earned and which they are owed.

130.    Plaintiffs are empowered by law to bring this claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), and (a)(9).

<u>**CLASS ALLEGATIONS**</u>

131.    Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23. They seek to represent the 96,000 Plan participants and beneficiaries ejected from the Plan by the AT&T-State Street-Athene transaction (the "Class").

132.    <u>Numerosity:</u> The 96,000-member Class is so numerous that joinder of all members is impracticable.

133.    <u>Commonality:</u> There are questions of law and fact common to the class because class members' claims are identical to one another and predicated on the common contention that they were injured by the transfer of their pension liabilities to Athene in violation of ERISA. Proceeding as a class action will generate answers to common questions that are apt to drive resolution of the litigation. Such common questions include:

     i.   Did AT&T and AT&T Services breach their fiduciary duties when they selected Athene as an annuity provider?

    ii.   Did State Street breach its fiduciary duty when it assisted AT&T and AT&T Services in entering into, and itself entered into, the transaction?

   iii.   Was the transaction *per se* unlawful under ERISA?

   iv.   Did the analysis performed by AT&T, AT&T Services, and State Street that led AT&T and State Street to select Athene as the annuity provider satisfy those entities' fiduciary obligations?

    v.   Should the Court order injunctive relief that ensures Plaintiffs will be able to obtain the value of their retirement benefits?

   vi.   Should the Court order AT&T to disgorge the $360 million-plus profit it secured from breaching its fiduciary duty?

134.   <u>Typicality:</u> The named plaintiffs' claims are typical of the Class's claims. The named plaintiffs' claims arise from the same conduct, and seek to redress the same legal violations, as the Class's claims.

135.   <u>Adequacy:</u> The named plaintiffs will fairly and adequately protect the interests of the Class. The named plaintiffs have no interest antagonistic to those of the other members of the Class. The named plaintiffs are committed to the vigorous prosecution of this action. They have retained counsel who specialize in the substantive law of ERISA and pension plans, and who are experienced and competent in the prosecution of large class actions, including those arising under ERISA.

136.   <u>Rule 23(b)(1):</u> The prerequisites for a (b)(1) class are satisfied. Prosecution of separate actions by Class members would risk establishing incompatible standards of conduct for

28

Defendants. Additionally, adjudications as to individual Class members would, as a practical matter, dispose of the interests of other members of the Class and substantially impair their ability to protect their interests.

137.   <u>Rule 23(b)(2)</u>: The prerequisites for a (b)(2) class are satisfied. Defendants' misconduct was generally applicable to the Class. The injunctive relief that Plaintiffs seek affects the Class as a whole. Individual Class members do not have an interest in prosecuting their claims in this action individually because Class members' claims are identical and the injunctive relief sought will affect each Class member equally.

138.   <u>Rule 23(b)(3)</u>: The prerequisites for a (b)(3) class are satisfied because common questions of law and fact predominate and are susceptible to class-wide proof. Class-wide litigation of this action is also superior to individual litigation because there are no difficulties in managing this case as a class action and there is a strong need to concentrate the Class members' claims in one action.

## COUNT I: BREACH OF FIDUCIARY DUTY
*Against AT&T Inc. and AT&T Services*

139.   The foregoing allegations are incorporated by reference herein.

140.   AT&T and AT&T Services were, at all relevant times, Plan fiduciaries.

141.   Under 29 U.S.C. § 1104(a)(1), they were thus required to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." This duty requires that ERISA plans be operated for the "exclusive benefit" of plan participants, and ERISA relatedly provides that, except in limited circumstances inapplicable here, "the assets of a plan shall never inure to the benefit of any employer." 29 U.S.C. § 1103(c)(1). AT&T and AT&T Services were also required to act "with the

care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

142.    AT&T and AT&T Services breached these fiduciary duties of loyalty and prudence when they selected Athene as the annuity provider to receive Plaintiffs' pension liabilities, thereby allowing AT&T to receive at least a $363 million profit.

