## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

LANELL PIERCY, WILLA G. WARD, THOMAS L. MAZZEO, SUE RUSH, CATHERINE SCHLOSS, PATRICIA TATE-JACKSON, and DARLENE WILSON, individually and as representatives on behalf of a class of similarly situated persons,

     Plaintiffs,

     v.

AT&T INC., AT&T SERVICES, INC., THE BENEFIT PLAN INVESTMENT COMMITTEE, PASCAL DESROCHES, GEORGE GOEKE, DEBRA DIAL, WILLIAM HAMMOND, JULIANNE GALLOWAY, STATE STREET GLOBAL ADVISORS TRUST CO., and DENISE R. SISK,

     Defendants.

Case No. 1:24-cv-10608-NMG

## CONSOLIDATED CLASS ACTION COMPLAINT

1.     Plaintiffs LaNell Piercy, Willa G. Ward, Thomas L. Mazzeo, Sue Rush, Catherine Schloss, Patricia Tate-Jackson, and Darlene Wilson, individually and as representatives on behalf of a class of similarly situated participants and beneficiaries whose benefit payments were transferred from the AT&T Pension Benefit Plan (the "Plan"), bring this action against Defendants AT&T Inc. ("AT&T"), AT&T Services, Inc. ("AT&T Services"), the Benefit Plan Investment Committee ("Investment Committee"), Pascal Desroches, George Goeke, Debra Dial, William Hammond, Julianne Galloway (collectively the "AT&T Defendants"), State Street Global Advisors Trust Co. ("State Street"), and Denise R. Sisk, for breach of fiduciary duties and other

violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*

## NATURE OF THE CASE

2. This case is about a venerable American business, AT&T—a Fortune 15 corporation with roots dating to the 19th Century—turning its back on its retired workers and choosing to put the pensions of almost 100,000 AT&T retirees in peril, to secure itself an enormous profit and other economic benefits. Although AT&T is worth more than $100 billion, and is the world's fourth-largest telecommunications company, the company decided to fatten its wallet by dispensing over $8 billion of pension benefits to Annuity and Life Company and Athene Annuity & Life Assurance Company of New York (collectively "Athene"), a private-equity-controlled insurance company that is dependent on its Bermuda-based subsidiary and which has an asset base far riskier than AT&T's and traditional annuity providers'. AT&T's plan was assisted by State Street, the Plan's so-called "independent fiduciary." As a result of the transaction, Plaintiffs and similarly situated participants no longer enjoy any of the protections of federal law through an ERISA-governed plan. Although ERISA does not prohibit an employer from shedding pension obligations to an insurance company, ERISA requires that a fiduciary satisfy exacting standards when selecting an annuity. *See* 29 U.S.C. § 1104 (mandating that fiduciaries act "solely in in interests of the participants and beneficiaries"); *see also* 29 CFR § 2509.95-1 ("IB 95-1") (fiduciary duty imposed by ERISA requires fiduciaries to select the "safest annuity available," and "purchasing an unsafe annuity" is "never justif[ied]").

3. Defendants selected Athene, which is substantially riskier than numerous traditional annuity providers, instead of a safe annuity (much less the safest available annuity). In doing so, Defendants thus favored their own interests over those of Plan participants and

beneficiaries. AT&T stood to gain—and did gain—hundreds of millions of dollars in profit from this scheme. Moreover, Athene structured its annuities to generate higher expected returns but at a cost to retirees and their beneficiaries: Athene invested in lower-quality, higher-risk assets without the traditional mix of quality assets to support future benefit obligations. Because the market accounts for risk in pricing annuities, AT&T saved a substantial sum by selecting Athene instead of the safest annuity available.

4.      AT&T was not alone in placing its own interests over that of Plan participants and beneficiaries. As the Plan's independent fiduciary, State Street selected an annuity provider with whom it maintained a mutually beneficial relationship and profited handsomely. Putting a company's financial interest in saving money ahead of participants' interests in retirement security by selecting a riskier annuity provider is an egregious act of disloyalty.

5.      The only losers in the transaction were AT&T's retirees. By transferring Plaintiffs' pension benefits to Athene, Defendants have deprived Plaintiffs of all the protections of federal law; substantially degraded the value of the pensions; and put the retirement benefits at substantial risk of default—a risk for which AT&T's retirees and beneficiaries were not compensated.

6.      To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of similarly situated participants and beneficiaries of the Plan, bring this action to obtain appropriate relief for Defendants' ERISA violations, including without limitation disgorgement of the sums involved in the improper transactions and the posting of security, to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

**BACKGROUND**

7. AT&T, AT&T Services, and the Investment Committee operate and administer the AT&T Pension Benefit Plan. AT&T is the Plan Sponsor under 29 U.S.C. § 1002(16)(B). AT&T Services is the Plan Administrator under 29 U.S.C. § 1002(16)(B), the named fiduciary under 29 U.S.C. § 1102(a), and is responsible for the general administration of the Plan. AT&T Services delegated to the Investment Committee power and authority to operate and administer the Plan.

8. The Plan is a defined benefit, employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(35) covering certain employees of AT&T and employees of companies from mergers and acquisitions. The Plan was established on January 1, 1984, and is to be maintained under a written document last amended and restated on December 1, 2016, in accordance with 29 U.S.C. § 1102(a)(1).

9. As of 2022, before the 2023 transaction at issue, the Plan covered 393,447 total participants and held approximately $50 billion in assets.

10. On May 3, 2023, AT&T "annuitized" over eight billion dollars' worth of its Plan pension liabilities—retirement money it had promised to pay 96,000 Plan participants and beneficiaries—using Athene. In doing so, it removed those Plan participants and former employees from the Plan and placed them beyond ERISA's protections. As a consequence, AT&T recognized a gain that the company valued at $363 million; reaped hundreds of millions of dollars' worth of profit; and secured an economic benefit from selecting a lower-cost annuity provider.

11. AT&T and State Street accomplished this result by entering into a commitment agreement with Athene under which AT&T agreed to purchase group annuity contracts ("GACs") from Athene in exchange for Athene assuming the obligation to pay the Plan's participants and beneficiaries their retirement benefits outside of ERISA's protective regime. Pension industry

insiders refer to such transactions as "de-risking" or "Pension Risk Transfers" ("PRTs"). Only the latter term, however, is accurate. AT&T's transaction with Athene was a "de-risking" from AT&T's perspective. But it was a massive risk transfer from AT&T to Plan participants and beneficiaries, designed to secure hundreds of millions in profit for AT&T.

12.    Before the transaction, Plan pension benefits were guaranteed by AT&T—a Fortune 15 business and one of the world's largest telecom companies—which was responsible for paying the benefits as they came due, even if Plan investments fell short of expectations. AT&T was also obliged by ERISA's funding requirements to protect the Plan's financial health by making additional contributions to the Plan when necessary. And the benefits were further assured by the Pension Benefit Guaranty Corporation ("PBGC"), the federal agency charged with insuring pension benefits, which is effectively backed by the full faith and credit of the federal government, because AT&T paid premiums to the PBGC for each of the 96,000 participants.

13.    After the 2023 transfer, none of this is true. AT&T no longer guarantees payment of the retirement benefits to AT&T retirees affected by the transaction. AT&T is no longer subject to ERISA's funding requirements as to these liabilities. The 96,000 annuitants are no longer Plan participants; and the PBGC no longer provides a backstop to ensure that participants and beneficiaries receive their retirement benefits. And the Plan need no longer pay PBGC premiums associated with the 96,000 participants.

14.    Plan participants and beneficiaries are now entirely reliant on the solvency of Athene for their retirement benefits. But Athene is not an entity to be trusted with the retirement income of tens of thousands of Americans. Athene is one of a new class of private equity-backed insurers (the "Risk-Taking Insurers") engaged in the dicey "shadow banking" sector, and it is a highly risky annuity provider for the 96,000 Plan participants. Whatever place insurers like Athene

have in the financial system, that place is not the American retirement sector given Athene's high-risk, low-transparency strategies.

15. The 96,000 Plan participants and beneficiaries whom AT&T unloaded onto Athene had no say in the transaction. And they bear all of the transaction's risk while enjoying none of the profits that AT&T reaped through its purchase of a much less expensive, but far riskier, annuity than was available and that AT&T could have purchased. Thus, the upside of the transaction was enjoyed by AT&T, which reaped hundreds of millions of dollars in profit; by State Street, an "independent fiduciary" of the Plan which was paid to recommend, assess, and bless the transaction; and by Athene, which was paid to assume the liabilities and is now gambling with retirees' livelihoods.

16. Congress has, through ERISA, imposed strict fiduciary duties and other obligations upon plan sponsors, administrators, and others to regulate their ability to transfer workers' benefits from the federally regulated pension system to private annuity providers. Plan fiduciaries have duties that are the highest known to the law. They must make plan-related decisions with an eye single to the interests of the participants and beneficiaries, instead of favoring their own interests.

17. To satisfy their duties, Defendants were obliged to act solely in the Plan participants' best interests and to select the safest annuity provider available. IB 95-1. Athene is anything but. Defendants did not select Athene because it was the safest annuity provider for Plan participants; rather, they selected Athene because it was cheaper *for AT&T* than safer, traditional annuity providers that have a proven record of the financial strength necessary to shoulder such large and important obligations over a period of many decades.

18. Because Athene is invested in lower-quality, higher-risk assets than traditional annuity providers and, because the market accounts for that risk in annuity pricing, AT&T saved a

substantial sum of money by selecting Athene, rather than a traditional annuity provider, as the insurer to receive the annuities. Defendants, all of whom are fiduciaries, have thus breached their fiduciary duties under ERISA, and the transaction was prohibited by ERISA.

19.    Plaintiffs LaNell Piercy, Willa G. Ward, Thomas L. Mazzeo, Sue Rush, Catherine Schloss, Patricia Tate-Jackson, and Darlene Wilson bring this action, individually and on behalf of the 96,000 participants and beneficiaries whose pensions are no longer guaranteed by AT&T or afforded the protections of ERISA, to remedy those violations. These pensions were meant to support them through the later years of their lives and to compensate them for decades of faithful work.

20.    AT&T and State Street profited at the retirees' expense to the tune of hundreds of millions of dollars. At the same time, the fiduciary breaches of Defendants have caused Plaintiffs massive financial injury: their retirement benefits are no longer backed by Plan assets, AT&T, or the PBGC—are now in Athene's hands alone, so the pensions' present value has diminished and there is a substantial risk that Plaintiffs will not receive their full retirement benefits.

## PARTIES

### I.    Plaintiffs

21.    Plaintiff LaNell Piercy was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7) at all relevant times. She resides in Marseilles, Illinois. Ms. Piercy started working for Western Electric, which played an essential role in the Bell System, in 1973 when she worked in a manufacturing plant that produced telephones. She then worked in Operator Services at Illinois Bell until the AT&T divestiture. She retired in 2007 with 31 years of eligible service under the Plan.

22.    Plaintiff Willa G. Ward was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7) at all relevant times. She resides in Waterford, Michigan. She started working for Michigan Bell, one of the entities that comprised the Bell System, in 1946. She retired in 1983 after 37 years of continuous work as a phone operator, connecting telephone calls manually through a switchboard; as a customer educator, and in telephone line assignment.

23.    Plaintiff Thomas L. Mazzeo was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7) at all relevant times. He resides in Camilus, New York. Mr. Mazzeo began working for AT&T in 1996 and worked for the company for nineteen years in the outbound marketing group.

24.    Plaintiff Sue Rush was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). She resides in Syracuse, New York, and retired from AT&T after more than 27 years of service.

25.    Plaintiff Catherine Schloss resides in Lincoln, California and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). She retired in 1998 after working for approximately 36 years as an Operator and Communications Technician for Pacific Telesis and AT&T.