143.    Athene was neither a safe nor a reasonable choice of annuity provider.

144.    Further, IB 95-1 and ERISA provide that to satisfy their fiduciary duties under ERISA, fiduciaries must take steps to obtain the safest annuity available, which requires an objective, thorough search to determine which annuity provider is best for plan participants.

145.    Athene was not the safest annuity available, its selection was not in Plaintiffs' best interest, and AT&T and AT&T Services did not take the necessary steps to obtain the safest annuity available.

146.    The transfer of Plaintiffs' pension liabilities to Athene has caused Plaintiffs injury, namely the increased and substantial risk that they will not receive the full retirement benefits to which they are entitled, the loss of ERISA protections, and the decreased value of their pension benefits, which are far less secure as a result of the transaction.

## COUNT II: BREACH OF FIDUCIARY AND CO-FIDUCIARY DUTIES
### *Against State Street*

147.    Paragraphs 1 through 138 are incorporated by reference herein.

148.    As a fiduciary, State Street was, like AT&T and AT&T Services, required to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a). It was also required to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and

familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

149.    As a fiduciary, State Street also is liable for "the acts of another fiduciary with respect to the same plan in the following circumstances:

(1) if it participated knowingly in, or knowingly undertook to conceal, an act or omission of such fiduciary, knowing such act or omission was a breach;

(2) if, by its failure to comply with 29 U.S.C. § 1104(a)(1) in the administration of its specific responsibilities which gave rise to its status as a fiduciary, it has enabled such other fiduciary to commit a breach; or

(3) if it had knowledge of a breach by such other fiduciary, unless it made reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).

150.    State Street breached these duties through its participation and assistance in AT&T's unlawful annuity transaction with Athene on behalf of the Plan.

151.    State Street's efforts were undertaken not solely in the interests of the Plan participants and beneficiaries but rather in its own financial interests and the interests of AT&T.

152.    State Street's actions did not comply with ERISA's prudent person standard of care.

153.    State Street knowingly participated in, enabled, and made no reasonable efforts to remedy AT&T's fiduciary breaches, including AT&T's prohibited transactions with State Street and Athene.

## COUNT III: PROHIBITED TRANSACTION
### *Against AT&T Inc. and AT&T Services*

154.    Paragraphs 1 through 138 are incorporated by reference herein.

155.     Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect . . . furnishing of services between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C).

156.     AT&T and AT&T Services were at all times fiduciaries to the Plan.

157.     AT&T and AT&T Services caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between State Street and the Plan.

158.     When AT&T and AT&T Services caused the Plan to engage in the annuity transaction, State Street was a party in interest, including because State Street was a fiduciary of the Plan and a person providing services to the Plan. 29 U.S.C. § 1002(14). AT&T and AT&T Services knew of that fact when they caused the Plan to engage in the annuity transaction.

## COUNT IV: PROHIBITED TRANSACTION
*Against AT&T Inc. and AT&T Services*

159.     Paragraphs 1 through 138 are incorporated by reference herein.

160.     AT&T and AT&T Services also caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or indirect (i) exchange of property between the Plan and Athene; (ii) furnishing of services between the Plan and Athene; and (iii) transfer to, or use by or for the benefit of Athene, of Plan assets, *see* 29 U.S.C. § 1106(a)(1)(A), (C), (D);

161.     When AT&T and AT&T Services caused the Plan to engage in the annuity transaction, Athene was a party in interest, including because Athene was a person providing services to the Plan. 29 U.S.C. § 1002(14). AT&T and AT&T Services knew of that fact when they caused the Plan to engage in the annuity transaction.

## COUNT V: PROHIBITED TRANSACTION
*Against State Street*

162.    Paragraphs 1 through 138 are incorporated by reference herein.

163.    State Street was at all relevant times a fiduciary to the Plan.

164.    State Street caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or indirect (i) exchange of property between the Plan, on one hand, and AT&T and AT&T Services, on the other hand; (ii) furnishing of services between the Plan and AT&T and AT&T Services; and (iii) the transfer to, or use by or for the benefit of AT&T and AT&T Services, of Plan assets;

165.    When State Street caused the Plan to enter into the annuity transaction, AT&T and AT&T Services were parties in interest, including because they were fiduciaries of the Plan and persons providing services to the Plan. 29 U.S.C. § 1002(14). State Street knew of these facts when it caused the Plan to engage in the annuity transaction.