26.    Plaintiff Patricia Tate-Jackson resides in Lawrenceville, Georgia and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). She retired in 2020 after working for approximately 19 years as an ESOD Provisioning Manager for AT&T.

27.    Plaintiff Darlene Wilson resides in Smyrna, Tennessee and was a participant in the plan within the meaning of 29 U.S.C. § 1002(7). She retired in 2018 after working for approximately 38 years as a Senior Network Support Specialist for AT&T.

## II.    Defendants

28.    Defendant AT&T, Inc. is a global telecommunications company whose subsidiaries and affiliates operate worldwide in technology industries. It is one of the most valuable companies in the world, with a market capitalization of over $100 billion. It is a publicly traded company with 149,900 employees worldwide across more than 250,000 managed locations. In 2023, it recorded $122.43 billion in net sales and $15.62 billion in net earnings. AT&T is the Plan Sponsor and one of the fiduciaries to the Plan with respect to the transaction with Athene because it approved, co-signed, and ratified the selection of Athene as the annuity provider; elected to enter into the transaction with State Street and Athene; and engaged State Street to assist it with the annuitization. AT&T decided to purchase the GACs from Athene, transferred the billions of dollars' worth of liabilities to Athene, and enjoyed at least hundreds of millions of dollars' worth of profit from the transaction.

29.    Prior to December 14, 2020, AT&T was the Plan administrator under 29 U.S.C. § 1002(16)(B) and the named fiduciary under 29 U.S.C. § 1102(a) responsible for the general administration of the Plan. Through amendment to the Plan, AT&T delegated certain fiduciary authority to AT&T Services. As alleged herein, after that amendment, AT&T continues to exercise discretionary authority and control respecting management of the Plan, exercise authority and control respecting management or disposition of Plan assets, and/or has discretionary authority and responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

30.    Defendant AT&T Services, Inc. is a wholly-owned subsidiary of AT&T. It is responsible for the general administration of the Plan and is the named fiduciary for the Plan. As alleged herein, AT&T Services exercised discretionary authority and control respecting

9

management of the Plan, exercised authority and control respecting management or disposition of Plan assets, and/or had discretionary authority and responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

31. Defendant Benefit Plan Investment Committee was delegated power and authority to operate and administer the Plan by AT&T Services through its Board of Directors, which includes the authority to appoint trustees and investment managers, and enter into contracts with insurers to provide annuities under the Plan. The Investment Committee is effectively controlled by, and beholden to, the interests of AT&T and AT&T Services. Its membership is not selected based on based on merit or even on any individual characteristics of selectees; rather, the Investment Committee is composed of the following executive officers and directors of AT&T: the company's Chief Financial Officer, Treasurer, Controller, as well as the Vice Presidents of Investment Management and Benefits. In other words, whoever occupies these AT&T offices automatically enjoys membership on the Investment Committee and, when any such officeholders are no longer employed by AT&T, they immediately lose their membership on the Committee and all attendant power. AT&T knowingly assented to this structure, the purpose of which is to ensure that top AT&T principals have the power to direct the Investment Committee. As alleged herein, the Investment Committee exercised discretionary authority and control respecting management of the Plan, exercised authority and control respecting management or disposition of Plan assets, and/or had discretionary authority and responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

32. Defendant Pascal Desroches is the Chief Financial Officer of AT&T and was a member of the Investment Committee during the relevant time. Accordingly, he was delegated fiduciary responsibilities from the Investment Committee.

33.     Defendant George Goeke was the Chairman of the Investment Committee and Treasurer of AT&T during the relevant time. Accordingly, he was delegated fiduciary responsibilities from the Investment Committee.

34.     Defendant Debra Dial was the Controller of AT&T from 2016 through 2023 and member of the Investment Committee during that period. Accordingly, she was delegated fiduciary responsibilities from the Investment Committee.

35.     Defendant William Hammond was the Vice President of Investment Management of AT&T until April 2024. He was a member of the Investment Committee during the relevant period. Accordingly, he was delegated fiduciary responsibilities from the Investment Committee.

36.     Defendant Julianne Galloway is the Vice President of Benefits of AT&T and member of the Investment Committee. Accordingly, she was delegated fiduciary responsibilities from the Investment Committee.

37.     By serving on the Investment Committee, these individuals each exercised discretionary authority and control respecting management of the Plan, exercised authority and control respecting management or disposition of Plan assets, and/or had discretionary authority and responsibility in the administration of the Plan, and were thus fiduciaries under 29 U.S.C. § 1002(21)(A)(i) and (iii). At all relevant times, these individuals held senior posts at AT&T and were acting as AT&T's agents.

38.     Defendant State Street Global Advisors Trust Co. is a trust company headquartered in Boston, Massachusetts. State Street is a wholly owned subsidiary of State Street Bank and Trust Company. As a wholly owned subsidiary, it was formed to facilitate State Street Bank and Trust Company's asset management business and State Street Global Advisors' U.S. institutional investment management business. In connection with the challenged transaction, AT&T and AT&T

11

Services contracted with State Street to serve as an "independent fiduciary" to the Plan, which required, among other things, for State Street to perform work selecting an annuity provider in compliance with IB 95-1. As indicated, AT&T and State Street entered into the commitment agreement with Athene for the transaction at issue. Accordingly, State Street exercised discretionary authority and control respecting management of the Plan, exercised authority and control respecting management or disposition of Plan assets, and/or had discretionary authority and responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

39.    Defendant Denise R. Sisk is a Managing Director of State Street Global Advisors and head of State Street's Independent Fiduciary Services Team. The Independent Fiduciary Services Team is responsible for all independent fiduciary transactions, including the transaction at issue. As its head, Ms. Sisk exercised discretionary authority and control respecting management of the Plan, exercised authority and control respecting management or disposition of Plan assets, and/or had discretionary authority and responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii). At all relevant times, she was acting as an agent of State Street.

**JURISDICTION AND VENUE**

40.    **Subject-matter jurisdiction**. This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action brought under 29 U.S.C. § 1132(a)(2), (a)(3), and (a)(9).

41.    **Personal Jurisdiction**. The Court has personal jurisdiction over each Defendant. *See* 29 U.S.C. § 1132(e)(2); Fed. R. Civ. P. 4(k)(1)(C).

42.    **Venue**. This District is the proper venue under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because State Street and Ms. Sisk reside and may be found in this District, and because State Street is a creature of Massachusetts law, is a resident of Massachusetts, conducts business in Massachusetts, and operates from its Massachusetts headquarters.

43.    **Standing**. Plaintiffs have standing to bring this action. Each of them has suffered injuries traceable to Defendants' conduct. The transaction at issue simultaneously removed them from an ERISA-governed pension plan backed by one of the largest and most stable companies in the United States and placed their pension benefits in the hands of a private-equity controlled insurance company with a highly risky offshore structure, which immediately and substantially degraded the present value of their pension benefits and subjected them to an increased and significant risk that they will not receive those benefit payments. Plaintiffs, as well as any rational investor, would demand a greater reward for bearing greater risk. By undertaking the transaction, Defendants exposed Plaintiffs to a much higher risk that they will not receive their benefits—a risk to which Plaintiffs never assented and for which they have received no compensation. In addition, Plaintiffs have standing to compel Defendants to disgorge any assets derived from their illegal conduct, as well as to rectify Defendants' fiduciary breaches. All of Plaintiffs' injuries would be redressed by this Court if Plaintiffs prevail in this action.

**ERISA'S FIDUCIARY STANDARDS**

44.    ERISA's primary purpose is to protect the retirement security of plan participants and their beneficiaries. The statute achieves its protective purposes by imposing on plan fiduciaries strict standards of conduct derived from the common law of trusts, most notably a duty of loyalty and a duty of prudence. 29 U.S.C. § 1104(a), (1). The statute states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of

    (i)     providing benefits to participants and their beneficiaries; and

    (ii)    defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

45.    Because the selection of an annuity provider involves the exercise of discretion and implicates fiduciary duties, the Department of Labor has issued regulatory guidance, known as IB 95-1, setting forth its view of the legal standard imposed by § 1104(a)(1)(A) and (B) as those provisions relate to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. IB 95-1. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available." *Id.* Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

46.    The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106 and are considered *per se* violations because they entail a high potential for abuse, including self-dealing transactions and transactions with "parties in interest," defined to include entities that a fiduciary may be inclined to favor at the expense of the plan beneficiaries. 29 U.S.C. § 1106(a)–(b); 29 U.S.C. § 1002(14).

## FACTS APPLICABLE TO ALL COUNTS

### I.    Background on PRTs

47.    Defined contribution plans dominate the retirement plan scene today. But before they became the norm, defined benefit plans (or pension plans) ruled the retirement world because they were seen as the ideal vehicle to attract and retain the best workforce. They were America's retirement system when ERISA was enacted in 1974.

48.    A fundamental difference between traditional pension plans and defined contribution plans is which party bears the risk of underperformance. In a defined benefit pension plan, the plan sponsor (typically the employer) bears the risk. In a defined contribution plan, by contrast, the employee's benefit is limited to the value of an individual investment account, meaning the risk of underperformance falls on the employee.

49.    A defined-benefit pension plan sponsor/employer agrees to pay monthly pension benefits to retirees as they come due for the rest of the participants' lives, and it funds those benefits through assets contributed both initially and over time by the employer that are invested and held in trust for plan participants. The employer must pay the pension benefits, even if investment performance falls short of expectations.

50.    The employer must also make contributions to the Plan in accordance with ERISA's funding requirements, which demand additional plan contributions in certain circumstances, including if investment returns fall short of expectations and are insufficient to satisfy obligations to plan participants. Thus, the investment risk—the possibility that the plan's investments will generate insufficient returns to cover the plan's pension obligations and the expenses of operating the plan—is borne entirely by the plan sponsor. If the sponsor goes bankrupt or otherwise lacks

15

the resources to continue to fund the Plan and pay required benefits, the PBGC steps in as a backstop to pay benefits due.

51.     These features of defined benefit plans make them both valuable and predictable for retirees. But because these plans are so valuable to employees, they are conversely expensive for employers. Consequently, as part of a recent trend by employers that sponsor defined benefit plans to improve their bottom lines, numerous sponsors have chosen to shift their liability for monthly pension payments to some or all of the plan participants to insurance companies through pension risk transfer (PRT) transactions.

52.     In a PRT transaction, an employer rids itself of all or part of its pension benefit obligations by using plan assets to purchase GACs from an insurer, who then assumes the responsibility of future benefit payments to employees and retirees covered by the transaction.

53.     The upside of such transactions—enjoyed by plan sponsors—is increased profits; the downside—borne by plan participants—is the increased risk of losing promised retirement benefits, because the annuity provider is unable to perform and the benefits are no longer guaranteed by their former employer and the PBGC. Although these transactions are now used by employers to diminish their defined benefit liabilities (and to profit from such transactions) or to dispense with defined benefit plans altogether, they are not new, as discussed below.

## II.     Lack of ERISA and PBGC Protections

54.     With few exceptions, ERISA-governed defined benefit plans are protected by the PBGC. When a PRT transaction occurs, affected pensioners lose both their ERISA and their PBGC protections, and are instead protected by only state guaranty associations ("SGAs").

55.      ERISA-governed defined benefit plans are required to pay PBGC premiums, which fund the PBGC and allow coverage of vested pension benefits up to a certain amount so

that pensioners will be protected if their plan sponsor becomes insolvent. These monthly limits for normal retirees currently range from over $7,000 per month for a single life annuity for a 65-year-old to well over $17,000 per month for a 75-year-old. Because PRT transactions remove PBGC protections, they also remove PBGC premium obligations. Thus, removing participants from a plan through a PRT leaves pensioners unprotected by the PBGC while saving the employers money in premium payments that will never need to be made.