## COUNT VI: PROHIBITED TRANSACTION
*Against State Street*

166.    Paragraphs 1 through 138 are incorporated by reference herein.

167.    State Street also caused the Plan to engage in the annuity transaction with actual or constructive knowledge that the transaction constituted a direct or indirect (i) exchange of property between the Plan and the Athene, (ii) furnishing of services between the Plan and Athene; and (iii) transfer to, or use by or for the benefit of Athene, of Plan assets;

168.    When State Street caused the Plan to enter into the annuity transaction, Athene was a party in interest, including because it was a person providing services to the Plan. 29 U.S.C. § 1002(14). State Street knew of this fact when it caused the Plan to engage in the annuity transaction.

## **PRAYER FOR RELIEF**

Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court:

    i.  Certify the Class under Federal Rule of Civil Procedure 23, appoint Plaintiffs Piercy, Ward, Mazzeo, and Rush as Class representatives and appoint their attorneys as Class counsel to represent the members of the Class;

    ii.  Order the Defendants to guarantee the annuities purchased from Athene through the purchase, at their expense, of appropriate guarantees from reliable insurers selected through appropriate procedures or the posting of an appropriate security;

    iii.  Issue an injunction assuring receipt by Class members of the amounts to be provided by the annuities, plus reasonable prejudgment interest on those amounts, 29 U.S.C. § 1132(a)(9);

    iv.  Order AT&T and AT&T Services, through Plan amendment or otherwise, to place the GACs it unlawfully purchased inside the Plan as a Plan asset and to return the Class members to their former status as Plan participants;

    v.  Order AT&T to remain secondarily liable for Plaintiffs' pension benefits;

    vi.  Disgorge the profits Defendants earned from the unlawful transaction; and/or

    vii.  Order any appropriate relief this Court deems just and equitable.

Plaintiffs also seek reasonable attorneys' fees, costs, and pre- and post-judgment interest on any monetary compensation to which they are entitled.

Dated:  March 11, 2024

*/s/ Douglas S. Brooks*
Douglas S. Brooks (Bar No. 636697)
Elizabeth N. Mulvey (Bar No. 542091)
LIBBY HOOPES BROOKS & MULVEY, P.C.
260 Franklin Street
Boston, MA  02110
(617) 338-9300
(617) 338-9911
dbrooks@lhbmlegal.com
emulvey@lhbmlegal.com

*Attorneys for Plaintiffs*

*/s/ Cyril V. Smith*
Cyril V. Smith (*pro hac vice* forthcoming)
ZUCKERMAN SPAEDER LLP
100 E. Pratt Street, Suite 2440
Baltimore, MD  21202
(410) 949-1145
(410) 659-0436 (Fax)
csmith@zuckerman.com

Bryan M. Reines (*pro hac vice* forthcoming)
ZUCKERMAN SPAEDER LLP
1800 M Street N.W., Suite 10000
Washington, D.C. 20036
(202) 778-1846
(202) 822-8106 (Fax)
breines@zuckerman.com

*Attorneys for Plaintiffs*

*/s/ Edward Stone*
Edward Stone (*pro hac vice* forthcoming)
EDWARD STONE LAW P.C.
175 W. Putnam Ave., 2nd Floor
Greenwich, CT 06830
(203) 504-8425
(203) 348-8477 (Fax)
eddie@edwardstonelaw.com

*Attorney for Plaintiffs*

*/s/ Elizabeth Hopkins*

Elizabeth Hopkins (*pro hac vice* forthcoming)
Susan L. Meter (*pro hac vice* forthcoming)
KANTOR & KANTOR LLP
19839 Nordhoff St.
Northridge, CA 91324
(818) 886-2525
(818) 350-6272 (Fax)
ehopkins@kantorlaw.net
smeter@kantorlaw.net

*Attorneys for Plaintiffs*