56.     Although the PBGC is not explicitly backed by the full faith and credit of the federal government, it is commonly agreed that, as a practical matter, the PBGC is backed by the full faith and credit of the federal government because, in the event of the PBGC's financial insolvency, Congress would face overwhelming pressure to bail out the PBGC to protect against massive losses by pension beneficiaries of their accrued benefits.

57.      SGAs are neither pre-funded like the PBGC nor effectively backed by the federal government. They thus offer less protection than the PBGC. SGAs are funded by assessments of member insurers, but only in the case of another insurer's declaring insolvency. And SGAs provide coverage only up to state law limits rather than one standard limit as defined by the PBGC. In most states, this limit is set to $250,000 "in present value of annuity benefits," which a pensioner could exhaust in mere years if their insurer becomes insolvent.

58.     All members of the proposed class are subject to one form or another of SGA limits, and some—such as Plaintiff Schloss—would be subject to an automatic 20% haircut based on the SGA limit in the state where she lives.

### III.     The Risk of Insolvency and Executive Life

59.     The risk of insurance company failure is not merely hypothetical. In the 1980s, hundreds of employers terminated their well-funded, federally-insured defined benefit pension

17

plans and bought retirement annuities from a variety of insurance companies, including Executive Life Insurance Company ("Executive Life"), which was then one of the country's largest insurers. Executive Life had an A+ credit rating in 1982, attracting over 300,000 policyholders by 1991, but it had already embarked on a disastrous "junk bond" investment strategy. The pension benefits of approximately 84,000 workers and retirees were transferred from the federally regulated pension system to Executive Life.

60.     Those decisions proved disastrous when, in 1991, Executive Life became insolvent. A significant portion of its assets had been invested in high-risk, high-yield bonds procured through the Drexel Burnham Lambert ("Drexel") investment bank, which then failed due to its risky bond strategy.

61.     In contrast to most insurance companies that invested in safer assets, such as high-grade bonds, mortgage securities, and government obligations, Executive Life, led by an aggressive money manager, invested in risky junk bonds with high interest rates, which allowed them to make higher payouts to policyholders. Executive Life's portfolio consisted of 60% junk bonds vs. the industry-standard 24% at the time of its collapse. First Executive Corp., the parent company of Executive Life of California and Executive Life of New York, was one of Drexel's largest buyers of junk bonds.

62.     Executive Life was often selected by employers because its risky investment strategy allowed it to offer the lowest bid on GACs. Rather than choose a safer, more expensive annuity, employers placed their own financial interests over plan participants' needs.

63.     The failure of Drexel led to Executive Life defaulting on its annuity contracts, thereby failing to make good on its obligations to tens of thousands of pension annuitants. Executive Life's bond portfolio cratered with the bond market meltdown, and in 1991 the insurer

18

was seized by the California insurance commissioner who proceeded to sell Executive Life's investment portfolio to a financier named Leon Black for approximately half its original value. The losses to policyholders as a direct result of the Executive Life takeover were extreme, with policyholder damages estimated at $3.9 billion.

64.    By 1990, many of the Executive Life assets used to meet policyholder claims were in distress and trading far below than their purchase price. However, on December 27, 1990, the National Association of Insurance Commissioners ("NAIC") published its findings that Executive Life's California and New York insurers were *not* in imminent financial danger, and thus, it was unnecessary for state insurance regulators to take over the insurers. Executive Life even held "impeccable" ratings from major ratings agencies, including an A+ from AM Best and an AAA from Standard & Poor's, which the company often mentioned in response to questions from critics regarding the makeup of the Executive Life bond portfolio.

65.    On April 11, 1991, despite the NAIC's recommendation, California Insurance Commissioner John Garamendi seized Executive Life of California. Just a week before the seizure, Executive Life maintained a contingent B-plus rating from AM Best. Contrary to ratings agencies' pronouncements, as well as Executive Life's statements that its investments were safe, the New York insurance regulator seized Executive Life of New York on April 17, 1991, and just weeks later parent company First Executive filed for bankruptcy.

66.    Executive Life ultimately was declared insolvent in 2012. In August 2013, the Guaranty Association of Benefits Company ("GABC") was created to liquidate Executive Life. GABC continues to make payments to annuitants. However, a large number of annuitants

experienced losses of 50% or more of their annuity payments.[1] Notably, the Executive Life Restructuring Agreement indicates that GABC is expected to make reduced annuity payments to annuitants for another 50 years.

### IV.    Response to Executive Life's Meltdown

67.    Members of Congress were outraged by Executive Life's implosion and its impact on retirees. In response, they enacted the Pension Annuitants Protection Act of 1994, Pub. L. No. 103-401 (Oct. 22, 1993) ("PAPA"), an amendment to ERISA, to prevent similar crises and ensure that plan participants would have legal recourse against risky pension transfers by plan fiduciaries. Through this amendment, ERISA now provides expressly that plan participants and beneficiaries subject to a plan sponsor's purchase of annuities have a right to relief to, *inter alia*, assure the receipt of the benefits to which they are entitled, including "the posting of security" as needed to ensure that participants receive their full benefits, plus prejudgment interest. 29 U.S.C. § 1132(a)(9).

68.    And in 1995, the Department of Labor promulgated IB 95-1, which—like PAPA— aimed to prevent the irresponsible transfer of pension liabilities to insurance companies insufficiently secure to guarantee retirement benefits—a principal animating force behind the enactment of PAPA and indeed ERISA itself. IB 95-1 has since been updated consistent with that purpose.

69.    IB 95-1 is an explication and summary of the fiduciary duty set forth in ERISA as that duty pertains to a defined benefit plan's selection of an annuity provider for an annuitization. *See* IB 95-1(a)–(c). IB 95-1 thus provides courts, regulated entities, and the public with the Department of Labor's expert guidance on the content of that fiduciary duty in the particular

---

[1] *See* Agreement of Restructuring in Connection with the Liquidation of Executive Life Insurance Company of New York, Apr. 23, 2023, and Schedule 1.15 (List of Contracts).

circumstance at issue in this action. It explains that selecting an annuity provider is a fiduciary decision under ERISA, 29 U.S.C. § 1104(a), and that employers therefore must act solely in the interest of the plan's participants and beneficiaries and in accordance with ERISA's strict prudence standard when selecting an annuity provider. IB 95-1(b) (citing 29 U.S.C. § 1104(a)).

70.    Indeed, the selection of annuity provider is a critically important fiduciary function. As one independent expert from NISA Investment Advisors, LLC, has explained, such a selection is one of the most consequential decisions a fiduciary can make because it fundamentally changes the nature of the promised pension benefit. Thus, to meet their loyalty and prudence obligations in selecting an annuity provider, fiduciaries must "take steps calculated to obtain the safest annuity available, unless the interests of the participants and beneficiaries demand otherwise." Fiduciaries must also, at a minimum, "conduct an objective, thorough and analytical search for the purpose of identifying and selecting providers from which to purchase annuities." IB 95-1(c).

71.    In order to determine the safest available annuity, IB 95-1 requires plan fiduciaries to evaluate the insurer's "claims paying ability and creditworthiness" by considering six factors: (1) the annuity provider's investment portfolio quality and diversification; (2) "[t]he size of the insurer relative to the proposed contract;" (3) "[t]he level of the insurer's capital and surplus;" (4) the insurer's exposure to liability; (5) the structure of the annuity contract and guarantees supporting them; and (6) the availability of additional protection through state guaranty associations. The fiduciaries must "obtain the advice of a qualified, independent expert" if they do not possess the necessary expertise to properly evaluate these factors.

## V.    Private Equity Firms: the Risk-Taking Insurers

72.    Since Executive Life's collapse, the PRT market had been dominated by traditional annuity providers, including household names such as MassMutual Insurance Company

("MassMutual") and New York Life Insurance Company ("New York Life"). But more recently a new class of annuity providers, backed by private equity firms, has entered the market. These are the "Risk-Taking Insurers."

73.    Private equity firms began purchasing insurance companies primarily to finance their operations. Today, they have moved beyond this business into those of private credit and insurance. This has heightened their influence over the annuity insurance industry by purchasing life insurers while also serving as their asset managers. As of 2023, private equity firms had spent almost $40 billion on insurance company purchases and controlled over 7% of the industry's assets, double those that they controlled in 2015.

74.    These new Risk-Taking Insurers are considerably more likely than traditional annuity providers to become insolvent now and in the future. Many (i) have not been tested through a full economic cycle and have never weathered a recession; (ii) re-insure annuities with offshore insurance companies that are not required to set aside as much capital as the traditional U.S.-based insurance companies; and/or (iii) invest in assets that are riskier, less liquid and more opaque than those invested in by traditional providers, such as collateralized loan obligations ("CLOs"), asset-backed securities, private fixed-income placements, subordinated debt, and even the stock of affiliated companies.

75.    In addition, the mission of private equity does not align with the best interests of policyholders. Not only do private equity firms receive cash from premiums that can be invested into their other affiliated businesses, but they can also generate significant investment management fees for themselves. Because private equity firms focus on maximizing their immediate financial returns, their entry into the insurance business poses danger: a chief aim of the insurance business

is ensuring that promised retirement benefits are there at the end of the day for policyholders and failure on that front can put policyholders at very significant risk.

76. Independent industry experts, scholars, and journalists have begun to sound the alarm that these new Risk-Taking Insurers are unstable and even threaten the wider financial system. For example, a paper authored by two economists, Natasha Sarin, of Yale Law School, and Divya Kirti, of the International Monetary Fund, found that "PE [private equity]-backed insurance firms take on greater asset risk [than non-private equity backed firms] by moving out of highly rated corporate bonds and into poorly rated private-label asset backed securities, increasing their holdings of private-label asset-backed securities by two-thirds of the industry average." This risk-taking is nearly instantaneous: according to Professor Sarin, "[w]ithin days of a P.E. acquisition of an insurance company, they tilt their bond portfolios to riskier assets."

77. Three economists at the Board of Governors of the Federal Reserve System have also recounted how such insurers have, since 2009, developed "a new shadow banking business model that resembles investment banking in the run up to the 2007–09 financial crisis. These life insurers profit by lending to highly-leveraged firms. In particular, they originate risky loans, hold them, and securitize them in [collateralized loan obligations]." By extending credit to "risky projects," these insurers "earn a sizeable spread over the cost of their fixed-annuity liabilities." The paper "show[s] that these life insurance companies hold some of the riskiest portions of the CLOs issued by their own affiliate asset managers against virtually no capital." It also shows that "[t]he shadow banking business of life insurers exponentially increases the industry's vulnerability to aggregate corporate-sector shocks." In short, certain insurers have, since the 2008 financial crisis, "filled a void left by banks in risky corporate loan markets." In doing so, they have "create[d] and become vulnerable to run risk," the likelihood that such insurers could see their assets shrink

quickly and irreversibly when markets turn down. The paper identifies Athene as an example of one insurer that has a shadow banking business.

### VI. Athene: A Paradigmatic Example of a Risk-Taking Insurer

78.     Athene is, in fact, a perfect example of a Risk-Taking Insurer. Athene was purchased in 2022 by the private equity giant Apollo Global Management ("Apollo"), which was founded by Drexel alumni Leon Black, Josh Harris, and Marc Rowan in 1990, the year Drexel collapsed and entered bankruptcy (and thereby caused the collapse of Executive Life). Leon Black was not only the co-head of Drexel during Executive Life's junk bond binge, but also the financier who purchased Executive Life's discounted assets after its implosion. Apollo found a way to make money off the retirement savings of millions of everyday Americans by buying out corporate retirement obligations cheaply and then backing up their resulting annuity obligations through collateralized loans and other risky assets.

79.     When Apollo announced its merger with Athene, Athene accounted for roughly 40% of Apollo's assets under management and generated 30% of its fee revenue. Following the merger, Athene became a subsidiary of Apollo. Today, approximately one-fifth of Athene's portfolio is invested in risky asset-backed securities and leveraged loans made to companies highly in debt, and approximately 80% of its PRT liabilities are reinsured through Bermuda affiliates owned by Athene's parent, Apollo. Apollo collects asset management fees on *all* of the investments that it manages for Athene.

### A. Athene's Complex and Risky Offshore Practices Threaten Pensioners.

80.     Athene and Apollo pioneered much of the risky conduct characteristic of the Risk-Taking Insurers. Athene is today a prime example of an insurer that has grown its shadow banking business by assuming an organizational structure that allows it to engage in risky conduct with

former pension plan assets. As with other insurers engaging in such shadow banking, a central feature of Athene's organizational structure is the location of its captive reinsurers, Athene Life Re Ltd. and Athene Annuity Re Ltd.—both headquartered in Hamilton, Bermuda to take advantage of Bermuda's favorable (more lax) regulatory regime.

81. Athene's use of complex investment structures under lax regulatory standards has contributed to its higher risk as an annuity provider.

82. In Bermuda, capital requirements are lower, investment limitations are virtually non-existent, and transparency is minimal to zero. For example, the Bermuda Solvency Capital Requirements ("BSCR") require insurers to hold similar levels of capital against both corporate bonds and CLOs, even though some CLO tranches have greater downside risk than bonds with the same credit rating.

83. The reinsurance of PRT liabilities in Bermuda poses unique risks to pensioners. Bermuda reinsurers report under Bermuda accounting standards rather than United States Statutory Accounting Principles ("U.S. SAP"), which is the required reporting regime for all U.S.-based insurance companies. Under U.S. SAP, insurers must file detailed statutory financial statements that report all individual purchases and sales of securities. For fixed-income investments, U.S.-based insurers report all individual stock and bond purchases and sales, including CUSIP numbers, which are unique identifiers assigned to stocks and registered bonds. By contrast, under Bermuda standards, Athene's affiliated reinsurers today report only in the aggregate with no individual stock and bond level purchase or sale information. Further, Bermuda standards allow for investments in assets that would not qualify as suitable under U.S. SAP.

84. The lack of transparency in the reporting by Athene's Bermuda reinsurers is stark. To illustrate, Athene's current statutory financial statements for its principal U.S. insurer, Athene,

is 3,939 pages long, whereas the Athene Bermuda entities' consolidated report filed under Bermuda standards is 59 pages long.

85.    In addition, Athene's excessive reliance on affiliated offshore reinsurance today is troublesome for those whose retirement benefits are affected by PRT transactions, for numerous reasons. Whereas arm's-length reinsurance, with pricing set by the marketplace, can improve policyholder security by diversifying and sharing fully transparent risk with strong, independent financial partners, reinsurance with a commonly-owned affiliate is regulatory arbitrage, at best, as pricing is not set by the marketplace. The lack of oversight in offshore jurisdictions leaves the reinsurer's management free to do virtually anything with the extra funds. As a result, captive reinsurance allows insurers to gain multiple advantages, including the ability to price annuities lower than other competitors. That is the case for Athene because both it and the reinsurer are today owned by Apollo.

86.    Life insurance and annuity companies maintain surpluses to ensure long-term solvency, but those with captive reinsurers use them to back their liabilities with assets that would not be "admitted" (accepted) by insurance company examiners in their own domiciles. In other words, reinsuring liabilities with captive reinsurers opens up excess capital for profit generation but does not decrease risk. Athene Annuity Re Ltd of Bermuda had $87 billion on its books in 2020 and circular transactions between Athene and both its offshore and U.S. affiliates totaled $115.7 billion in 2021.

87.    If a fraction of that reinsurance transferred in 2021 was backed by letters of credit which were evaluated with SAP and consequently disallowed, Athene would face a funding shortfall. A funding shortfall for Athene would directly impact Apollo because Athene insurance companies represent 40% of Apollo's value.

88.     For the year ending in 2022, Athene took credit for reinsurance with its Bermuda affiliates in the amount of $15.2 billion, whereas traditional insurers like New York Life had no offshore affiliated reinsurance whatsoever and took a total of $3.58 billion in credit for reinsurance with third party arm's length reinsurance companies. The ratio of Athene's surplus to liabilities is also quite low when compared to other life insurance companies, as evidenced by the chart below:



89.     The same holds true when evaluating Athene's surplus for the year ending 2023. It maintained a surplus-to-liabilities ratio of 1.44% for that year. In contrast, the national average for life and annuity carriers was 7.49%, or over 400% higher than Athene's.

90.     Athene has increased the amount of its liabilities at a significant pace from 2018 through 2023. Over this time period, Athene's liabilities as a percentage of assets have increased over 250%. In contrast, a traditional insurer, like New York Life, increased its liabilities as a percentage of assets by 30%. Athene's dramatic increase in liabilities further adds to the risk assumed by Plaintiffs and similar AT&T retirees.

91.     The amount of an insurer's surplus is critically important. It measures an insurer's total assets less liabilities. The surplus to liabilities ratio indicates an insurer's ability to pay claims from policyholders because it is the only buffer between an insurer's solvency and default. If an

insurer's assets are written down, or its liabilities are written up, the amount of surplus will be reduced accordingly. And the likelihood of this occurring is increased when an insurer holds riskier assets.

92.    Athene has maintained one of the smallest surplus levels among life insurance and annuity carriers, as indicated above. New York Life's surplus-to-liabilities ratio, for example, is more than *eight times* that of Athene. The comparison of this simple measure highlights the risk taken by Athene in contrast to safer annuity providers.

93.    Athene also reports a very large amount of modified co-insurance ("ModCo") arrangements with its Bermuda affiliates: $104 billion as of year-end 2022 versus only $2 billion in surplus as reported by Athene. For year-end 2023, Athene reported over $141 billion in ModCo while only maintaining $2.9 billion in surplus. Other insurers, including New York Life and TIAA, reported zero in ModCo with offshore affiliates as of year-end 2022 and 2023.

94.    ModCo arrangements are those in which an insurer (the "ceding carrier") which is transferring risk to a reinsurer retains assets related to the reinsured policies while transferring its regulatory capital requirements associated with the asset risks to the reinsurer. They are particularly risky for pensioners severed from ERISA plans by PRTs.

95.    Such arrangements allow Athene to remove risky assets from its own reported Risk Based Capital ("RBC") ratio. The RBC ratio measures the amount of capital or surplus an insurer must maintain to pay policyholders (or annuitants) based on its level of risk. Athene's use of ModCo arrangements has the effect of artificially inflating its RBC ratio, which in turn allows Athene to hold a substantially lower amount in minimum required surplus. That is because, in Bermuda, insurers who hold riskier assets with higher credit spreads (or higher returns) are able to

28

value their liabilities a lower rate. Athene's manipulation of its RBC ratio is shown though its lower credit ratings relative to traditional insurers, as discussed further below.

96.     Although Athene's total liabilities increased by more than 250% from 2018–2023, the amount of surplus maintained to support its liabilities has not kept pace. On information and belief, if Athene were to reverse or back out of its $104 billion in ModCo it would be required to increase its minimum required surplus by 400%. Athene's excessive use of offshore affiliated reinsurance, including ModCo, therefore obscures its true financial condition and exposes pensioners, including Plaintiffs, to substantial risk.

97.     Put simply, Athene's use of financial alchemy makes it dramatically under-reserved today.

98.     Athene also has a very high concentration of risky assets relative to its surplus. For example, Athene reports $21 billion in "other loan-backed and structured securities" as of year-end 2022 against only $2 billion in surplus—ten times its surplus. New York Life, on the other hand, reported $11.7 billion in that category—*less than half of its surplus*, which stood at $23.88 billion as of year-end 2022. All of Athene's other loan-backed and structured securities were originated by Apollo.

99.     Athene also held $18 billion in "Deposit Type Contracts" as of year-end 2022 versus $2 billion in surplus. Deposit Type Contracts are essentially funding agreement-backed notes which are callable by institutional investors. In the event of a liquidity stress environment, like that which existed during the March 2023 collapse of Silicon Valley Bank and during the 2008 financial crisis, it is certain that sophisticated investors in these funding agreement-backed notes would request their money back long before "de-risked" pensioners would even suspect that a liquidity crisis was looming. Funding agreement-backed notes are not reported as debt as they are

29

considered an insurance product. As a result, Athene's actual liquidity is dramatically overstated, and Plaintiffs and similar AT&T retirees are at substantial risk of not receiving their pensions.

100.   And today Athene's affiliated transactions are, on information and belief, also dramatically understated. It is publicly known that Apollo has had a long-term practice of bundling asset-backed notes and selling those notes to Athene in exchange for upfront cash and future management fees.

101.   Athene is a prime example of a Risk-Taking Insurer that has used what experts refer to as the "Bermuda Triangle Strategy" to generate profits. The first side of the triangle is the U.S. life insurer (*e.g.*, Athene), which builds a block of annuity business through PRTs like the one at issue here. The second side of the triangle is the affiliated offshore reinsurers (*e.g.*, Athene Life Re Ltd.), which accept the purchased insurance liabilities from the insurer and thereby free up annuity capital for use in the organization's private debt business. And the third side of the triangle is the affiliated asset manager (*e.g.*, Athene Asset Management) which originates, acquires, and manages private debt.

102.   The interdependence between Athene and its in-house reinsurer exposes each of these entities to a heightened risk of failure. The risks that Athene's separate account (for the AT&T PRT at issue here), and then its general account would be insufficient to cover its liabilities, forcing Athene to seek payment from its affiliated reinsurer for a portion of the annuity liabilities, are closely correlated events that are tied to Athene's weak financial condition relative to other insurers. Because Athene is dramatically under-reserved relative to peers, as shown through its thin surplus and dramatic increase in liabilities, in a liquidity crisis or shortfall, it would be entirely dependent on IOUs from its own captive in-house reinsurer, which is essentially itself. And any

inability to satisfy Athene's general account obligations would cause a downgrade in its credit preventing it from raising funds in the credit markets.

103. Moreover, Athene's separate account used to pay benefits to AT&T retirees is not truly "ring-fenced" or insulated from Athene's general liabilities. According to GACs issued by Athene for other similar PRTs, the separate account holds assets supporting the contract. However, the separate account assets may *also* be used to support Athene's payment obligations under other separate GACs issued by Athene. And on a quarterly basis but no less frequently than annually, Athene may also withdraw assets from the separate account and transfer them to its general account if the market value of the assets in the separate account exceed Athene's liabilities under the GAC.

104. In sum, Athene's use of riskier investments is in stark contrast to traditional insurers. For instance, New York Life maintains substantially more traditional, lower-risk investments than Athene and engages in *no* captive reinsurance.

105. Apollo has expressly recognized that PRTs involving its affiliated companies may generate conflicts of interest relating to the GAC purchase price and the amount of investment management/advisory fees that Apollo affiliates charge for managing the underlying pension assets and liabilities. Despite this admission, Apollo has undertaken no efforts to mitigate those conflicts.

106. The United States Department of the Treasury expressed concerns, writing that it merits further consideration "whether a potential misalignment may exist between the shorter-term objectives/strategy of the alternative asset manager investment model and the long-term commitment necessary for fulfilling annuity/life insurance policyholder interests."[2] Apollo specifically "was, in many ways, culturally ill suited" to create and run Athene. Its reputation as

---

[2] Department of the Treasury, *Letter from Jonathan C. Davidson, U.S. Department of the Treasury, to Senator Sherrod Brown*, June 29, 2022, https://www.banking.senate.gov/imo/media/doc/fio_85.pdf.

"cutthroat" and "bare-knuckled" does not align with the historically conservative nature of life insurance, which should be primarily concerned with fulfilling policyholder obligations.

### B. Athene is Not Creditworthy Enough to Ensure Payment of Plaintiffs' Retirement Benefits.

#### 1. Objective measures illustrate that Athene is not the safest annuity available.

107. At least one set of independent analyses (the "NISA Reports") has thus explained why an ERISA plan sponsor cannot, consistent with its fiduciary duties and the risk factors outlined in IB 95-1, offload pension liabilities to Athene. The NISA Reports found that industry-wide PRTs to lower quality insurers, like the transfer at issue here, harm pensioners by as much as $5 billion annually through uncompensated credit risk.[3] The NISA Reports quantify the extent to which Athene is neither a safe nor a reasonable annuity choice for ERISA fiduciaries. The reports conclude that Athene is substantially riskier than multiple traditional annuity providers and approximately 14% riskier than, for example, New York Life:

---

[3] Eichorn, David, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA, 2022, https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.

**FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk**

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | CLEAR CANDIDATES |
| (B) Prudential | 76 | 7.6% | 0.2% | |
| (C) MassMutual | 84 | 8.4% | 1.0% | |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | |
| (F) Principal | 147 | 14.7% | 7.3% | |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | |
| (I) Athene | 214 | 21.4% | 14.0% | |

Source: Bloomberg, NISA calculations.

108.    They reach that conclusion by using the bond market as a measure of risk—a necessity given the NISA Reports' finding that insurance company balance sheets are exceedingly complex and opaque, especially given the use of Bermudian reinsurers.

109.    The bond market provides a market-based measure of creditworthiness because a bond's spread over U.S. Treasuries is the additional compensation an investor demands to accept the credit risk of holding a bond from a particular issuer as compared to the U.S. government. The market price of Athene's bond risk is 21.4% higher than U.S. Treasuries, as compared to the safest annuity provider analyzed by the NISA Reports (New York Life), whose market price is 7.4% higher than U.S. Treasuries—a 14% gap.[4]

110.    In fact, this analysis *understates* the true risks to beneficiaries of a plan shedding benefits liabilities to Athene. The market spread on bonds is set by the marginal buyer, a buyer who by definition would have bond holdings that represent only a small portion of that buyer's

---

[4] *Id.,* Figure 2.

overall, diversified portfolio. By contrast, the pension of a typical retiree receiving an annuity is a significant portion of their net worth. Such retirees would, if they had a choice (which Plaintiffs did not have in this case), demand additional compensation for Athene's riskiness.

111.    The NISA analysis separately compared the agency rating of Athene to its market-adjusted implied rating based on the bond market. The analysis found that although Athene had an A+ rating (like Executive Life before its downfall), Athene's implied rating was BBB-, the lowest rating among all reported annuity providers.[5]



**FIGURE 1. The Market's View: There is a Very Wide Range of Provider Creditworthiness**

|  | (A) NY Life | (B) Prudential | (C) MassMutual | (D) AIG | (E) MetLife | (F) Principal | (G) PacLife | (H) F&G | (I) Athene |
|---|---|---|---|---|---|---|---|---|---|
| Agency Rating | AAA | AA- | AA+ | A | AA- | A+ | AA- | A- | A+ |
| Market Implied Rating | AA | AA | AA | A+ | A | A- | BBB+ | BBB | BBB- |
| Observed Market Spread | 74 | 76 | 84 | 102 | 106 | 147 | 158 | 186 | 214 |

Note: In our opinion, when the DOL warned fiduciaries that they may not rely solely on ratings they were making it clear that a high rating would not be an effective safe harbor. For example, a AAA rated insurer is not appropriate when it is known to have higher credit risks. But can lower Agency ratings be ignored when the market is corroborating this assessment, or in this case, taking a dimmer view on the insurers credit quality?

Source: Bloomberg, 8/31/2022 NISA calculations.

---

[5] *Id.,* Figure 1.

112. The reported range in Figure 1 is the median between the ratings reported by established rating agencies: Standard & Poor's Rating Services ("S&P"), Moody's Investor Service, Inc. ("Moody's"), and Fitch Ratings ("Fitch"). By agency, the ratings range as follows from highest to lowest: S&P (AAA to D), Moody's (Aaa to C), and Fitch (AAA to C).

113. An A+ rating for Athene noted above should not be interpreted as suggesting that Athene is on par with safer annuity providers. As shown, there are levels of safety above A, including AA and AAA. New York Life and MassMutual, for example, maintain higher credit ratings due to their stronger creditworthiness.

114. The differences in credit ratings have a material impact on the likelihood of default. Athene has a Moody's rating of A1 (or A+ for S&P) in contrast to New York Life that maintains a credit rating of Aaa (or AAA for S&P).

115. Moody's has reported the average cumulative issuer-weighted default rates by issuer credit rating from 1970 through 2021. Over a 20-year time horizon, the default rates for riskier issuers are apparent. The default rates are only 0.7% for Moody's Aaa ratings compared to 5.0% for its A ratings. Thus, over a 20-year time horizon, the default rate of bonds with Athene's rating is almost *seven times* riskier than those of a high-credit quality issuer. And the differential among default rates for them would be even greater over a 30-year time horizon. This differential is yet another indicator of the risk that pensioners have assumed with Athene.

116. Athene's transition out of the life insurance business also contributes to its higher risk as an annuity provider. An insurance company that provides life insurance is considered a natural hedge to an annuities business. In 2013, most of Athene's life insurance business was acquired by another company, Accordia Life and Annuity Company, and by 2016, Athene

completely transitioned out of the business. Therefore, the important hedge to Athene's annuities business of providing life insurance no longer exists.

117. Put simply, Athene today is, according to multiple objective measures, the least safe annuity provider—even among the category of least safe annuity providers of those analyzed in the NISA Report. The annuities purchased by AT&T were thus not safe, much less the safest annuities available. The AT&T Plan participants whose benefits have been annuitized through the PRT with Athene receive none of the upside of Athene's inherently risky "value proposition." The risk posed by Athene could be worthwhile to Plan participants, at least theoretically, if they were to enjoy increased benefits that compensated them for Athene's risk of failure. But that is not the case for Plan participants, and it is never the case for defined benefit plan participants, because their benefits are fixed.

### 2. Athene relies on unreliable, private letter ratings.

118. Since at least 2017, Athene has also relied on unreliable and misleading credit ratings from suspect private credit ratings, which should have been a cause of serious concern to Defendants when they decided to annuitize Plaintiffs' pension benefits.

119. The CLOs in which Athene invests are a type of structured debt divided into different tranches with varying risks and returns, so their creation depends on private letter ratings ("PLRs") from private credit rating agencies rather than more stringent public ratings from the Securities Valuation Office of the NAIC and those provided by major rating agencies, such as S&P, Moody's, and Fitch. Two such private credit rating agencies from which Athene obtains ratings are Kroll Bond Rating Agency ("KBRA") and DBRS Inc. ("DBRS").

120. In 2019, the Wall Street Journal ("WSJ") found significant discrepancies among structured securities ratings, including those of CLOs, between the major ratings agencies and the

"challenger" ratings agencies—DBRS, KBRA, and Morningstar. The WSJ found that across most structured-finance segments, challengers were more likely to give higher grades than the major ratings agencies on the same bonds, resulting in the classification of a bond as "junk" by major ratings agencies while challenger rating agencies would rate it as a very safe AAA bond.

121. The NAIC found similar discrepancies: it reported that as of year-end 2021, small credit rating providers provided PLRs on 83% of the privately rated securities owned by U.S. insurance companies. Overall, the NAIC found that private ratings by large credit rating providers were, on average, 1.3 notches lower than those provided by their counterparts for the same security, while private ratings provided by small credit rating providers were 1.2 notches higher. Notably, unlike PLRs, *public* ratings provided by small credit rating providers, were largely comparable to those provided by other ratings agencies.

122. This problem persists because bond issuers can actually pay for their ratings by choosing to purchase ratings from only those agencies which are more likely to issue higher ratings. According to the WSJ, there is an added incentive to hire the most lenient rating firm, because interest payments are lower on higher-rated bonds. And as major ratings agencies lose out on business to more lenient challenger ratings agencies they adjust their standards downwards so that they can continue to compete. These ratings are important because a higher rated structured security requires lower levels of capital to be held by the insurer.

123. Both KBRA and DBRS have been fined millions of dollars by the SEC based on their rating practices, and the SEC recently found that KBRA failed to establish, maintain, enforce and document the required policies and procedures surrounding their ratings of certain CLOs, resulting in inaccurate ratings that did not fully account for cash flows payable to noteholders and which would almost certainly pose a threat to policyholders in the case of insolvency.

37

124. The SEC also found that DBRS violated Section 17(a)(1) of the Exchange Act and Rule 17g-2(b)(7) thereunder for off-channel discussions of internal credit rating practices, as well as discussions of adjustments to the DBRS commercial mortgage-backed securities rating model. The SEC found that company cell phones had been wiped in 2022 under the DBRS's direction without proper preservation, and DBRS paid millions in civil penalties.

125. Despite years of documented wrongdoing by KBRA and DBRS involving extensive failures to comply with SEC credit rating policies and procedures, Athene continued to retain both companies for rating services. Indeed, KBRA and DBRS provided private rating services to Athene from 2017 through 2023. Athene's reliance on these ratings agencies is a red flag, which Defendants either ignored or failed to identify, by failing to properly vet Athene before selecting it as the annuity provider.

**C.    Athene has been the subject of investigation and was found to have violated the law.**

126. Athene has been investigated by the State of New York for misconduct regarding its PRT business and was found to have violated New York law. In January 2019, the New York State Department of Financial Services initiated an investigation into Athene Annuity and Life Company and Athene Holding Ltd. The agency concluded from its investigation that Athene Annuity and Life Company had violated New York law by conducting insurance business related to its PRT business without a license. As a result of the investigation, Athene Annuity and Life Company and Athene Holding Ltd. were ordered to pay a $45 million civil monetary penalty and satisfy other conditions.

**VII.    The Conflicted Relationships Between and Among AT&T, State Street, and Athene**

127.    State Street and its affiliates have had a longstanding corporate relationship with AT&T. Apart from AT&T's defined benefit plans, State Street and its affiliates have provided trustee, investment manager, and independent fiduciary services for the AT&T Stock Fund in AT&T's defined contribution plans. In addition, between 2016 and 2020, State Street received over $9,000,000 for services performed for the AT&T Savings Plan Master Trust. State Street is also ranked as the third largest institutional shareholder of AT&T, owning 305,826,819 shares of AT&T valued at $5,202,114,000 as of December 31, 2023. State Street maintained the same ranking among institutional investors in 2022.

128.    AT&T and State Street also have a corporate relationship with Athene. On June 5, 2023, just a month after the PRT transaction at issue, Athene's parent company, Apollo, announced that it agreed to invest $2 billion in preferred equity securities issued by a subsidiary of AT&T, AT&T Mobility II LLC ("AT&T Mobility"). AT&T Mobility will use those assets to partially replace $8 billion of outstanding preferred membership interests. Before the June 2023 announcement, the Plan also entered into put option agreements in February and April 2023 whereby AT&T Mobility or another subsidiary of AT&T would repurchase approximately $5.5 billion in preferred membership interests. Although the AT&T Mobility deal with Athene closed on June 15, 2023, on information and belief, Apollo and AT&T were negotiating the terms of this deal when Athene was selected and the PRT transaction at issue was completed.

129.    And State Street is also one of the largest shareholders of Apollo. As of December 31, 2023, State Street was the seventh largest institutional investor of Apollo, owning 10.31 million shares valued at $1.1 billion. Similarly, State Street provides custodial services for Athene insurance products.

130. State Street has recommended or selected Athene in numerous transactions while playing the role of a purportedly "independent" fiduciary.

**VIII.     The AT&T-State Street-Athene Transaction**

131. In or around April 2023, AT&T, AT&T Services, and the Investment Committee engaged State Street to assist AT&T in shedding its pension liabilities. State Street has publicly asserted that it is "[b]lazing the trail into the mega-pension transfer market."[6]

132. Specifically, the AT&T Defendants sought assistance from State Street's "Independent Fiduciary Services team." A key service offered by State Street's Independent Fiduciary Services team—and, according to State Street, "often one of the reasons why companies decide to hire" supposedly independent fiduciaries like them—is that hiring State Street, as a third-party and purportedly neutral advisor, "may help in the event of litigation." *Id.*

133. When State Street represents that hiring it "may help in the event of litigation," State Street means that engaging it to assist with annuitizations helps provide employers with legal cover in the form of a justification that State Street complied with IB 95-1 when it assists with the selection of an annuity provider.

134. In fact, State Street has conceded the applicability of IB 95-1 to annuitizations like the one at issue here, both publicly and in legally binding documents.

135. State Street represents, for example, that Defendant Denise Sisk's "team of independent fiduciary services specialists continue to support clients seeking to transfer liabilities to insurance companies in the form of annuitizations" in light of the new insurance landscape that, according to State Street, has "increased 'safest available annuity' options available to independent fiduciaries and other fiduciaries." *Id.* (quoting and citing IB 95-1)

---

[6] https://www.ssga.com/us/en/institutional/ic/insights/how-independent-fiduciary-services-evolved.

136.    And State Street represents in its engagement agreements, including the one it executed with AT&T, AT&T Services, and the Investment Committee in this case, that it will perform its work in selecting an annuity provider "in accordance and compliance with ERISA, including the requirements of the U.S. Department of Labor's IB 95-1."

137.    In advising the AT&T Defendants to shed the pension liabilities, State Street was in fact acting as a fiduciary of the Plan. As the Plan's "independent fiduciary," State Street was held to the same stringent fiduciary standards as the AT&T Defendants. For its fiduciary services, State Street received financial compensation for the services that it provided to the AT&T Defendants.

138.    Based on a decision jointly reached by all of the Defendants, AT&T, with State Street's assistance, entered into an agreement with Athene on April 26, 2023. By that agreement, AT&T purchased GACs from Athene in exchange for Athene assuming over $8 billion of the Plan's defined benefit pension obligations. The purchase closed on May 3, 2023. Pension benefit payments began to be paid in August 2023.

139.    AT&T's purchase of the GACs was funded directly and exclusively by Plan assets, requiring no cash or contribution from AT&T. Defendants structured the PRT to cover retirees who had lower salaries during their tenure, specifically targeting retirees whose single life annuity payments were below $2,200 per month. The transaction thus did not affect higher-income AT&T retirees.

140.    Athene is now solely responsible for paying the pension benefits; Plan participants covered by the transfer have been terminated as participants in the Plan; and such participants no longer enjoy any of the benefits intended by Congress under ERISA, including the protections and backstop provided by the PBGC.

141.     AT&T retirees played no role in the selection of Athene, Plan assets transferred to Athene in connection with PRT transactions cannot be withdrawn by retirees, and retirees do not have the option to transfer their pension benefits to a safer, less risky annuity provider.

**IX.     Defendants Acted in their Own Self-Interest By Transferring AT&T's Pension Obligations to Athene.**

142.     Defendants breached their fiduciary duty to Plaintiffs and the class by selecting and then shedding billions of dollars of Plan participants' retirement assets to Athene. They failed to select the safest annuity provider available. Relative to traditional annuity providers, Athene invests in far riskier assets. In a market with no shortage of stable and established annuity providers, no prudent and loyal fiduciary under the circumstances would have shed billions of dollars of participants' retirement benefits to Athene.

143.     Numerous facts demonstrate that Athene was not the safest choice: (i) Athene lacks a sufficient track record to be entrusted with guaranteeing such a massive amount of pension liabilities; (ii) Athene today is, compared to traditional providers, invested in riskier assets to support participants' payments; (iii) Athene's risk is increased by its reinsurance of annuities with offshore companies affiliated with Athene which are not as transparent or required to set aside as much capital as U.S.-based insurers; (iv) Athene employs questionable accounting strategies to overvalue its assets and understate its liabilities; (v) Athene uses excessive amounts of ModCo to artificially inflate its Risk Based Capital ratio; and (vi) the risks inherent in Athene's strategies are magnified by unstable economic conditions.

144.     In the PRT industry, it is customary for plan fiduciaries to solicit a number of bids from insurers to ensure that the transfer is in the plan participants' best interest. In light of the extensive information available to Defendants regarding the creditworthiness of Athene, and other deficiencies relative to traditional annuity providers, it is evident that Defendants either (i) did not

solicit bids from a large number of providers or (ii) did not engage in an independent and reasoned decision-making process prior to selecting and transferring pension benefits to Athene. Had they done so, the bids and other information would have revealed that Athene was not the safest available annuity provider. Thus, they would not have placed retirees and beneficiaries' retirement assets at risk of Athene's insolvency.

145.    Defendants' decision to use Athene as the annuity provider harmed, and will continue to harm, participants and beneficiaries over an extended period of time through uncompensated risk. The market measures Athene as at least 14% riskier than traditional annuity providers, including New York Life. Investors in the market demand a risk premium to compensate them for exposure to higher risk. Plan participants and beneficiaries receive no additional compensation for taking on the additional risk of having their pension benefits placed with Athene.

146.    The AT&T Defendants received an economic benefit from the selection of Athene in the form of reduced premium payments relative to what they would have paid to an established and reputable insurance provider, such as New York Life, to provide the same pension benefits to Plan participants. In fact, State Street has admitted that Athene charged less than its competitors. Although AT&T has not been forthcoming about the amount of money it paid Athene to assume the pension benefit obligations, AT&T has publicly revealed that it paid Athene an unusually low percentage of the value of the pension benefits being transferred. AT&T benefitted dollar-for-dollar from the savings resulting from the selection of Athene as the annuity provider, which was the direct result of Athene offering cheaper annuity contracts and which was made possible by Athene's dangerous, high-risk strategies.

147.    IB 95-1 expressly instructs fiduciaries that "increased costs or other considerations could never justify putting the benefits of annuitized participants and beneficiaries at risk by

43

purchasing an unsafe annuity." Thus, even if Athene's pricing was not more favorable to AT&T than that of traditional annuity providers, no prudent fiduciary would select a riskier annuity if a safer annuity was available for the same price.

148. AT&T also received other financial benefits from the PRT transaction. AT&T expected that the transaction would allow it to recognize a gain of approximately $350 million in the second quarter of 2023. In fact, the transaction allowed AT&T to recognize a $363 million gain on its financial statements. In addition, AT&T reaped hundreds of millions of dollars of profit from the PRT with Athene.

149. AT&T will enjoy large cost savings from the elimination of the 96,000 participants from the Plan. Because the benchmark range of such costs is $50–100 per participant per year, AT&T will save $4.8–9.6 million per year. Over an 18.8-year life expectancy for an average 70-year-old retiree, which is a reasonable estimate under current IRS guidance, the transfer will net AT&T between $90–180 million in administrative cost savings.

150. And it will profit from the transaction by saving on flat-rate and variable-rate premiums that it previously paid the PBGC to insure its retirees' benefits. Because of the transaction, AT&T and the Plan are no longer required to pay annual flat-rate PBGC premiums for the 96,000 participants terminated from the Plan, which will save AT&T more than $9.2 million annually since 2023. AT&T will enjoy over $182 million in additional profits from the transaction over the lives of the 96,000 retirees, using the IRS life expectancy of 18.8 years for an average 70-year-old retiree. And the amount of variable-rate premiums over the lives of the retirees is also substantial, measuring in the hundreds of millions of dollars. That is because variable-rate premiums are linked to interest rates, and AT&T had historically paid significant amounts of this additional premium.

151.    All told, AT&T's additional profits from the avoided premiums likely measure in the multiple hundreds of millions of dollars, if not more.

152.    The changes in the interest rate environment in the year leading up to the transaction gave AT&T a financial incentive to move quickly. Annuity pricing and interest rates are inversely related; interest rates rose by 200–250 basis points in the year preceding the transfer; and the Plan's discount rate increased from 3.0% at the beginning of 2022 to 5.2% at the time of the transaction in 2023. Those conditions mean that if AT&T had undertaken the transaction a year earlier it would have paid at least $1 billion more for the annuities than it in fact paid. Put simply, AT&T was eager to offload the liabilities in 2023 after interest rates had climbed because that is when the conditions for maximizing its own profit became favorable.

153.    Although State Street was nominally engaged by AT&T to provide independent fiduciary advice about selecting the safest annuity available in satisfaction of fiduciary obligations, State Street's true role was to give the appearance of legitimacy to their selection of Athene as an annuity provider.

154.    State Street has financial incentives to advise plan sponsors to use Athene as the annuity provider in PRTs. State Street offers a financial product backed by Athene. State Street is also one of the largest shareholders of Apollo, Athene's parent company. And State Street provides custodial services for Athene's insurance products.

155.    Given the corporate relationship between State Street and Athene, and the numerous factors that would lead to the rejection of Athene by a *bona fide* independent fiduciary, it is evident that State Street selected Athene without conducting a sufficiently independent and objective evaluation of available annuity providers or, alternatively, after ignoring apparent risks posed by Athene. The risk posed by Athene as of 2023 and in the years immediately prior would

have been known or ascertainable by any prudent and loyal fiduciary. Without conducting an independent, impartial investigation aimed to identify the safest annuity provider, State Street could not determine whether the use of Athene as the Plan's annuity provider was prudent or in the best interest of Plan participants.

156.   It should come as no surprise that State Street—ignoring the public red flags attached to Athene—has routinely rubber-stamped Athene as an annuity provider to displace retirees' longstanding, valuable rights to ERISA-protected pension benefits. Since 2018, State Street has advised plan fiduciaries on the selection of Athene for no fewer than ten PRTs, shifting more than $30 billion in pension liabilities from the federally regulated pension system to Athene. State Street thus has a history of being hired by companies to act as a so-called "independent fiduciary," performing a process which—to the surprise of no one—identifies Athene as the annuity provider of choice.

157.   Based on this information and that available to sophisticated entities like AT&T and State Street, the selection of Athene was an imprudent decision, even if the selection of Athene had not led to an attendant economic benefit for AT&T and even if Athene's pricing was not more favorable to AT&T than that of a traditional annuity provider.

158.   It was a separate violation of AT&T's fiduciary duties for AT&T to select State Street as an independent fiduciary of the Plan. AT&T either failed to engage in a thorough, independent investigation of available independent fiduciaries for the Plan, or ignored the results of such an investigation.

159.   Had AT&T conducted an impartial investigation of available independent fiduciaries it would have discovered that State Street had a relationship and dealings with Athene that could and, on information and belief, did impact the independence of the fiduciary services

that State Street offered, especially given the numerous factors that would lead a loyal and prudent fiduciary to conclude that Athene was not a reasonable or safe annuity, much less the safest annuity available.

### X.    The PRT Diminished the Value of AT&T Retirees' Pension Benefits.

160.    The PRT to Athene immediately diminished the present value of Plaintiffs' and other AT&T retirees' pension benefits. This transaction replaced the valuable benefits to which Plaintiffs were entitled with substantially and quantifiably less valuable benefits.

161.    The market for annuities sets the value for the same or similar future stream of payments issued by different annuity providers. If an annuitant receives the same payments, but from an issuer of lower creditworthiness, it is a loss for the annuitant. This is because the market will assign a lower price for an annuity issued by a riskier annuity provider to cover a similar stream of future payments, to compensate the annuitant for the additional risk.

162.    Accordingly, the AT&T retirees' pensions benefits transferred to Athene are worth far less than they would be worth if issued by a traditional insurer of high credit quality. Because of these providers' high credit quality, they provide a greater likelihood that retirees will receive their full pension. If the Athene annuity were purchased on the open market, any rational annuitant, if offered an identical annuity at the same price from these alternative issuers, would choose one from them, rather than the one from Athene—or, equivalently, would insist on paying a lower price for the annuity bought from Athene because of its lesser value. And that is indeed what Plaintiffs would have done if given that choice. The amount of this loss of value of the pensions of the AT&T retirees whose pensions have been transferred to Athene is real and substantial in dollar terms.

163.    It is a basic proposition that riskier assets are, all else equal, worth less than safer assets. Athene annuities have a higher credit spread relative to U.S. Treasuries, and thus, have

47

higher risk, than annuities offered by other insurers. That was also true when Defendants undertook PRT. Thus, the annuities from Athene are worth measurably less than the annuities would be worth if issued by another insurer.

164.    Before the AT&T-Athene-State Street transaction, the risk that Plaintiffs would not receive the pension benefits to which they were entitled was negligible. There was no realistic probability that the Plan would not be sufficiently funded to pay the benefits *and* that AT&T would fail *and* that the PBGC—which has billions of dollars of cash on hand and which is effectively backed by the federal government—would fail to pay Plaintiffs' benefits. There was no safer place for their pension benefits.

165.    After the transaction, the risk that Plaintiffs will not receive the benefits to which they are entitled is substantial. Because of the transaction, Plaintiffs are no longer members of the Plan, and their retirement benefits are no longer backed by the Plan, AT&T, or the PBGC. Their pension benefits were safer in the hands of AT&T or the PBGC, and thus, the risk assumed by Plaintiffs and other AT&T retirees is greater than even the difference in the risk between Athene and traditional annuity providers. Based on Athene's current and likely future financial position, there is a substantial probability that it will fail to make good on its obligation to pay Plaintiffs' retirement benefits, and the profit realized by AT&T is at least a rough proxy for the harm to retirees from being terminated as plan participants and having their pension benefits secured through a risky annuity with Athene.

166.    The selection of Athene injured Plaintiffs the moment the transaction was executed because, at that moment, the present material and economic value of Plaintiffs' promised benefits was substantially and quantifiably diminished. And the PRT transaction thus greatly increased the risk—and indeed created a substantial risk—that Plaintiffs will not receive the retirement benefits

that they have earned and which they are owed. Plaintiffs are therefore empowered to bring their claims under 29 U.S.C. § 1132(a)(2), (a)(3), and (a)(9).

## CLASS ALLEGATIONS

167.   Plaintiffs seek a class certified that consists of all participants in the AT&T Pension Benefit Plan and their beneficiaries since March 11, 2018, for whom the responsibility for plan-related benefit payments has been transferred to Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York.

168.   Numerosity: The proposed class includes over 96,000 members and is so large that joinder of all members is impracticable.

169.   Commonality: There are questions of law and fact common to the class because class members' claims are identical to one another and predicated on the common contention that they were injured by the transfer of their pension liabilities to Athene in violation of ERISA. Proceeding as a class action will generate answers to common questions that are apt to drive resolution of the litigation. Such common questions include:

    i.   Did Defendants breach their fiduciary duties when they selected Athene as an annuity provider?

    ii.   Did State Street breach its fiduciary duty when it assisted AT&T and AT&T Services in entering into, and itself entered into, the transaction?

    iii.   Was the transaction *per se* unlawful under ERISA?

    iv.   Did the analysis performed by Defendants that led AT&T and State Street to hire Athene as the annuity provider satisfy those entities' fiduciary obligations?

v. Should the Court order injunctive relief that ensures Plaintiffs will be able to obtain the value of their retirement benefits?

vi. Should the Court order AT&T to disgorge the $360 million-plus gain it secured from breaching its fiduciary duty and/or the profits Defendants reaped through the annuitization?

170. Typicality: The named plaintiffs' claims are typical of the class's claims because all Plaintiffs and all class members were participants in the Plan and were subjected to the same conduct by Defendants in transferring their benefit payments to the Athene entities, and seek to redress the same legal violations, as the class's claims.

171. Adequacy: The named plaintiffs will fairly and adequately protect the interests of the class. The named plaintiffs have no interest antagonistic to those of the other members of the class. They are committed to the vigorous prosecution of this action. They have retained counsel who specialize in the substantive law of ERISA and pension plans, and who are experienced and competent in the prosecution of large class actions, including those arising under ERISA.

172. Rule 23(b)(1): The prerequisites for a (b)(1) class are satisfied. Prosecution of separate actions by class members would create a risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to their obligations to the Plan and members of the proposed class, and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan which would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

173.    Rule 23(b)(2): The prerequisites for a (b)(2) class are satisfied. Defendants' misconduct was generally applicable to the Class. The injunctive relief that Plaintiffs seek affects the class as a whole. Individual class members do not have an interest in prosecuting their claims in this action individually because class members' claims are identical and the injunctive relief sought will affect each class member equally.

174.    Rule 23(b)(3): Alternatively, the prerequisites for a (b)(3) class are satisfied because common questions of law and fact predominate and a class action is superior to individual actions or other methods of adjudication. Given the nature of the allegations and Defendants' common course of conduct as to the class as a whole, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

175.    Plaintiffs' counsel will fairly and adequately represent the interests of the class and meet all requirements to serve as class counsel under Rule 23(g). The firms have agreed to advance costs of this action contingent upon the outcome and are aware that no fee can be awarded without the Court's approval.

## COUNT I: BREACH OF FIDUCIARY AND CO-FIDUCIARY DUTIES
*Against the AT&T Defendants for the Selection of Athene*

176.    Plaintiffs restate and incorporate the foregoing allegations.

177.    At all relevant times, the AT&T Defendants acted as fiduciaries under ERISA with respect to the Plan and the transaction at issue.

178.    Under 29 U.S.C. § 1104(a)(1)(A), the AT&T Defendants were thus required to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." This duty requires

51

that they operate the Plan for the "exclusive benefit" of Plan participants. *Id.* ERISA relatedly provides that, except in limited circumstances inapplicable here, "the assets of a plan shall never inure to the benefit of any employer." 29 U.S.C. § 1103(c)(1). The AT&T Defendants were also required to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

179.    IB 95-1 explicates and summarizes the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available" and fiduciaries may never select an unsafe annuity. Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

180.    The AT&T Defendants breached these fiduciary duties of loyalty and prudence when they selected Athene as the annuity provider to receive Plaintiffs' pension liabilities. Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plan, Athene was not the safest annuity available., and the AT&T Defendants did not take the necessary steps to obtain such an annuity. They selected Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but to advance corporate interests by saving AT&T money and enhancing corporate profits. In so doing, they breached their duty of loyalty by favoring their own corporate interests over the participants' interests in a secure retirement. Because their goal was to save the company money, the AT&T Defendants' search and their decision to transact with Athene were biased in favor of the lowest-

cost provider and thus not objective or sufficiently thorough or analytical, thereby breaching the duty of prudence.

181. The AT&T Defendants are subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation disgorgement of all ill-gotten profits/cost savings pocketed by them from purchasing Athene annuities instead of the safest available annuity, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

182. In addition to breaching their own fiduciary duties, the AT&T Defendants knowingly participated in the breach of those duties by the other Defendants, knowing that such acts were a breach, enabled the other Defendants' commission of that breach by failing to lawfully discharge their own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, they are liable for the losses caused by the breach of their co-fiduciary under 29 U.S.C. § 1105(a).

### COUNT II: KNOWING PARTICIPATION IN A FIDUCIARY BREACH RELATED TO AN INSURANCE ANNUITY
*Against the AT&T Defendants for the Selection of Athene*

183. Plaintiffs restate and incorporate paragraphs 1 through 175.

184. Section 1132(a)(9) not only empowers individuals to bring actions when their status as plan participants is terminated by annuitizations that violate ERISA, it also imposes substantive duties on certain nonfiduciaries.

185. Specifically, it creates liability for nonfiduciaries who knowingly participate in a fiduciary breach in violation of ERISA, 29 U.S.C. § 1104.

186. Plaintiffs thus allege, in the alternative to Count I, that, even if any of the AT&T Defendants are deemed nonfiduciaries for the purpose of the annuitization, any such Defendants

are liable under Section 1132(a)(9). Among other things, each of these Defendants knew of the circumstances that rendered their co-defendants' conduct a breach of fiduciary duties. These Defendants hired State Street for the purpose of selecting an annuity provider; knew that State Street's investigation of available annuity providers was not objective or sufficiently thorough; knew that the deficient selection of Athene instead of a prudent alternative annuity provider would generate a massive corporate benefit for AT&T; and knowingly accepted that benefit by entering into the PRT with Athene.

## COUNT III: BREACH OF FIDUCIARY AND CO-FIDUCIARY DUTIES
*Against the AT&T Defendants for the Selection of State Street*

187. Plaintiffs restate and incorporate paragraphs 1 through 175.

188. ERISA's fiduciary duties apply to the selection of service providers. 29 U.S.C. § 1104(a)(1)(A)–(B).

189. The AT&T Defendants breached their fiduciary duties by selecting State Street as the Plan's "independent fiduciary" for purposes of the transaction. Because of AT&T's relationship with State Street (and State Street's relationships with Apollo/Athene), the AT&T Defendants had an interest in selecting State Street as the "independent fiduciary" that was not predicated on the best interest of Plan participants. On information and belief, the AT&T Defendants selected State Street in part based on the companies' existing corporate relationships rather than an objective and thorough investigation of alternatives and failed to consider how State Street's relationship with Apollo and Athene would impair its ability to discharge its duties as an independent fiduciary solely in the interest of Plan participants.

190. The AT&T Defendants' fiduciary breaches in selecting an independent fiduciary facilitated the subsequent selection of Athene, which caused harm to Plaintiffs and class members

54

by creating a significant risk that they will not receive the benefit to which they are entitled and by substantially reducing the value of Plaintiffs' benefits.

191.    The AT&T Defendants knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants' commission of a breach by failing to lawfully discharge their fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, they are liable for the losses caused by the breach of their co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT IV: BREACH OF FIDUCIARY AND CO-FIDUCIARY DUTIES**
*Against State Street and Denise R. Sisk for the Selection of Athene*

192.    Plaintiffs restate and incorporate paragraphs 1 through 175.

193.    At all relevant times, State Street acted as a fiduciary as defined by ERISA with respect to the Plan and the transaction at issue.

194.    In addition, Defendant Sisk was an agent of State Street at all relevant times, and references to "State Street" in this count and in all counts refer to Sisk as well.

195.    Like the AT&T Defendants, State Street was required to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). This duty requires that it operate the Plan for the "exclusive benefit" of Plan participants. *Id.* State Street was also required to act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

196.     As the Plan's independent fiduciary, State Street breached these duties by recommending Athene to assume AT&T's pension obligations. Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plan, Athene was not the safest annuity available. State Street was conflicted and its selection or recommendation of Athene was influenced by its corporate relationships with Athene and affiliates rather than through an objective and thorough independent investigation into the merits of whether using Athene was in the interest of Plan participants. In so doing, State Street breached its duty of loyalty by favoring its own corporate interests over the participants' interests in a secure retirement. Because State Street's goal and motivation was to benefit itself and its corporate partners, including AT&T, State Street's search was not objective or sufficiently thorough or analytical, thereby breaching the duty of prudence.

197.     State Street is subject to appropriate relief to remedy these prohibited transactions, including without limitation disgorgement of all ill-gotten profits by selecting Athene annuities instead of the safest available annuity, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

198.     State Street knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants' commission of a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT V: PROHIBITED TRANSACTION
*Against the AT&T Defendants for Hiring State Street*

199.     Plaintiffs restate and incorporate paragraphs 1 through 175.

56

200.    ERISA supplements the general fiduciary duties by categorically prohibiting certain transactions. 29 U.S.C. § 1106(a)(1), (b).

201.    Section 1106(a) prohibits various transactions between a plan and a "party in interest," which Congress defined to encompass those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries, such as employers, other fiduciaries, and service providers. 29 U.S.C. § 1002(14)(A)–(C).

202.    State Street was a party in interest because it provided services to the Plan. 29 U.S.C. § 1002(14)(B). The AT&T Defendants knowingly caused the Plan to engage in a transaction resulting in a direct or indirect furnishing of services between the Plan and State Street. 29 U.S.C. § 1106(a)(1)(C).

203.    The AT&T Defendants entered into a prohibited transaction when they engaged State Street as the Plan's independent fiduciary, which facilitated the subsequent selection of Athene and harmed Plaintiffs and class members.

204.    The AT&T Defendants knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants' commission of a breach by failing to lawfully discharge their fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, they are liable for the losses caused by the breach of their co-fiduciaries under 29 U.S.C. § 1105(a), and would be liable even if they were deemed nonfiduciaries.

**COUNT VI: PROHIBITED TRANSACTION**
*Against the AT&T Defendants for Engaging in the PRT Transaction*

205.    Plaintiffs restate and incorporate paragraphs 1 through 175.

206.    Athene was a party in interest because it provided services to the Plan. 29 U.S.C. § 1002(14)(B). The AT&T Defendants knowingly caused the Plan to engage in the annuities

transaction with actual or constructive knowledge that the transaction constituted a direct or indirect (i) exchange of property between the Plan and Athene; (ii) furnishing of services between the Plan and Athene; and (iii) transfer to, or use by or for the benefit of Athene, of Plan assets, *see* 29 U.S.C. § 1106(a)(1)(A), (C), (D).

207.    The transactions at issue do not qualify for any exemption from the prohibitions of § 1106(a). Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene received more than reasonable compensation for its services to the Plan.

208.    The AT&T Defendants are subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits/cost savings pocketed by AT&T by virtue of purchasing Athene annuities instead of the safest available annuity, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

209.    The AT&T Defendants knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants' commission of a breach by failing to lawfully discharge their fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, they are liable for the losses caused by the breach of their co-fiduciaries under 29 U.S.C. § 1105(a), and would be liable even if they were deemed nonfiduciaries.

210.    The AT&T Defendants had actual or constructive knowledge that the Plan's PRT transaction with Athene was unlawful. They knew or should have known that State Street was engaged in unlawful self-dealing by causing the Plan to transfer billions of dollars of pension obligations to Athene.

## COUNT VII: PROHIBITED TRANSACTION

*Against the AT&T Defendants for Self-Dealing Transactions*

211.    Plaintiffs restate and incorporate paragraphs 1 through 175.

212.    Section 1106(b) categorically prohibits a fiduciary from engaging in certain transactions with a plan, which often involve self-dealing.

213.    By using pension trust assets to purchase Athene annuities instead of the safest available annuity so as to increase AT&T's corporate profits, the AT&T Defendants dealt with the assets of the Plan in their own interest or for their own account, and acted on behalf of a party (AT&T) whose interest in using a riskier, lower-cost annuity provider was adverse to the interests of the Plan's participants and their beneficiaries in obtaining the safest available annuity. 29 U.S.C. § 1106(b)(1)–(2).

214.    The AT&T Defendants are subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits/cost savings pocketed by AT&T from purchasing Athene annuities instead of the safest available annuity, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

215.    The AT&T Defendants knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants' commission of a breach by failing to lawfully discharge their fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, they are liable for the losses caused by the breach of their co-fiduciaries under 29 U.S.C. § 1105(a), and would be liable even if they were deemed nonfiduciaries.

216.    The AT&T Defendants had actual or constructive knowledge that the Plan's PRT transaction with Athene was unlawful. They knew or should have known that State Street was

59

engaged in unlawful self-dealing by causing the Plan to transfer billions of dollars of pension obligations to Athene.

<u>**COUNT VIII: PROHIBITED TRANSACTION**</u>
*Against State Street and Denise R. Sisk for Engaging in the PRT Transaction*

217. Plaintiffs restate and incorporate paragraphs 1 through 175.

218. Athene was a party in interest because it provided services to the Plan. 29 U.S.C. § 1002(14)(B). State Street knowingly caused the Plan to engage in the PRT with actual or constructive knowledge that the transaction constituted a direct or indirect (i) exchange of property between the Plan and Athene; (ii) furnishing of services between the Plan and Athene; and (iii) transfer to, or use by or for the benefit of Athene, of Plan assets, *see* 29 U.S.C. § 1106(a)(1)(A), (C), (D).

219. The transactions at issue do not qualify for any exemption from the prohibitions of § 1106(a). Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene received more than reasonable compensation for its services to the Plan.

220. State Street is subject to appropriate relief to remedy these prohibited transactions, including without limitation disgorgement of all ill-gotten profits by selecting Athene annuities instead of the safest available annuity, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

221. State Street knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants' commission a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed

to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT IX: PROHIBITED TRANSACTION
*Against State Street and Denise R. Sisk for Self-Dealing Transactions*

222.    Plaintiffs restate and incorporate paragraphs 1 through 175.

223.    By using pension trust assets to purchase Athene annuities instead of the safest available annuity so as to increase AT&T's corporate profits, State Street dealt with the assets of the Plan in its own interest or for its own account; and acted on behalf of a party (State Street) whose interest in using a riskier, lower-cost annuity provider were adverse to the interests of the Plan's participants and their beneficiaries in obtaining the safest available annuity. 29 U.S.C. § 1106(b)(1)–(2).

224.    State Street is subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits by selecting Athene annuities instead of the safest available annuity, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

225.    State Street knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants' commission of a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT X: FAILURE TO MONITOR FIDUCIARIES
*Against the AT&T Defendants*

226.    Plaintiffs restate and incorporate paragraphs 1 through 175.

227.   The AT&T Defendants' fiduciary responsibility for overseeing the Plan included monitoring any other fiduciaries appointed or hired to manage the Plan on a day-to-day basis, including the day-to-day responsibility of selecting service providers such as an annuity provider.

228.   A monitoring fiduciary must ensure that those to whom its fiduciary duties are delegated are performing those duties in compliance with ERISA's fiduciary standards. In particular, AT&T remained responsible as an appointing fiduciary to monitor the actions of the AT&T Services to ensure that it carried out its fiduciary obligations loyally and prudently. The same is true for AT&T Services and the Investment Committee. AT&T Services, as the Plan administrator and named fiduciary, and through its delegation of authority to the Investment Committee, remained responsible for monitoring the actions of the Investment Committee with respect to the selection and monitoring of the Plan's independent fiduciary and investment manager. The Investment Committee exercised its delegated authority to appoint State Street, and thus, had a duty as the appointing fiduciary to monitor the actions of State Street to ensure it complied with its fiduciary obligations over the selection of Athene as the annuity provider for the PRT transaction.

229.   The AT&T Defendants breached their fiduciary monitoring duties by failing to ensure that the process of selecting Athene as the annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(A)–(B) and IB 95-1.

230.   Had the AT&T Defendants fulfilled their fiduciary monitoring duties, Athene would have been rejected in favor of a safer annuity provider, or they would have decided not to proceed with the transaction. As a result of those monitoring failures, Plaintiffs and class members suffered harm including an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits.

**PRAYER FOR RELIEF**

Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court:

i.   Certify the proposed class under Federal Rule of Civil Procedure 23, appoint each Plaintiff as class representatives, and appoint Schlichter Bogard LLP and Zuckerman Spaeder LLP as co-class counsel to represent the members of the class;

ii.  Order Defendants to post adequate security to assure receipt by Plaintiffs and class members of all retirement benefits covered by the Athene annuities, plus reasonable prejudgment interest on those amounts, 29 U.S.C. § 1132(a)(9);

iii. Order the Defendants to guarantee the annuities purchased from Athene through the purchase, at their expense, of satisfactory guarantees from reliable insurers selected through appropriate procedures or the posting of an appropriate security;

iv.  Order AT&T, AT&T Services, and the Investment Committee, through Plan amendment or otherwise, to place the GACs they unlawfully purchased inside the Plan as a Plan asset and to return the Class members to their former status as Plan participants;

v.   Order AT&T to remain secondarily liable for Plaintiffs' pension benefits;

vi.  Order disgorgement of all sums derived from the unlawful transaction;

vii. Award to Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

viii.   Order pre- and post-judgment interest on any monetary compensation to which they are entitled; and

  ix.   Order any appropriate relief this Court deems just and equitable.

Dated: November 15, 2024

/s/ Douglas S. Brooks
Douglas S. Brooks (Bar No. 636697)
Elizabeth N. Mulvey (Bar No. 542091)
LIBBY HOOPES BROOKS & MULVEY, P.C.
260 Franklin Street
Boston, MA 02110
(617) 338-9300
(617) 338-9911
dbrooks@lhbmlegal.com
emulvey@lhbmlegal.com

/s/ Robert T. Naumes
NAUMES LAW GROUP
Robert T. Naumes (Bar No. 367660)
Christopher Naumes (Nar No. 671701)
2 Granite Ave., # 425
Milton, Massachusetts 02186
(617) 227-8444
(617) 696-2437 (Fax)
robert@naumeslaw.com
christopher@naumeslaw.com

/s/ Cyril V. Smith
Cyril V. Smith (admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
100 E. Pratt Street, Suite 2440
Baltimore, MD 21202
(410) 949-1145
(410) 659-0436 (Fax)
csmith@zuckerman.com

/s/ Jerome J. Schlichter
Jerome J. Schlichter (admitted *pro hac vice* in Case No. 1:24-cv-10656-FDS)
Sean E. Soyars (admitted *pro hac vice* in Case No. 1:24-cv-10656-FDS)

64

Kurt C. Struckhoff (admitted *pro hac vice* in Case
No. 1:24-cv-10656-FDS)
SCHLICHTER BOGARD LLP
100 South Fourth Street, Suite 1200
St. Lousi, Missouri 63102
(314) 621-6115
(314) 621-5934 (Fax)
jschlichter@uselaws.com
ssoyars@uselaws.com
kstruckhoff@uselaws.com

*/s/ Bryan M. Reines*

Bryan M. Reines (admitted *pro hac vice*)
ZUCKERMAN SPAEDER LLP
1800 M Street N.W., Suite 10000
Washington, D.C. 20036
(202) 778-1846
(202) 822-8106 (Fax)
breines@zuckerman.com

*/s/ Edward Stone*

Edward Stone (admitted *pro hac vice*)
EDWARD STONE LAW P.C.
175 W. Putnam Ave., 2nd Floor
Greenwich, CT 06830
(203) 504-8425
(203) 348-8477 (Fax)
eddie@edwardstonelaw.com

*/s/ Elizabeth Hopkins*

Elizabeth Hopkins (admitted *pro hac vice*)
Susan L. Meter (admitted *pro hac vice*)
KANTOR & KANTOR LLP
19839 Nordhoff St.
Northridge, CA 91324
(818) 886-2525
(818) 350-6272 (Fax)
ehopkins@kantorlaw.net
smeter@kantorlaw.net

*Attorneys for Plaintiffs*

65

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

/s/ *Douglas S. Brooks*
Douglas S. Brooks