UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LANELL PIERCY, WILLA G. WARD,
THOMAS L. MAZZEO, SUE RUSH,
CATHERINE SCHLOSS, PATRICIA TATE-
JACKSON, and DARLENE WILSON,
individually and as representatives on behalf of
a class of similarly situated persons,

    *Plaintiffs,*

v.

AT&T INC., AT&T SERVICES, INC., THE
BENEFIT PLAN INVESTMENT
COMMITTEE, PASCAL DESROCHES,
GEORGE GOEKE, DEBRA DIAL,
WILLIAM HAMMOND, JULIANNE
GALLOWAY, STATE STREET GLOBAL
ADVISORS TRUST CO., and DENISE R.
SISK,

    *Defendants.*

No. 24-cv-10608-NMG

## REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS

LEVENSON, U.S.M.J.

### INTRODUCTION

Before the Court are two motions to Dismiss the Consolidated Class Action Complaint

(Docket No. 69) (the "Complaint") in this case, which Judge Gorton has referred to me for report

and recommendation (Docket No. 116).

One of these motions (Docket No. 75) has been filed by defendants AT&T Inc., AT&T

Services, Inc., the Benefit Plan Investment Committee, Pascal Desroches, George Goeke, Debra

Dial, William Hammond, and Julianne Galloway (the "AT&T Defendants" or "AT&T"). The

other (Docket No. 73) has been filed by defendants State Street Global Advisors Trust Company and Denise R. Sisk (the "SSGA Defendants" or "SSGA").

The AT&T Defendants and SSGA Defendants have separately submitted memoranda (including replies) and declarations (with attached exhibits) in support of their respective motions. *See* Docket Nos. 76 (AT&T Mem.), 80 (AT&T Decl.), 81 (AT&T Decl.), 113 (AT&T Reply Mem.), 121 (AT&T Resp. to Supp. Auth.), 74 (SSGA Mem.), 77 (SSGA Decl.), 111 (SSGA Reply Mem.), and 112 (SSGA Decl.).

Plaintiffs have submitted a consolidated opposition ("Plaintiffs' Opp.") to the motions to dismiss (Docket No. 91), and a Notice of Supplemental Authorities (Docket No. 120).

In addition, amici have weighed in with two briefs, one in support of Defendants' motions (Docket No. 90) and one in opposition (Docket No.99).

I have considered these submissions, as well as the oral arguments of counsel (heard on July 30, 2025), in preparing this report and recommendation.

I.      **Factual Background**

        *A.      The Challenged Transaction*

Plaintiffs are retired employees of AT&T who allege that the AT&T Defendants, with the assistance of the SSGA Defendants, violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. in the course of "annuitiz[ing]" approximately $8 billion dollars' worth of pension liabilities. Complaint ¶¶ 2–20. Plaintiffs allege that Defendants breached their fiduciary duties by causing AT&T's pension benefit plan (the "Plan") to use Plan assets to purchase group annuity contracts ("GACs") from an insurer, Annuity and Life Company and Athene Annuity & Life Assurance Company of New York (collectively "Athene"). *Id*.

Plaintiffs' claims arise from a transaction, commonly referred to as a pension risk transfer ("PRT") in which "an employer rids itself of all or part of its pension benefit obligations by using plan assets to purchase GACs from an insurer, who then assumes the responsibility of future benefit payments to employees and retirees covered by the transaction." *Id.* ¶ 52. The effect of the PRT in this case was to obligate Athene to provide lifetime annuities that would cover the amount of the retirement benefits owed to certain Plan beneficiaries (the proposed class members) and to relieve the Plan of those obligations. *See id.* ¶¶ 2–20. Plaintiffs allege that this transaction profited Defendants while increasing risk to Plan beneficiaries. *See id.* ¶ 53.

Plaintiffs seek to proceed as representatives of a class of former participants in AT&T's pension plan who have been affected by the annuitization of their pensions. Plaintiffs propose to represent a class of "over 96,000 members" (Complaint ¶ 168) who—prior to the 2023 PRT—were participants and beneficiaries of the Plan and who now receive annuity payments from Athene. *Id.* ¶¶ 2, 21–27. Prior to the PRT, the Plan covered 393,447 participants[1] as of 2022, so nearly one-quarter of the Plan's former Plan participants are now covered by annuities from Athene. *See id.* ¶ 9.

The AT&T Defendants are AT&T, Inc., its subsidiary AT&T Services, Inc., which is currently the Plan sponsor, the Benefit Plan Investment Committee, which is comprised of four senior AT&T financial officers, and those four officers. The Complaint alleges that that, directly or indirectly, the AT&T Defendants were responsible for alleged fiduciary breaches and otherwise violated ERISA. Complaint ¶¶ 28–37.

---

[1] By referring to "participants," the complaint does not specify how many of these individuals are retirees and how many may be current AT&T employees.

The SSGA Defendants are State Street Global Advisors Trust Company, a trust company that is a wholly-owned subsidiary of State Street Bank and Trust, and Denise R. Sisk, who is head of the trust company's "Independent Fiduciary Services Team." *Id.* ¶ 38–39. SSGA was hired as an independent fiduciary and conducted the selection process for obtaining annuity contracts to complete the PRT. *Id.* ¶ 38.

Broadly speaking, the Complaint alleges that Defendants violated ERISA by failing properly to exercise their fiduciary duties and also violated various other provisions of ERISA. The central claims of the Complaint are: that Defendants should not have entered into GACs with Athene, but instead should have purchased annuities from some other insurer; and that the decision to purchase annuities from Athene was impermissibly motivated by a desire to save money for AT&T. The Complaint alleges:

> Defendants selected Athene, which is substantially riskier than numerous traditional annuity providers, instead of a safe annuity (much less the safest available annuity). In doing so, Defendants thus favored their own interests over those of Plan participants and beneficiaries. AT&T stood to gain—and did gain—hundreds of millions of dollars in profit from this scheme. . . . Because the market accounts for risk in pricing annuities, AT&T saved a substantial sum by selecting Athene instead of the safest annuity available.

Complaint ¶ 3.

As discussed below, the question before the Court is *not* whether Plaintiffs would be better off with a pension than with an annuity. The question is whether Plaintiffs have adequately alleged justiciable claims that Defendants violated ERISA: Did Defendants breach their fiduciary duties by selecting the annuities offered by Athene, instead of purchasing annuities offered by some other insurer?

### B.    *Defined-Benefit Plans and PRTs*

Broadly speaking, ERISA sets minimum standards for the operation of health and retirement benefit plans for private sector employers throughout the United States. As discussed

below, among other things, ERISA establishes standards of care for fiduciaries who manage such plans, prohibits particular transactions, and provides avenues for legal redress for those who claim to have been harmed by breaches of ERISA's requirements.

There are two main kinds of retirement plans governed by ERISA: defined-benefit plans (commonly termed "pensions") and defined-contribution plans (which correspond to employer-sponsored retirement accounts, such as 401(k) plans). The Supreme Court has described these kinds of plans, in shorthand, as follows:

> In a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions. By contrast, in a defined-contribution plan, such as a 401(k) plan, the retirees' benefits are typically tied to the value of their accounts, and the benefits can turn on the plan fiduciaries' particular investment decisions.

*Thole v. U. S. Bank N.A.*, 590 U.S. 538, 540 (2020).

This case involves a defined-benefit plan: a pension under which retirees have the right to receive a defined stream of payments for the rest of their lives. Complaint ¶ 8, 49.

In abstract economic terms, entitlement to a pension under a defined-benefit pension plan is equivalent to an annuity. An annuity is a financial product typically sold by insurance companies. In simplified form, both a pension and annuity entitle the recipient to a stream of payments for the duration of the recipient's life.[2] In less abstract terms, however, there are significant differences in the financial and regulatory structures upon with pensions and annuities rest.

As explicated in the Complaint, a pension represents an obligation of the plan sponsor, typically the employer, subject to the regulatory regime of ERISA. The sponsor's obligations are

---

[2] There are, of course, myriad potential variations in such arrangements, such as cost-of-living adjustments or survivorship benefits. But these do not figure in the issues before the Court.

fixed and do not depend on the investment performance of plan assets; "[t]he employer must pay the pension benefits, even if investment performance falls short of expectations." *Id.* ¶ 49. The default risk associated with a pension is thus linked to the financial health of the plan sponsor/employer. Here, the Complaint alleges that the Plan sponsor, AT&T is a large and well-financed public corporation which—prior to the PRT—"was obliged by ERISA's funding requirements to protect the Plan's financial health by making additional contributions to the Plan when necessary." *Id.* ¶ 12. The Complaint emphasizes that converting Plaintiffs' pensions into annuities means the Plaintiffs can no longer look to AT&T to secure their future payments. *Id.* ¶ 164–65. Moreover, Plaintiffs point out, if an employer goes broke or is otherwise unable to meet its pension obligations, the Pension Benefit Guaranty Corporation ("PBGC"), a federally chartered agency established under ERISA, may "step[] in as a backstop to pay benefits due." *See id.* ¶ 50. Plaintiffs go so far as to allege that there is also an implicit federal guarantee against PBGC insolvency. *See id.* ¶ 56.

Unlike a pension offered by an employer through a pension plan, an annuity is issued by an insurance company. After a PRT, the insurance company bears the liability for future payments and the employer or other plan sponsor is no longer financially responsible. The risk of default associated with an annuity depends upon the financial strength and stability of the insurer, upon the insurer's reinsurance arrangements to protect against larger losses, upon other security arrangements (such as a dedicated account) that may be in place, and—in case of insurer insolvency—upon various state guarantee associations ("SGAs") that offer some backstop coverage. Typically, insurers are subject to regulation on a state-by-state basis and, according to the complaint, SGA benefits for failed annuities are typically limited to a present-value of $250,000, a sum that appears to be significantly less than the cap on benefits payable by PBGC

in the event of a pension plan failure. *Id.* ¶¶ 54–57. Relevant to Plaintiffs' allegations in this case, reinsurers may be located outside the United States and may thus be subject to regulation by insurance authorities of the jurisdiction(s) where they are domiciled. *See id.* ¶ 80–84.

Much of the Complaint is dedicated to exploring ways in which PRTs expose plan participants to different and, Plaintiffs contend, greater risks when their pensions are converted into annuities. *See, e.g., id.* ¶¶ 10–13, 43, 47–66, 140, 164–165. But this comparison is not directly relevant. PRTs are generally legal, as Plaintiffs acknowledge: ". . . ERISA does not prohibit an employer from shedding pension obligations to an insurance company . . .." *Id.* ¶ 2. If there is a claim to be made, it relates to the obligation to the exercise of fiduciary responsibilities of an annuity provider. In this case, Plaintiffs allege is that there was a fiduciary failure in the selection of Athene, as opposed to some other annuity provider. *See id.* ¶ 3.

## II.    Subject Matter Jurisdiction—Constitutional Standing

The Court is required, in every case, to attend to its subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1).

The Court's jurisdiction, of course, is limited to actual cases or controversies within the meaning of Article III of the Constitution. "This 'irreducible constitutional minimum of standing' requires a showing of 'injury in fact' to the plaintiff that is 'fairly traceable to the challenged action of the defendant,' and 'likely [to] be redressed by a favorable decision.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)) (citations and alterations omitted in original).

In this case, Defendants contend that Plaintiffs have failed to allege an injury that is sufficiently concrete to satisfy the case or controversy requirement. Whether Plaintiffs have sufficiently pled the kind of concrete injury—and personal interest in the outcome—that would make this a justiciable case or controversy is a separate question from whether their claims are

ultimately sufficient to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Accordingly, before the Court may consider the legal sufficiency of Plaintiffs' claims, it must determine whether Plaintiffs' claims allege a sufficiently concrete injury to meet the Constitutional threshold for a "case or controversy."

In this case, the constitutional standing issue requires some extended analysis. The relevant caselaw is nuanced and the nature of the injury that is claimed in this case requires careful scrutiny. Meanwhile, the Complaint itself is difficult to parse. It is cluttered with extended discursions about the asserted evils of permitting employers to satisfy their pension obligations by purchasing annuities: a policy judgment that has no direct bearing on any of Plaintiffs' legal claims. The Court, therefore, must sift through the Complaint to identify potentially viable legal claims and relevant allegations of fact, in order to assess the nature of the injury that Plaintiffs seek to redress.

For the reasons discussed below, I am persuaded that the Complaint limns a justiciable claim. Specifically, Plaintiffs' contention that they received a riskier annuity than they otherwise would have been entitled to receive—but for Defendants' alleged breach of fiduciary duty—implicates a concrete present injury sufficient to constitute a genuine case or controversy. Although the relevant caselaw and the particular factual circumstances of this case present some intricacies, at bottom, Plaintiffs' claim is that a fiduciary was obligated to purchase a suitably safe annuity on their behalf, and that the fiduciary instead bought an unsafe annuity in order to save money.

### A.    The Supreme Court's Decision in Thole

The Supreme Court's decision in *Thole v. U. S. Bank N.A*, 590 U.S. 538 (2020), is the starting point for considering constitutional standing in this case. In *Thole*, retired employees of U.S. Bank sued various fiduciaries who were responsible for managing the assets of the

company's pension plan, claiming that the fiduciaries had mismanaged that plan's investments. The Court, however, ruled that the plaintiffs in that case had failed to allege any concrete injury, regardless of whether any fiduciary breach had occurred. Critical to the ruling in *Thole* was the Court's focus on the distinction between a defined-*contribution* plan, in which the benefits ultimately payable to plan participants would fluctuate depending on the plan's investment successes or failures, and a defined-*benefit* plan, in which the retirees' pension benefit "payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Id.* at 540. With that distinction at the forefront, the Court noted that "[the plaintiffs] have received all of their monthly benefit payments so far, and the outcome of this suit would not affect their future benefit payments." *Id. at* 541. The Court concluded, "[t]he plaintiffs therefore have no concrete stake in this lawsuit." *Id.*

*Thole* reinforced, in the ERISA context, the point that constitutional standing is discrete from the merits of any particular statutory claim. Merely claiming that fiduciaries had breached their duty under ERISA did not, by itself, satisfy the constitutional standing requirement. This is so, the Supreme Court ruled, even though there is an explicit statutory provision in ERISA that purports to authorize such a claim:

> [I]n arguing for standing, [Plaintiffs] stress that ERISA affords the Secretary of Labor, fiduciaries, beneficiaries, and participants—including participants in a defined-benefit plan—a general cause of action to sue for restoration of plan losses and other equitable relief. See ERISA §§ 502(a)(2), (3), 29 U.S.C. §§ 1132(a)(2), (3). But the cause of action does not affect the Article III standing analysis. This Court has rejected the argument that "a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo, Inc.* v. *Robins*, 578 U. S. ——, ——, 136 S.Ct. 1540, 1549, 94 L.Ed.2d 635 (2016); see *Raines v. Byrd*, 521 U.S. 811, 820, n. 3, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). The Court has emphasized that "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 578 U. S., at ——, 136 S.Ct., at 1549. Here, the plaintiffs have failed to plausibly and clearly allege a concrete injury.

*Id.* at 544.

In dicta that bears heavily on this case, the Court in *Thole* acknowledged that there might be some circumstances in which beneficiaries of a defined-benefit plan could potentially state a justiciable claim. The Court acknowledged, but did not rule upon, the possibility that a substantially-increased risk of default might present the kind of concrete injury needed for a cognizable claim arising from mismanagement of a defined-benefit plan: "According to the plaintiffs' *amici*, plan participants in a defined-benefit plan have standing to sue if the mismanagement of the plan was so egregious that it substantially increased the risk that the plan and the employer would fail and be unable to pay the participants' future pension benefits." *Id.* at 546. The *Thole* case, however, did not present any such scenario: "[T]he plaintiffs' complaint did not plausibly and clearly claim that the alleged mismanagement of the plan substantially increased the risk that the plan and the employer would fail and be unable to pay the plaintiffs' future pension benefits." *Id.* (citing and quoting *Rue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 255 (2008) ("Misconduct by the administrators of a defined benefit plan will not affect an individual's entitlement to a defined benefit unless it creates or enhances the risk of default by the entire plan.")). Nor, the *Thole* Court ruled, did a generalized assertion of potential vulnerability meet that standard: "a bare allegation of plan underfunding does not itself demonstrate a substantially increased risk that the plan and the employer would both fail." *Id.* at 46. Indeed, in a footnote the Court hypothesized that even an actual plan failure might not give rise to a cognizable case or controversy, assuming there were PBGC guarantees to backstop full payment of the retirees' pension benefits. *Id.* at 546 n.2.

### B.    *The Parties' Arguments*

In this case, the parties' arguments about constitutional standing are centered on the Supreme Court's suggestion in *Thole* that a cognizable case could be based on "substantially increased risk" of plan failure and default on future benefits.

In Defendants'[3] telling, "Plaintiffs *have* received every penny of their vested pension benefits, and today they are entitled to the same stream of future benefits as they were before the pension risk transfer. Plaintiffs thus clearly have not been injured." AT&T Mem., Docket No. 76 at 6 (emphasis in original). From this premise, Defendants argue, "Plaintiffs cannot manufacture a concrete and actual injury because they have received every dollar of their pension payments due to date, and Plaintiffs are entitled to future payments per the annuity contracts with Athene that exactly match Plaintiffs' prior entitlement from the Plan." *Id.* Defendants contend that this case is indistinguishable from *Thole* and is subject to dismissal on the same basis. *Id.*

For their part, Plaintiffs respond that they "allege three injuries, each sufficient for standing: (a) the reduced value today of their retirement benefits, which they suffered the moment of the Athene annuitization; (b) the invasion of their legal right to be free from fiduciary breaches, recognized under common law; and (c) the substantial risk that Plaintiffs will suffer future pocketbook injury upon Athene's default." Plaintiff's Opp., Docket 91 at 15.

There are significant flaws in both parties' arguments.

a.    Defendant's Argument on Standing

Defendants' primary argument on constitutional standing[4] is premised on the fact that, to date, no retirees have missed a check and that no one knows for certain when, or if, they will.

_____

[3] The SSGA Defendants join the AT&T Defendants' argument on constitutional standing. *See* SSGA Mem., Docket No. 74 at 5.

[4] In a secondary argument, the AT&T Defendants suggest in passing that their "independent actor" argument (*viz.* their contention that only the SSGA exercised relevant fiduciary duties in this case) implicates Plaintiffs' Article III standing. But the central case on which this secondary argument rests, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), is inapposite. *Clapper* dealt with allegations that a non-party actor might, *in the future*, cause harm. 568 U.S. at 413–14. Here, by contrast, we are talking about events that have already occurred. Whether Plaintiffs have adequately alleged a factual basis for claiming that AT&T bears some responsibility for

*Footnote continues on following page.*

There is some truth in the pro-plaintiff *amicus*'s parody of Defendants' position, which describes Defendants as claiming "that the allegations that Defendants failed to prudently select an annuity in the sole interest of the participants cannot be tested in court so long as the annuity provider has not yet failed." Docket No. 99 at 2–3.

The problems with Defendants' argument are: (1) that it asks the Court to ignore the commonsense economic realities of counterparty risk; and (2) that it ignores the wording of the *Thole* dictum.

i.    Defendants' Argument Ignores Commonsense Financial Principles

If an individual goes to an investment adviser and engages the adviser to purchase a suitably safe annuity on her behalf, the adviser owes a fiduciary duty to that individual, who is her client. It does not matter whether the client is buying the annuity with her own money, or with funds from a third-party—be it an insurance settlement, an inheritance, a divorce, or a wealthy relative—the duty is owed to the client. If, instead of buying a suitable annuity, the adviser purchases a substandard one (say, from a low-rated insurer), in order to save money for

---

alleged breaches of fiduciary duty is a matter for the merits discussion, below. But there's no question that the event – which Plaintiffs say injured them – has actually occurred. Whether or not Plaintiffs have plausibly identified the persons responsible for their alleged injury is an ordinary factual/pleading dispute; the *constitutional* issue is whether the harm that Plaintiffs say they have suffered amounts to a justiciable concrete injury. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct.")

the third party who is footing the bill, that would plainly be a breach of fiduciary duty.[5] In such circumstances, it cannot seriously be doubted that the client has been harmed, regardless of whether there is reason to hope that—with luck—the low-rated insurer will survive and the substandard annuity will pay out for the rest of the client's life.

Defendants' focus on the fact that no payments have yet been missed ignores the fundamental financial concept of counterparty risk. The concept is perhaps most familiar in loan transactions, where the commonly used term "credit risk" refers to the prospect that a borrower may ultimately be unable or unwilling to meet their obligations. Counterparty risk, however, may be identified in any kind of transaction, to describe the prospect that any counterparty may prove unwilling or unable to meet its obligations. Here, of course, Plaintiffs are focused on the risk that Athene (with its reinsurers and other guarantors) may in the future stop paying Plaintiffs' annuity benefits.

Defendants sidestep the issue of counter-party risk with a glib quotation from *Thole.* They parrot the Supreme Court's observation that the plaintiffs in *Thole* were "legally and contractually entitled to receive those same monthly payments for the rest of their lives." AT&T Mem., Docket No. 76 at 6 (quoting *Thole*, 590 U.S. at 540). But, by wresting this phrase from its context, Defendants bury the critical point. In *Thole* the plaintiffs were "legally and contractually entitled to receive" their payments from the same set of payors and guarantors, regardless of the outcome of that case. In this case, by contrast, the dispute is about the substitution of different payors and guarantors. Plainly that can make a big difference. Consider an I.O.U. from a

---

[5] The law is clear—and the parties do not dispute—that that fiduciaries in this case owed sole allegiance to the former participants in the Plan (*i.e.*, the beneficiaries of the annuities). *See generally Pegram v. Herdrich*, 530 U.S. 211, 225 (2000) (although employers may play various roles, they must "wear the fiduciary hat when making fiduciary decisions").

reputable bank and an I.O.U. from one's impecunious cousin. Ostensibly both "legally and contractually entitle" the holder to the same future stream of payments, but the bank's is obviously more valuable than the other.

Defendants' argument ignores the reality that substantially-increased risk—not only imminent disaster—represents, in myriad contexts, a material, financially-quantifiable harm. Indeed, gradients of risk are a staple of the world's financial markets. It would be ridiculous to suppose that the pricing of bonds (which are, like annuities, long-term promises to provide a stream of payments) could be based on a simply binary: whether the debtor has, or has not, missed any payments. The world's insurance and credit markets routinely identify and price various kinds of counterparty risk on a daily basis.[6] No one knows when future economic downturns will occur, or whether such downturns will be mild or catastrophic, but this does not prevent markets from pricing debt securities based on the greater or lesser likelihood of failure under stress (*i.e.* "substantially increased risk").

No one could seriously dispute that the purchaser of a AAA-rated bond suffers a concrete injury if the seller delivers a riskier, B-rated, bond. The purchaser's injury is concrete, even though the absolute likelihood of default for either bond is slim, and even though the circumstances that might trigger a default lie in the unpredictable future. The loss of value, and concrete injury, does not depend on any showing of "immediate risk of default." Rather the obvious injury—and the market's price differential—arises from the *substantially increased risk* of default by a given counterparty. There is no good reason why a different result should obtain when the financial instrument is an annuity instead of a bond.

---

[6] In well-organized markets, the time intervals are sometimes much shorter: minutes, seconds, or even less.

Here, Plaintiffs allege that the obligation to pay their pensions has been assigned to an annuity provider that Plaintiffs disparage as unduly risky, with only limited coverage from SGAs for backstop. Plaintiffs allege that a prudent fiduciary would have obtained—and that they were thus entitled to receive—materially less risky annuities from a more established annuity provider. Regardless of whether Plaintiffs have alleged an adequate factual basis for such a claim—to be discussed below—the claim itself plainly describes a tangible financial harm.

Notwithstanding Defendants' emphasis on the fact that no payments have been missed to date, I don't take their argument to be that *Thole* requires plan members to wait until the Titanic hits the iceberg before they have standing to object to a collision course. At oral argument, counsel conceded the obvious point that an annuity offered by Charles Ponzi,[7] which would pay out steadily for 15 years and then go belly-up, would meet the imminent-risk-of-default standard that Defendants espouse. *See* Transcript of Oral Argument, Docket No. 129 at 9–11 (July 30, 2025).

Thus, in a moderate concession to economic realities, Defendants recognize that—in extreme instances—substituting an unreliable payor *could* inflict a concrete harm on annuity holders. But Defendants posit that only an "imminent failure," not just a materially increased risk of failure, provides an adequate basis for an allegation of concrete injury. *See* AT&T Mem., Docket 76 at 8–9. Defendants argue that "Plaintiffs must plausibly allege that they are at imminent risk of being denied their annuity payments—*i.e.*, that Athene is at immediate risk of default," and that Plaintiffs "do not plausibly establish that Athene is on the verge of defaulting on Plaintiffs' benefits." *Id.* at 8–10. Defendants contend that the iceberg must be in sight and

_____

[7] *See* Investor.gov, *https://www.investor.gov/protect-your-investments/fraud/types-fraud/ponzi-scheme* ("Ponzi schemes are named after Charles Ponzi, who duped investors in the 1920s with a postage stamp speculation scheme").

even some minimal distance away from the Titanic. Indeed, the ship must be "on the verge" of hitting the iceberg before anyone has cause for complaint.

Not only do Defendants ignore the basic economic reality that concrete, measurable, compensable harms may attend an increased risk of failure, even when such failure is not "imminent." They also rely on inapposite caselaw to support their contention that a concrete injury requires an allegation that the annuity provider is facing "imminent failure." The decisions that AT&T cites deal with potential harms to pension *plans*, resulting from improvident financial decisions. *Id.* at 9. Those cases do not even purport to address the prospect that beneficiaries may be injured if they are relegated to unduly risky annuities.

In *Lee v. Verizon Commc'ns, Inc.*, the Fifth Circuit noted that "our sister circuits have concluded that constitutional standing for defined-benefit plan participants requires imminent risk of default *by the plan* . . . ." 837 F.3d 523, 546 (5th Cir. 2016) (emphasis added). In framing this point, the court in *Lee* noted that the argument before it was whether "constitutional standing requires allegations to support injury against an individual's benefit payments, *rather than injury to the plan as a whole*." *Id.* at 545 (emphasis added). In ruling that there was no constitutional case or controversy in that case, the court in *Lee* pointed out that the employer would be responsible for any underfunding that might result from the mismanagement of plan assets, with the PBGC as a further insurer of pension benefits: circumstances that are notably not present here. With the employer as the financial backstop, the possibility of actual future injury to individual current participants stemming from mismanagement of assets in the Verizon's defined-benefit plan was highly attenuated. *See id*. at 545–46. But the employer's and the PBGC's financial backstop is precisely what the PRT in this case takes away; the employer and

the PBGC are off the hook. While the *Lee* court's focus on whether there was an imminent prospect of default by the *plan* made sense in that context, it doesn't really bear on this case.

Similar to *Lee,* the Sixth Circuit's decision in *Duncan v. Muzyn*, found no Article III injury where "depleting the savings account did not put *the Plan* at risk of default." 885 F.3d 422, 428 (6th Cir. 2018) (emphasis added). Pointedly, the court in *Duncan* recognized that "a beneficiary under a defined-benefit plan suffers an injury only where the challenged action puts his defined benefits in jeopardy." *Id.* In this case, Plaintiffs' central allegation is precisely that: they allege that a fiduciary breach by Defendants has put their defined retirement benefits "in jeopardy."

In citing *Lee* and *Duncan*, Defendants by-pass a Fifth Circuit case that is more nearly on point. Twenty-five years ago, in a case that *did* involve an allegation that substandard annuities had exposed former pension holders to an undue risk of default, the Fifth Circuit described a plaintiff's claim that conflicts of interest had led plan fiduciaries to select a cut-rate annuity as follows:

> We agree that beneficiaries and participants whose plan is being terminated gain nothing from an annuity offered at a comparative discount by a provider that brings to the table a heightened risk of default. We would even add that the purchase of such an annuity can be considered an example of the imposition on annuitants of uncompensated risk—the risk of default is borne by the annuitants and, in those states that have guaranty associations, by those associations, while the benefit is granted to the sponsor in the form of a lower price and larger reversion.

*Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 298 (5th Cir. 2000).

With the benefit of perfect hindsight, the harms to the pension beneficiaries in *Bussian* were manifest; by the time that case was brought, the Executive Life Insurance Company had failed and some former pensioners had been stranded. *See id.* at 293. But hindsight is neither the norm, nor is it the legal standard, for gauging fiduciary misfeasance. As the First Circuit has noted:

> [U]nder ERISA, a fiduciary is required to act with "'the care, skill, prudence and diligence ... that a prudent man acting in a like capacity and familiar with such matters would use.'" *Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12, 18 (1st Cir.1998) (quoting 29 U.S.C. § 1104(a)(1)(B)). "[T]he test of prudence—the Prudent Man Rule—is one of *conduct,* and not a test of the result of performance of the investment." *Donovan v. Cunningham,* 716 F.2d 1455, 1467 (5th Cir.1983) (emphasis added) (quotation marks omitted). "[W]hether a fiduciary's actions are prudent cannot be measured in hindsight...." *DiFelice,* 497 F.3d at 424. The "test [is] how the fiduciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight." *Roth v. Sawyer–Cleator Lumber Co.,* 16 F.3d 915, 917–18 (8th Cir.1994) (quotation marks omitted).

*Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009).

ii.    The Dictum in *Thole*

There are pitfalls in reading too much into dicta, even from the Supreme Court. That said, given Defendants' heavy reliance on *Thole*, it bears noting the Defendants' argument ignores the language of the Supreme Court's dictum in *Thole.* Notably, the pertinent comment refers to "substantially *increased* risk," as opposed to some absolute quantum of risk. 590 U.S. at 546 (emphasis added). *Thole* does not say that plan members must be able to assign some absolute degree of probability, let alone a probability amounting to "imminent risk of default," in order to allege a cognizable injury.

The holding in *Thole* is that there was no case or controversy when a defined-benefit pensioner sought to challenge pension trustees' investment decisions, given that there was no well-pleaded allegation that the pensioner had suffered a tangible harm. In dicta, *Thole* noted that the case under consideration did *not* involve allegations that the challenged investment decisions had created a "substantially increased risk" of default. 590 U.S. at 546. The matter at bar, however, is precisely such a case: Plaintiffs contend that the selection of Athene as the annuity provider has resulted in a substantially increased risk of a default in the stream of payments they are entitled to receive, as compared to the risk with a prudently selected annuity provider.

The Supreme Court's dictum in *Thole* dovetails with the commonsense economics of the situation. The key point in *Thole* is that there was no allegation that the ultimate risk of non-payment of pension benefits had increased in any meaningful sense, let alone that such an increase could be weighed and considered to be "substantial." In arguing that this case is indistinguishable from *Thole*, Defendants ignore that Plaintiffs have alleged that Defendants violated their fiduciary duties by saddling Plaintiffs with a financial product that, Plaintiffs contend, is materially riskier than what Plaintiffs would otherwise have received.

> b.     Plaintiffs' Argument on Standing

Plaintiffs are also off the mark in their constitutional standing arguments, which rely on three purported injuries.

The first of these, "the reduced value today of their retirement benefits, which they suffered the moment of the Athene annuitization," comes closest to the mark. The reference to "reduced value" at least faintly conjures the notion of counterparty risk. But Plaintiffs' formulation mixes apples and oranges. Plaintiffs contrast the pension benefits that they had previously been guaranteed by AT&T (and ultimately the PBGC) with their rights under an annuity backed by Athene (with some backstop from SGAs). That's not what is at stake here. As noted above, Plaintiffs acknowledge, as they must, that PRTs are legal. Indeed, as discussed below, the decision whether or not to engage in a PRT is a settlor decision, and thus not subject to fiduciary standards under ERISA. As a practical matter, for Plaintiffs to allege a constitutionally cognizable injury, it must be based on harms associated with a breach of fiduciary duty or a prohibited transaction.

As the Eight Circuit noted in *Braden v. Wal-Mart Stores, Inc.*, "the question whether [a plaintiff] has a cognizable injury sufficient to confer standing is closely bound up with the question of whether and how the law will grant him relief." 588 F.3d at 591 (citing William A.

Fletcher, *The Structure of Standing,* 98 Yale L.J. 221, 239 (1988) ("[T]he question of whether plaintiff 'stands' in a position to enforce defendant's duty is .... determined by looking to the substantive law upon which plaintiff relies.")). The *Braden* decision cautioned, however, that it is crucial "not to conflate Article III's requirement of injury in fact with a plaintiff's potential causes of action, for the concepts are not coextensive." 588 F.3d at 591 (citing *Ass'n of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 152–54 (1970)).

Counsel for Plaintiffs pressed this point at oral argument, pointing out—correctly—that the Court may have jurisdiction over a case and controversy irrespective of the ultimate merits of a claim. For example, in a diversity case involving a car crash, the existence of a case or controversy does not depend on whether the injured person is ultimately able to prove their claim of negligence, or to prove that they have correctly identified the at-fault driver. As the First Circuit has noted, "[i]n order to establish standing, a plaintiff does not need to show that her rights have actually been abridged: such a requirement 'would conflate the issue of standing with the merits of the suit.'" *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 52 (1st Cir. 2014) (quoting *Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006)). Indeed, the Supreme Court has clarified that what might have been termed "statutory standing" is not really a matter of standing (in constitutional terms) but simply a question of whether the plaintiff "has a cause of action under the statute." *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118 (2014).

From this premise, Plaintiffs' counsel argued that the harm Plaintiffs allegedly suffered by being moved from a pension to an annuity *could* itself constitute a cognizable injury for purposes of constitutional standing, even though PRTs are legally permissible. Counsel argued that, because Plaintiffs' have alleged that they are worse off due to the PRT, they have suffered a

concrete injury and thus have *constitutional* standing, even if there is no statutory violation. This reasoning will not hold water.

The problem with Plaintiffs' contention is that the Court needs to decide whether the particular claims that Plaintiffs actually expect to litigate are justiciable.[8] It makes no difference to say that there *would* hypothetically be a case or controversy, if only there were a legal basis for challenging AT&T's decision to conduct a PRT (as opposed to challenging the exercise of fiduciary duty in selecting an annuity provider for that PRT). The question for the Court is whether the claims that Plaintiffs seek to litigate constitute a "case" or "controversy" within the ambit of Article III. As the Supreme Court has noted, "Our standing decisions make clear that 'standing is not dispensed in gross.' . . . To the contrary, 'a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'" *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008)) (internal quotation marks and other citations omitted). The pertinent inquiry focuses on the justiciability of the claims that appear as potentially viable allegations in the complaint.

Plaintiffs' second assertion, that they have been injured by "the invasion of their legal right to be free from fiduciary breaches, recognized under common law" does not help their cause at all. The central holding of *Thole* is that fiduciary breaches, in the abstract, are not the stuff of redressable injury for purposes of constitutional standing. Re-phrasing this as a "right to be free from fiduciary breaches" adds nothing.

---

[8] It does Plaintiffs no good to posit that the Court would have jurisdiction over a meritless challenge to AT&T's decision, as settlor, to conduct a PRT. Once that challenge has been summarily dismissed for failure to state a claim, the Court would still have to decide whether it has jurisdiction over Plaintiffs' remaining claims, which relate to alleged breaches of fiduciary duty in connection with the selection of a particular annuity provider.

Plaintiff's third assertion is that their injury consists of "the substantial risk that Plaintiffs will suffer future pocketbook injury upon Athene's default." Like their first claim of injury, this formulation blurs the boundaries of what is at stake here. By focusing on absolute risk—which Plaintiffs conclusorily label a "substantial risk"—Plaintiffs suggest that the Court's jurisdiction depends upon some quantification or assessment of absolute risk. This contention is in some respects a mirror image of Defendants' assertion that Plaintiffs must show an "imminent risk."

As discussed in detail below, the Complaint recites a litany of factors that, Plaintiffs contend, show a prospect that Athene may fail in the future. Plaintiffs point to such indicators as the pricing of debt offerings by Athene's parent company, or the purported laxness of Bermuda's regulation of the re-insurance market, or recent trends in Athene's reserves. But it is impossible, at least in a vacuum, to assess whether such allegations plausibly describe an impending likelihood of collapse (whether it is termed "substantial" or "imminent"). Again, given that PRTs are generally permissible, the issue in this case is *not* whether Plaintiffs' annuities are riskier than the pensions they previously received. Nor is it evident what yardstick the Court could use to measure whether the risks associated with this or any particular annuity are "substantial," as opposed to, say, "moderate," or "imminent." The question is whether the risks associated with this particular annuity are materially higher ("substantially increased"), as compared with the risks associated with an annuity that a dutiful fiduciary should properly have selected.

### C.    *Plaintiffs' Core Claim Alleges a Cognizable Injury*

When we strip away Plaintiffs' rhetoric about the evils of PRTs and the asserted superiority of pensions and PBGC guarantees over annuities issued by an insurance company, the core claim in the Complaint is that Defendants failed properly to exercise their duty to loyally and prudently select an appropriate annuity. (As discussed below, Plaintiffs contend that this means the "safest available annuity.") Such a selection process presumably required the fiduciary

to weigh a wide range of considerations, both in selecting the insurer and in determining the structure and form of the annuity agreement. In crude terms, Plaintiffs' key claim is that they received a second-rate insurance product (the Athene annuities) when a loyal and prudent fiduciary would have selected for them a less risky, and hence more valuable, product. Leaving aside whether Plaintiffs have adequately alleged the factual basis for such a claim, the harm described is a concrete, redressable injury.

It is commonplace that risks vary substantially among financial products. And it cannot seriously be disputed that a party suffers a cognizable injury when it receives a financial product that is riskier than what it is entitled to receive. This is point is obvious in the example of delivery of an B-rated bond when the contract called for a AAA-rated one. The same concept holds true—at least in the abstract[9]—for the insurance market. Other things being equal, insurance policies (including annuities) issued by companies that are at greater risk of default are less valuable than policies issued by higher-rated companies.

The AT&T Defendants attempt to brush off this point by noting that the annuities are non-assignable and hence cannot be resold in any market.[10] AT&T Mem., Docket No. 76 at 13. From this starting point, Defendants propose a considerable leap of logic and posit that commercial injuries are only cognizable in the context of marketable securities: "With such readily transferable interests, the concept of a 'market value' has independent meaning and

---

[9] Ratings and prices in the bond market are relatively transparent, so head-to-head comparisons are often straightforward. It is not obvious, however, whether insurance contracts can be compared so easily. As addressed in the merits discussion below, it remains to be seen whether Plaintiffs' allegations suffice to make out a non-speculative claim that the annuities they received are substantially riskier than other available products.

[10] Pension benefits under ERISA are not assignable. *See* 29 U.S.C. § 1056(d)(1) ("Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.").

provides a rational baseline for making inferences (and proving) bona fide injuries. Not so with Plaintiffs' non-transferable and non-tradeable pension payments." AT&T Reply Mem., Docket No. 113 at 5.

Defendants' argument overshoots the target. Alleging, and proving, the value of a financial instrument (transferable or not) does not necessarily depend on whether the instrument is readily marketable, or even marketable at all; although proof may be easier when there is a transparent market. Although none of the cases cited by the parties are precisely analogous, it cannot seriously be disputed that there is a diminution of value whenever financial instruments are materially riskier. This point is amply explicated in the context of a securities action, in the Second Circuit's decision in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 165–67 (2d Cir. 2012). As Judge Barrington Parker summed up the point, "basic securities valuation principles—discounting future cash flows to their present value using a rate of interest reflecting the cash flows' risk—belie the proposition that a fixed income investor must miss an interest payment before his securities can be said to have declined in 'value.'" *Id.* at 166. So too, in such disparate contexts as government contracts or construction projects, even without a default, the quality of security arrangements, and failures to provide adequate security, implicate material contract terms, the breach of which may be actionable. *Cf. Charter Env't, Inc. v. Shaw Env't, Inc.*, No. 07-CV-11609, 2009 WL 2982772, at *11 (D. Mass. Sept. 14, 2009) ("[Performance bond] requirement is material because '[b]onds and insurance constitute significant instruments of risk allocation that, if not procured or maintained in force, materially shift to the owner the risk of nonperformance.'") (quoting 5 Bruner & O'Connor Construction Law § 18:31). Along the same lines, in *Precision Pine & Timber, Inc. v. United States*, the Court of Claims upheld a contract termination when the insurance company that supplied a required

surety bond was removed from a Treasury Department list of approved bond providers. 62 Fed. Cl. 635, 647 (2004).

This brings us back to *Thole.* As discussed above, the key distinction in that case was between defined-benefit plans and defined-contribution plans. For defined-benefit plans, as long as an employer is still guaranteeing the future stream of payments, investment missteps by plan administrators are largely irrelevant to the pension recipient, except possibly when those missteps are so catastrophic as to create a substantially increased risk that the employer will be unable to make pension payments (and even then, the backstop of PBGC insurance may mitigate any actual impact on the pensioners). *See Thole*, 590 U.S. at 546 & n.2; *See Lee*, 837 F.3d at 545 (injury to defined-benefit plan participant is attenuated because employer bears the risk and any injury is uncertain because the PBGC protects participant's benefits). By contrast, in a defined-contribution plan, any investment misstep by Plan administrators may potentially harm beneficiaries unless, by luck, things turn out for the best.[11] *See Thole*, 590 U.S. at 542–43.

A decision to purchase annuities for former pensioners is much more akin to an investment decision in a defined-contribution plan than it is to a transaction in a defined-benefit plan. It is true that the *maximum* benefits to participants are capped at the level of the pension payments. But the investment risk associated with purchasing the financial instrument in question falls entirely on the beneficiaries. The risk of default (and the value of the annuity) is directly tied directly to the quality of the investment decision (i.e. choice of insurer and structure

---

[11] *See generally Fink v. National Savings & Trust Co.*, 772 F.2d 951, 962 (D.C. Cir. 1985) (a fiduciary who fails to investigate investment decisions is not liable for damages if he "happened—through prayer, astrology or just blind luck—to make ... objectively prudent investments") (Scalia, J., concurring in part and dissenting in part).

Typically, in cases involving alleged mis-management of defined contribution plans the parties (and courts) have the benefit of hindsight.

of the funding mechanism). To reiterate the Fifth Circuit's words in *Bussian*, "beneficiaries and participants whose plan is being terminated gain nothing from an annuity offered at a comparative discount by a provider that brings to the table a heightened risk of default . . . such an annuity can be considered an example of the imposition on annuitants of uncompensated risk." 223 F.3d at 298.

In this case, regardless of whether Plaintiffs intended to (or could) sell their annuities, they have alleged that they were entitled to receive annuities of the quality that a disinterested fiduciary would obtain on their behalf. Plaintiffs allege that they have not received what they are entitled to and that, instead, they have received financial products that are riskier. It seems obvious that an annuity recipient is immediately and concretely harmed if she receives an annuity with a "substantially increased risk" of default than what she is entitled to. This is just as true for former beneficiaries of a pension plan as it would be for the individual investor who hires an investment adviser to purchase an annuity on her behalf.

In short, there is in this case a justiciable case or controversy based on Plaintiffs' claim that they received less valuable (riskier) annuities than they would have received, but for alleged breaches of fiduciary duty by Defendants.

a.  Recent Decisions

The parties have directed the Court to a pair of recent decisions that have addressed the question of Article III standing in circumstances closely akin to this case, and which reached diametrically opposite conclusions: *Konya v. Lockheed Martin Corp.*, No. CV 24-750, 2025 WL 962066 (D. Md. Mar. 28, 2025), *motion to certify appeal granted*[12], No. CV 24-750, 2025 WL

_____

[12] On July 22, 2025, the Court in *Konya* granted a request to stay the case pending the resolution of an interlocutory appeal, finding, among other things, a "substantial basis for difference of

*Footnote continues on following page.*

2050997 (D. Md. July 22, 2025), and *Camire v. Alcoa USA Corp.*, No. CV 24-1062, 2025 WL 947526 (D.D.C. Mar. 28, 2025). Both cases involved claims brought by former plan participants against their employers for engaging in a PRT with Athene. And, in both cases, the Courts considered whether the window left open by *Thole* for standing based on a substantially increased risk of plan failure would be wide enough for their respective plaintiffs. *See Konya*, 2025 WL 962066, at *8; *Camire*, 2025 WL 947526, at *6.

> The Court in *Konya* found that the plaintiffs there had standing, writing that:

> Plaintiffs have adequately alleged facts, if only barely so, sufficient to conclude there is "a substantially increased risk" that Athene will fail and Plaintiffs' will suffer harm because of it. Moreover, it appears undisputed that their pensions are no longer guaranteed in full by the PBGC. Also, Plaintiffs' requested remedy— the posting of security and disgorgement—would serve to protect their ability to receive their vested retirement benefits. As such, the Court finds they have eked out sufficient injury-in-fact to establish standing.

*Konya*, 2025 WL 962066, at *9 (citations omitted).[13]

By contrast, the Court in *Camire* found that the plaintiffs lacked standing and dismissed their claims. There, they wrote: "To establish a sufficiently increased risk of harm, the plaintiff must allege '*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account.' *Camire*, 2025 WL 947526, at *7, quoting *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007). Thus, the Court in *Camire* wrote:

---

opinion" among the district courts on the issue of Article III standing. No. CV 24-750-BAH, 2025 WL 2050997.

[13] The wording of the decision in *Ko*nya suggests that, in finding concrete injury, the court may have conflated the potential harm associated with the decision to conduct a PRT with the harm associated with an alleged breach of fiduciary duty in selecting the annuity provider. The comment that "their pensions are no longer guaranteed in full by the PBGC" refers to a "harm" that is inherent in any PRT and is not plausibly attributable to any breach of fiduciary duty in the course of implementing a PRT.

> Plaintiffs fail to make the necessary allegations to show an imminent risk of harm. At a high level, the allegations in the complaint are comparative—focusing on why Athene is riskier than other annuity providers, ECF No. 28 ¶¶ 51–79—rather than absolute. Plaintiffs do not allege that Athene is at a *high* risk of failure—just that it is at a *higher* risk of failure than other annuity providers. While these allegations, accepted as true, may suffice to establish "a *substantially* increased risk of harm," they fail to show "a *substantial* probability of harm with that increase taken into account." *Pub. Citizen, Inc.*, 489 F.3d at 1295. Put simply, because Plaintiffs never allege that Athene is substantially likely to fail—just that it is at a greater risk of failure than its competitors—they have failed to establish standing on the basis of an increased risk of harm.

*Camire*, 2025 WL 947526, at *7.

As reflected above, I reach my recommendation by a different route. Both *Konya* and *Camire* purport to gauge risk of default in absolute terms, and differ as to whether such a showing has been made. Indeed, *Camire* expressly finds the allegations at issue insufficient because they only show that Athene is at "greater" risk than its competitors and rejects comparative risk as a measure of concrete harm.

With respect, I think both *Konya* and *Camire* misgauge the distinction between annuities (on the one hand) and benefits under a defined-benefit plan (on the other). In my view, delivery of less valuable—that is, riskier—annuities as a result of alleged breaches of fiduciary duty by Defendants constitutes an actual injury for Article III standing. That the origin of the transaction was a PRT matters little. The key point is that the persons and entities selecting the annuities owed a fiduciary duty to the former beneficiaries of the Plan (and *only* to those former beneficiaries) to purchase for them a suitably safe annuity and not a riskier one.

## III.    Legal Sufficiency

Defendants' motions to dismiss require the Court to consider the legal sufficiency of Plaintiffs' allegations that one or both Defendants violated ERISA, based on allegedly disloyal or imprudent fiduciary conduct, or based on violation of ERISA's prohibited transaction rules. For

the reasons detailed below, I conclude that the well-pleaded factual allegations of the Complaint do not state a plausible claim for relief:

- Plaintiffs' allegations of corporate/financial entanglements are insufficient to plausibly suggest disloyalty;

- Plaintiffs' contention that only a dishonest or imprudent fiduciary could have selected Athene as an annuity provider rests on an incomplete, and thus unpersuasive, foundation. Notably, Plaintiffs' allegations omit one of the key selection criteria from the Department of Labor ("DOL") guidance that Plaintiffs claim to rely on; and

- Plaintiffs' prohibited transaction claims are unsupported by factual allegations that would support their contentions that SSGA and/or Athene were "parties in interest" within ERISA's statutory definitions. Further, Plaintiff's allegation that the PRT, which is explicitly permitted by ERISA, is a categorically prohibited transaction does not state a claim.

### A.    *Legal Standard for Motions to Dismiss*

#### 1.    *Rule 12(b)(6)*

"Dismissal of a complaint pursuant to Rule 12(b)(6) is inappropriate if the complaint satisfies Rule 8(a)(2)'s requirement of 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 11–12 (1st Cir. 2011) (quoting Fed. R. Civ. P. 8(a)(2)). "A short and plain statement needs only enough detail to provide a defendant with fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* at 12 (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Still, "in order to 'show' an entitlement to relief a complaint must contain enough factual material 'to raise a right to relief above the speculative level on the assumption

that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quoting *Twombly*, 550 U.S. at 555). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))).

To apply these standards, the Court "employ[s] a two-pronged approach." *Ocasio-Hernández*, 640 F.3d at 12. To begin, it must "identify[] and disregard[] statements in the complaint that merely offer "legal conclusions[s] couched as . . . fact[]" or "[t]hreadbare recitals of the elements of a cause of action." *Id*. (first and second alterations added) (quoting *Iqbal*, 556 U.S. at 678). "Non-conclusory factual allegations in the complaint must then be treated as true, even if seemingly incredible." *Id*. (quoting *Iqbal*, 556 U.S. at 681). "If that factual content, so taken, 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' the claim has facial plausibility." *Id*. (quoting *Iqbal*, 556 U.S. at 678). The resulting inquiry demands a "context-specific" approach, asking the Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

While the Court is required to "indulg[e] all reasonable inferences in [the plaintiff's] favor," it is not required to accept a complaint's "bald assertions" and "unsubstantiated conclusions." *See Fantini v. Salem State Coll.*, 557 F.3d 22, 26 (1st Cir. 2009) (first quoting *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006); and then quoting *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008)); *see also Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014) (applying "two-step approach" of constructively stripping complaint of conclusory allegations and assessing claim plausibility based only on surviving allegations).

**B.    *Statutory Standards: Elements of an ERISA Claim***

Plaintiffs invoke ERISA § 404(a), which sets standards for plan fiduciaries, ERISA § 406, and 29 U.S.C. § 1106, which enumerates prohibited transactions. A brief review of these provisions will set the table for the more detailed discussion that follows.

*1.    Fiduciary Duty under ERISA*

It is essential to consider *which* aspects of the PRT implicate fiduciary responsibilities under ERISA, as opposed to settlor functions. *Pegram*, 530 U.S. at 226 ("In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."). Settlor functions are generally subject to an employer's discretion; it is an employer's choice whether to offer a pension plan and how to fund it. Selection of appropriate investments (including annuities), however, involves fiduciary responsibilities governed by § 404 of ERISA.

For fiduciary functions, broadly speaking, "ERISA section 404(a) . . . imposes two duties upon a fiduciary: the duty of loyalty and the duty of prudence." *Ellis v. Fid. Mgmt. Tr. Co.*, 257 F. Supp. 3d 117, 126 (D. Mass. 2017), *aff'd*, 883 F.3d 1 (1st Cir. 2018).

Beginning with loyalty, section 404(a) "requires an ERISA fiduciary to . . . 'discharg[e] his duties with respect to a plan solely in the interest of the participants.'" *Id.* (quoting 29 U.S.C. § 1104(a)(1)). This means that, although "an accompanying benefit to the fiduciary is not impermissible," the fiduciary cannot "place its own interests ahead of those of the Plan beneficiary." *Id.* (quoting *Vander Luitgaren v. Sun Life Assurance Co. of Can.*, 765 F.3d 59, 65 (1st Cir. 2014)). "Accordingly, to succeed on a claim for breach of the duty of loyalty, a plaintiff needs to show that the fiduciary served an interest or obtained a benefit at the expense of the plan

31

beneficiaries." *Id.*; *see also Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 40 (1st Cir. 2018) ("[I]n reviewing ERISA duty of loyalty claims, we have asked whether the fiduciary's 'operative motive was to further its own interests.'") (quoting *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 6 (1st Cir. 2018)).

For the duty of prudence, ERISA requires that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). Thus, a "fiduciary must, among other things, follow a 'prudent man standard of care.'" *Watson v. Deaconess Waltham Hosp.*, 298 F.3d 102, 109 (1st Cir. 2002).

As discussed below, the Department of Labor has issued guidance, in the form of an interpretative bulletin, that is central to the consideration of prudent decision making in selecting an annuity provider for a PRT. *See* Interpretive Bulletin Relating to the Fiduciary Standard Under ERISA When Selecting an Annuity Provider, IB 95-1, 29 C.F.R. § 2509.95-1(c) (1999) ("IB 95-1"). Although IB 95-1 is not binding on the Court, it is persuasive. *Cf. Bussian*, 223 F.3d at 296 (noting, with respect to IB 95-1 that "interpretations in opinion letters and similar documents are . . . 'entitled to respect' . . . but only to the extent that those interpretations have the 'power to persuade.'") (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (internal quotations and citations removed)). As noted below, Plaintiffs treat IB 95-1 as authoritative. *See* Complaint ¶¶ 68–71.

### 2.    *Prohibited Transactions*

In addition to imposing fiduciary duties, ERISA designates certain kinds of transactions, such as transactions that involve conflicts of interest, as "prohibited transactions." While ERISA provides for various exceptions to such prohibitions, the Supreme Court has made clear that those exceptions are typically affirmative defenses, which may be raised by a Defendant.

Plaintiffs are not required to rebut such affirmative defenses in an initial complaint. *See*

*Cunningham v. Cornell Univ.*, 145 S. Ct. 1020, 1025 (2025).

> 3.    *Statutory Standing to Sue under ERISA*

ERISA includes several provisions that address parties' standing to sue plan

administrators—including for breach of fiduciary duty and prohibited transactions.[14] The parties

dispute *which* of those provisions applies here.

By its terms, § 1132(a)(9) plainly applies. It expressly addresses the standing of former

plan participants who now find themselves annuity holders:

> (9) in the event that the purchase of an insurance contract or insurance annuity in connection with termination of an individual's status as a participant covered under a pension plan with respect to all or any portion of the participant's pension benefit under such plan constitutes a violation of part 4 of this title or the terms of the plan, by the Secretary, by any individual who was a participant or beneficiary at the time of the alleged violation, or by a fiduciary, to obtain appropriate relief, including the posting of security if necessary, to assure receipt by the participant or beneficiary of the amounts provided or to be provided by such insurance contract or annuity, plus reasonable prejudgment interest on such amounts;

29 U.S.C. § 1132 (a). *See generally Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1455 (9th Cir.

1995) ("The Pension Annuitants Protection Act of 1994 ("PAPA"), Pub.L. No. 103–401 (Oct.

22, 1994), amends ERISA § 502(a), 29 U.S.C. § 1132(a), to clarify that former participants or

beneficiaries of terminated pension plans have standing to seek relief where, as here, a fiduciary

breach has occurred involving the purchase of insurance contracts or annuities in connection

with their termination as plan participants.").

It is less obvious whether Plaintiffs can also claim standing as "plan participants" under

§§ 1132(a)(1)–(3). Given that Plaintiffs have statutory standing under § 1132(a)(9), however,

---

[14] As discussed above, statutory standing implicates different questions from the Article III constitutional standing (injury in fact) issues discussed above.

there is no need to decide the issue.[15] The distinction as to which subsections govern might potentially be relevant in considering what kinds of "equitable relief" (for instance, disgorgement) may be sought. But, given that Plaintiffs have not stated a viable claim for breach of fiduciary duties, the distinction here would be without a difference.

## IV.    AT&T's Decision to Enter into a PRT is not a Fiduciary Matter

Before delving into the Complaint's allegations regarding breach of fiduciary duties and prohibited transactions, a brief pit-stop is in order, to clarify that AT&T's decision whether to enter into the PRT is not at issue in this case.

Much of the Complaint is devoted to a discussion of the presumptive superiority of pension benefits over annuity payments. *See, e.g.,* Complaint ¶¶ 47–66. For example:

> 164. Before the AT&T-Athene-State Street transaction, the risk that Plaintiffs would not receive the pension benefits to which they were entitled was negligible. There was no realistic probability that the Plan would not be sufficiently funded to pay the benefits *and* that AT&T would fail *and* that the PBGC—which has billions of dollars of cash on hand and which is effectively backed by the federal

---

[15] The legislative history of PAPA reflects that the addition of § 1132(a)(9) was intended to clarify, rather than supplement, the preexisting standing provisions of § 1132. It is, however, the language of the statute that controls, which leaves us with the question whether someone who was a plan participant at the time of the alleged fiduciary breach can bring suit under §§ 1132(a)(1–3) if they are no longer participants at the time of filing.

In *Konya*, the district court concluded that because the plaintiffs were plan participants at the time of the alleged breaches of fiduciary duty, they had statutory standing. 2025 WL 962066, at *14. In particular, the *Konya* decision cited the First Circuit's comment in *Waters Corp. v. Millipore Corp.*, to the effect that "[i]t would substantially undermine the protection ERISA gives to pension fund participants if individuals who are owed benefits stemming from their participation in one plan were foreclosed from challenging actions related to the transfer of those benefits to a new plan." 140 F.3d 324, 326 (1st Cir. 1998). There is considerable appeal to this line of reasoning. On the other hand, the cases cited in *Konya* don't bear directly on the issue. It is one thing to say, as the First Circuit did in *Millipore*, that plan participants still have standing to sue, even if their plan has been changed. It is another thing to say that former plan participants still have standing to sue even if they are no longer plan participants at all.

government—would fail to pay Plaintiffs' benefits. There was no safer place for their pension benefits.

165. After the transaction, the risk that Plaintiffs will not receive the benefits to which they are entitled is substantial. Because of the transaction, Plaintiffs are no longer members of the Plan, and their retirement benefits are no longer backed by the Plan, AT&T, or the PBGC. Their pension benefits were safer in the hands of AT&T or the PBGC, and thus, the risk assumed by Plaintiffs and other AT&T retirees is greater than even the difference in the risk between Athene and traditional annuity providers. . . .

Complaint ¶¶ 164–65.

Even assuming Plaintiffs are correct that pension payments are more certain, and hence more valuable, than annuity payments, the general merits of PRTs are matters for legislative, not judicial, judgment. ERISA is a comprehensive regulatory statute that addresses a wide array of employment benefits, including health and retirement plans. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90–91 (1983). Congress has not seen fit to prohibit employers (plan sponsors) from terminating employees' pension rights and replacing them with pre-paid annuities. On the contrary, the Supreme Court has made clear "that an employer's decision *whether* to terminate an ERISA plan is a settlor function immune from ERISA's fiduciary obligations." *Beck v. PACE Int'l Union*, 551 U.S. 96, 101 (2007). "Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss– Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78 (1995); *see also Lee*, 837 F.3d at 537 ("Consistent with Beck, therefore, we consider the decision to transfer pension assets outside ERISA coverage as a sponsor decision immune from fiduciary obligations."); *American Flint Glass Workers Union, AFL–CIO v. Beaumont Glass Co.,* 62 F.3d 574, 579 (3d Cir. 1995) ( "A decision to terminate a plan is 'unconstrained by the fiduciary duties that ERISA imposes on plan administration.' ") (quoting *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1162 (3d Cir.1990)); *Adams v. Avondale Industries, Inc.,* 905 F.2d 943, 947 (6th Cir. 1990) ("[A]

company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan.").

The principle that settlor functions are not themselves subject to fiduciary standards largely forecloses any claim against AT&T based on the decision to conduct at PRT. PRTs are permissible under ERISA. There is no prohibition on PRTs and the text of the statute contemplates that employers will make such arrangements, as reflected in ERISA's express provision permitting former-participants to sue "in the event that the purchase of an insurance contract or insurance annuity in connection with termination of an individual's status as a participant covered under a pension plan . . . constitutes a violation . . . ." 29 U.S.C. § 1132(a)(9). The associated regulations reflect this as well:

> (ii) An individual is not a participant covered under an employee pension plan or a beneficiary receiving benefits under an employee pension plan if—
>
> (A) The entire benefit rights of the individual—
>
> (1) Are fully guaranteed by an insurance company, insurance service or insurance organization licensed to do business in a State, and are legally enforceable by the sole choice of the individual against the insurance company, insurance service or insurance organization; and
>
> (2) A contract, policy or certificate describing the benefits to which the individual is entitled under the plan has been issued to the individual . . . .

29 C.F.R. § 2510.3-3. *See generally Lee*, 837 F.3d at 538 ("ERISA provisions, as well as regulations promulgated by the Department of Labor, set forth several mechanisms by which an employer may remove liabilities from a pension plan, one of which is through transfer to an insurance company by an annuity purchase.").

There is no dispute in this case that the annuity transaction at issue here complied with the requirements of 29 C.F.R. § 2510.3-3 by transferring the entire benefit rights of the Plaintiffs

and by satisfying the other requirements for removal from the Plan. Thus, no viable claim can rest on a challenge to AT&T's decision to undertake a PRT, per se.

For all the Complaint's focus on the supposed ills of PRTs, Plaintiffs do not actually contest the core point that PRTs are in fact legal and there is no serious dispute that the decision to conduct a PRT is not subject to fiduciary standards. Instead, Plaintiffs point out that a PRT does not extinguish all fiduciary functions. *See* Docket No. 91 at 32. As another session of this Court has noted, "[a] distinction must be drawn . . . between the decision to terminate a plan and the manner in which that decision is implemented. Although fiduciary duties do not govern the decision to terminate, courts have held plan trustees subject to fiduciary duties in making post-termination implementation decisions." *Jackson v. Truck Drivers' Union Loc. 42 Health & Welfare Fund*, 933 F. Supp. 1124, 1143 (D. Mass. 1996).

In cases where an employer selects the annuity provider, that selection process is subject to the fiduciary duties of loyalty and care. *See Pilkington PLC v. Perelman,* 72 F.3d 1396, 1401–1402 (9th Cir.1995) (employer's choice of annuity provider for pension plan post-termination is subject to ERISA's fiduciary duty of loyalty); *Beaumont Glass Co.,* 62 F.3d at 579 (assuming "once a termination decision is reached, that ERISA's fiduciary duties control the termination procedures"); *Waller v. Blue Cross of California*, 32 F.3d 1337, 1342 (9th Cir. 1994) ("The choice of an annuity provider is the quintessential exercise of 'discretionary control.'") (quoting 29 U.S.C. § 1002(21)(A)).

In moving to dismiss Count I, which charges breach of fiduciary duty, the AT&T Defendants emphasize that they did not select Athene as the annuity provider and that they hired the SSGA Defendants to serve as the independent fiduciary responsible for selecting an annuity

provider. This, the AT&T Defendants contend, shields them from any fiduciary responsibility for the selection of Athene. *See* AT&T Mem., Docket No. 76 at 15–16.

Plaintiffs, in turn, suggest that the AT&T Defendants are merely "finger-pointing" and that the hiring of the SSGA Defendants does not absolve them of their fiduciary responsibilities. Docket No. 91 at 32. Plaintiffs are at pains to note that while the Complaint acknowledges that the AT&T Defendants hired SSGA to act as an "independent fiduciary," Plaintiffs do not agree that SSGA properly fulfilled that role. *Id.* at 34. The Complaint alleges that any attempted hand-off of fiduciary responsibility was incomplete: that conflicted loyalties and prohibitions against self-dealing abound. This, Plaintiffs contend, leaves the AT&T Defendants as fiduciaries, or at least co-fiduciaries, with respect to the alleged impropriety of selecting Athene as the annuity provider.

Plaintiffs offer main two lines of argument in support of their contention that AT&T's delegation to SSGA does not fully shield AT&T from fiduciary responsibilities. The first line of argument is a frontal assault, which rests on Plaintiffs' contention that the Complaint plausibly alleges "that AT&T was a plan fiduciary as to the Athene transaction." *Id*. at 32. The second line of argument, which is mainly addressed to Counts II and III, is premised on various forms of derivative liability, such as knowing participation, failure to monitor, enabling a breach by a co-fiduciary, and failure to meet fiduciary standards in selecting SSGA to serve as independent fiduciary. For these derivative claims, there must first be a valid claim for breach of fiduciary duty. Thus, it makes sense to first consider whether the Complaint sets forth legally sufficient allegations of fiduciary breach.

Turning to Plaintiffs' frontal assault, they posit that because the AT&T Defendants ultimately executed the PRT transaction, those Defendants necessarily "chose to purchase

annuities from Athene," and so, Plaintiffs assert, this is tantamount to having "selected Athene as the annuity provider." *Id.* In Plaintiffs' view, the AT&T Defendants "always retained control to (a) not contract with Athene, (b) purchase annuities from another insurer instead, and (c) not annuitize at all." *Id.* In other words, the AT&T Defendants were in a position, right up to the moment the PRT transaction was consummated, to ignore the advice provided by SSGA and to choose some other annuity provider, or to slam the brakes and cancel the whole transaction. This, Plaintiffs contend, means that the employer must perforce be deemed a fiduciary, on the theory that the ability to cancel implies responsibility for the entire fiduciary process.

Plaintiffs' AT&T-could-have-cancelled-the-PRT argument is unpersuasive. First of all, it is circular. To accept Plaintiffs contentions would mean that every settlor, because it *could* cancel a planned PRT, must automatically be deemed a fiduciary. Such an approach would erase all distinctions between a settlor (on the one hand) and an administrator with fiduciary responsibilities under ERISA (on the other). To adopt this argument would expand fiduciary obligations to cover all aspects of an employer's activities, which is simply not a workable reading of the statute. Second, this approach cannot be reconciled with *Beck*, which recognizes that the settlor function is not governed by ERISA's fiduciary standards, although the selection of an annuity provider is. 551 U.S. at 102. *See also Lee*, 837 F.3d at 537–38 (5th Cir. 2016) (rejecting as "unsupported by any authority" the argument "that any action which disposes of plan assets creates fiduciary obligations").

Of course, a plan sponsor's ability to cancel a PRT may ultimately be part of the analysis, in considering various theories of *derivative* liability. For instance, an employer may face liability if it goes forward with a PRT after learning that there has been a breach of fiduciary in the selection of the annuity provider. But merely alleging that the employer wrote the check,

after an independent fiduciary selected the annuity provider, does not make out a claim for violation of fiduciary duty.

## V.    Alleged Violations of Fiduciary Duty

As noted above, Fiduciary obligations under Section 404(a) of ERISA encompass the duty of loyalty and the duty of prudence. *See* 29 U.S.C. § 1104(a)(1)(A)–(B). The Complaint alleges that Defendants breached both duties. After I discuss the Plaintiffs' claims in this overarching framework, I will return to the specific transactions at issue and address each count in the Complaint. Finally, in the last section of this report, I will turn to Plaintiffs' claims that Defendants engaged in prohibited transactions.

### A.    Duty of Loyalty

Plaintiff's breach of loyalty allegations are based on allegations about the business relationships between and among SSGA, AT&T, and Athene. Plaintiffs contend that these relationships were such that SSGA could not be expected to function as a disinterested fiduciary. As discussed below, the factual allegations of the Complaint fail to make out a plausible claim of impermissible conflict(s) of interest.

#### 1.    Hiring of an Independent Fiduciary

Before exploring the particular relationships that Plaintiffs suggest demonstrates conflicts of interest, a brief detour is in order to discuss potential conflicts that are inherent in many PRT transactions. The most obvious inherent conflict arises in circumstances when a PRT extinguishes the entirety of an employer's pension liabilities. When a plan is "over-funded" there is more money in an ERISA plan than would be needed to purchase annuities for all plan participants, so when the plan is terminated the excess may be paid to the employer. In such circumstances, the amount the employer receives would be directly linked to the price of the annuities purchased; every dollar "saved" on the annuities ends up in the employer's pocket.

40

This was the circumstance that the Fifth Circuit identified in the *Bussian* case, where the defendant, RJR Nabisco, stood to gain by purchasing a less expensive annuity, one offered by Executive Life Insurance Company. As the court noted, "[b]ecause an employer may, consistent with ERISA's provisions, receive a plan's surplus upon termination, the fact that the employer terminates a plan specifically to gain access to that surplus is not a violation." *Bussian*, 223 F.3d at 295.[16]

While ERISA contemplates that employers may be required to make fiduciary decisions in circumstances where also they stand to benefit monetarily, fiduciary responsibilities must take precedence. As the Supreme Court has noted, "[u]nder ERISA . . .a fiduciary may have financial interests adverse to beneficiaries. . . . ERISA does require, however, that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225 (citations omitted).

In *Bussian*, the Fifth Circuit, reversing the district court's grant of summary judgment for the defendant, pointed to evidence that RJR officials had pressed their consultant to include Executive Life on a list of candidates for the annuity contract, even though the consultant had previously decided that Executive Life should not be included in the initial list of companies to

---

[16] By contrast with the situation in *Bussian*, there is no allegation in this case that the entire Plan is being terminated or that any Plan assets will revert to AT&T. Nonetheless, there may be significant indirect financial benefits to AT&T. For instance, if the PRT saves money for the Plan, that would reduce the amount of money AT&T might ultimately be liable to pay into the Plan to meet its obligations. Such a reduction in contingent liabilities would undoubtedly appear in the company's financial statements. This may be the basis for the allegation that "AT&T recognized a gain that the company valued at $363 million; reaped hundreds of millions of dollars' worth of profit; and secured an economic benefit from selecting a lower-cost annuity provider." Complaint ¶ 10.

bid (233 F.3d at 289–90) and even though the consultant "did not think that 'Executive Life should be seriously considered in the final bidding process.'" 223 F.3d at 303. Ultimately, the court in *Bussian* concluded, there was trial-sufficient evidence that price—rather than regard for the interests of beneficiaries—had dictated the selection of Executive Life. *See id.* at 306 ("There is evidence in the record that of the final four companies, RJR first used price to reduce the field to two, and then simply went with the lowest bidder.").

Pointedly, the court in *Bussian* cited decisions from the Seventh Circuit and Second Circuit which discuss the conflicting pressures that corporate executives may face as ERISA trustees during corporate takeover battles. Both decisions emphasize the need for scrupulous and independent investigations and suggest that the best course might be to appoint an independent trustee. 223 F.3d at 299 (citing *Leigh v. Engle*, 727 F.2d 113, 125–26 (7th Cir. 1984) and *Donovan v. Bierwirth,* 680 F.2d 263, 271–72 (2d Cir.) (1982)). Thus, the court noted in *Bussian*, "[i]n some instances, the only open course of action may be to appoint an independent fiduciary." 223 F.3d at 299.

The Complaint acknowledges that AT&T has, in this case, taken precisely the precautionary step recommended in *Bussian*: hiring an independent fiduciary. Complaint ¶ 38 ("In connection with the challenged transaction, AT&T and AT&T Services contracted with State Street to serve as an "independent fiduciary" to the Plan . . . ."). Nonetheless, the Complaint alleges, the hiring of SSGA was merely window-dressing which did not yield an unbiased decision. Complaint ¶ 153 ("Although State Street was nominally engaged by AT&T to provide independent fiduciary advice about selecting the safest annuity available in satisfaction of fiduciary obligations, State Street's true role was to give the appearance of legitimacy to their selection of Athene as an annuity provider.").

The Complaint alleges that corporate connections between and among AT&T, SSGA, and Athene (and its parent company Apollo), created an unacceptable web of conflicting interests:

> On information and belief, the AT&T Defendants selected State Street in part based on the companies' existing corporate relationships rather than an objective and thorough investigation of alternatives and failed to consider how State Street's relationship with Apollo and Athene would impair its ability to discharge its duties as an independent fiduciary solely in the interest of Plan participants.

Complaint ¶ 189. The Court must, accordingly, review the Complaint to determine whether its factual allegations provide inferential support for the Complaint's conclusory assertion, "on information and belief" that SSGA's business interests made it unsuitable to serve as an independent fiduciary.

### 2.    Factual Allegations Regarding Potential Conflicts

Plaintiffs allege that Defendants were conflicted because of "corporate relationships" amongst AT&T, SSGA, and Athene and that their allegations of such relationships plausibly support an inference that Defendants favored their own corporate interests over the interests of the Plan and its participants. Complaint ¶ 127–130, 180 ("[AT&T] breached their duty of loyalty by favoring their own corporate interests"), 189 ("AT&T Defendants selected State Street in part based on the companies' existing corporate relationships"); 196 ("[SSGA] breached its duty of loyalty by favoring its own corporate interests"). Beyond these conclusory assertions, the Complaint includes several factual allegations that purport to support the charge of disloyalty. As discussed below, none of these allegations, alone or together, are enough to plausibly state a claim.

### i.    AT&T's Financial Interest in the PRT

At the outset, it bears noting the Complaint repeatedly emphasizes a circumstance that does *not* support any inference of fiduciary disloyalty: the fact that AT&T stood to save money

by providing annuities for some Plan participants, rather than keeping them as pensioners. *See* Complaint ¶¶ 148–49. As discussed above, that was a settlor decision, not a fiduciary matter. So, the bare fact that AT&T, presumably, expected to save money cannot be taken as suggesting disloyalty.

ii.    SSGA's Role as a Paid Fiduciary

The Complaint alleges that SSGA, which was selected to serve as an independent fiduciary to choose an annuity provider, gets paid for its services in fees that amount to millions of dollars, that SSGA is in the business of providing PRT annuity selection services, that SSGA has provided services to *other* benefit plans connected to AT&T, and that SSGA competes for business, seeking to be engaged as an independent fiduciary. For example, the Complaint recites, "State Street and its affiliates have provided trustee, investment manager, and independent fiduciary services for the AT&T Stock Fund in AT&T's defined contribution plans" and received $9 million "for services performed for the AT&T Savings Plan Master Trust." Complaint ¶ 127.

First, allegations that SSGA is in the business of providing independent fiduciary services, and gets paid for such work, do not plausibly suggest disloyalty. On the contrary, it is reasonable to assume that any company contemplating an $8 billion PRT transaction would seek out the services of a large, experienced, financial adviser with experience in such matters. There is nothing in these circumstances that plausibly supports an inference of disloyalty.

Plaintiffs also suggest that SSGA specifically was motivated by a desire to bolster its reputation as an independent fiduciary who will save companies money by selecting cheap annuities. Docket No. 91 at 62. The Plaintiffs point to SSGA's advertisements for its independent fiduciary services and emphasize that SSGA has selected Athene at least ten times since 2018. Complaint at ¶ 131–35, 156. The absence of a relevant denominator is telling.

According to the webpage[17] cited in the Complaint, SSGA has over 35 years of experience in this area, conducting over 80 PRTs. *See* Complaint ¶ 131. *Cf. Lister v. Bank of Am., N.A.*, 790 F.3d 20, 22 (1st Cir. 2015) ("The district court acted well within its discretion when it examined copies of land records that were expressly referred to in the complaint."). Contrary to Plaintiffs' conclusory assertions, the mere fact that SSGA is in the business of providing independent fiduciary services does not necessarily suggest that it acted disloyally in providing those services, or that AT&T was disloyal in selecting SSGA as independent fiduciary. Plaintiff's theory is speculative and conclusory, and so it fails to establish anything more than a "sheer possibility" that Defendants acted disloyally. *See Iqbal* 556 U.S. at 678.

iii.    Corporate Relationships Between AT&T, SSGA, and Athene

The Complaint alleges that corporate relationships created conflicts that engendered disloyalty in selecting an annuity provider for the PRT. On one end, Plaintiffs look to the services that SSGA has provided to other AT&T benefit plans, as just described. Plaintiffs' Opp. at 8; Complaint ¶ 127. On the other end, they allege that SSGA "offers a financial product backed by Athene" and "provides custodial services for Athene's insurance products." *Id.* ¶ 154. Further, Plaintiffs allege a corporate relationship between AT&T and Apollo, Athene's parent company:

> On June 5, 2023, just a month after the PRT transaction at issue, Athene's parent company, Apollo, announced that it agreed to invest $2 billion in preferred equity securities issued by a subsidiary of AT&T, AT&T Mobility II LLC ("AT&T Mobility"). AT&T Mobility will use those assets to partially replace $8 billion of outstanding preferred membership interests. Before the June 2023 announcement, the Plan also entered into put option agreements in February and April 2023 whereby AT&T Mobility or another subsidiary of AT&T would repurchase

---

[17] How Independent Fiduciary Services Evolved and What it Means Today, available at https://www.ssga.com/us/en/institutional/insights/how-independent-fiduciary-services-evolved (last visited August 11, 2025).

> approximately $5.5 billion in preferred membership interests. Although the AT&T Mobility deal with Athene closed on June 15, 2023, on information and belief, Apollo and AT&T were negotiating the terms of this deal when Athene was selected and the PRT transaction at issue was completed.

*Id*. ¶ 128.

The mere existence of a business relationship does not suggest that a party would act disloyally. *See Turner v. Schneider Elec. Holdings, Inc.*, 530 F. Supp. 3d 127, 135 (D. Mass. 2021) (allegations of a "long-standing business relationship" were not sufficient to raise claim of breach of a fiduciary duty above speculation); *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *14 (S.D.N.Y. Oct. 7, 2019) ("Put simply, the mere existence of a business relationship between two large financial institutions is not enough to lift Plaintiffs' otherwise deficient disloyalty claims above the bar set by *Twombly*, 550 U.S. at 570. More is needed."). The Complaint fails to bring to light any facts that would suggest how, beyond sheer speculation, these interactions between parent and subsidiary entities affected AT&T's selection of SSGA or the selection of Athene.

To put it differently, the mere existence of a potential conflict does not itself state a claim for disloyalty. Indeed, ERISA permits plan fiduciaries to hold multiple roles, some of which may conflict with the individual's fiduciary duties. *See Pegram*, 530 U.S. at 225 ("Employers, for example, can be ERISA fiduciaries and still take actions to the disadvantage of employee beneficiaries, when they act as employers (*e.g.,* firing a beneficiary for reasons unrelated to the ERISA plan), or even as plan sponsors (*e.g.,* modifying the terms of a plan as allowed by ERISA to provide less generous benefits)"); *Allen v. Wells Fargo & Co.*, 967 F.3d 767, 776 (8th Cir. 2020) ("the fact that some fiduciaries also hold high-ranking positions in the company is insufficient to create a plausible inference that Appellees failed to act loyally due to conflicts of interest."). The facts alleged in the Complaint do no more than recite the bare facts that such

relationships existed, this is insufficient to create a plausible inference that any fiduciary acted disloyally because of a conflict.

iv.    State Street's Ownership of Corporate Shares

The centerpiece of the Complaint's allegation of disloyalty is its identification of SSGA as a major shareholder of both AT&T and Athene's parent company, Apollo. The Complaint announces with a flourish that "State Street is also ranked as the third largest institutional shareholder of AT&T, owning 305,826,819 shares of AT&T valued at $5,202,114,000 as of December 31, 2023. State Street maintained the same ranking among institutional investors in 2022." Complaint ¶ 127. As for State Street's relationship with Athene, Plaintiffs trumpet that "State Street is also one of the largest shareholders of Apollo. As of December 31, 2023, State Street was the seventh largest institutional investor of Apollo, owning 10.31 million shares valued at $1.1 billion." Complaint ¶ 129.

The point is wholly meretricious.

While Plaintiffs' allegations about the size of State Street's holdings must be taken as true at the 12(b)(6) stage of the case, the Court is not required to abandon common sense in considering the import of such allegations. On the contrary, the Court's remit is to undertake a "context-specific" approach, drawing on the Court's "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. For the most part, the Complaint uses the term "State Street" as a defined term to denote Defendant State Street Global Advisors Trust Co. (*see* Complaint ¶ 1), as opposed to its parent company, State Street Bank and Trust Company. Complaint ¶ 38. But when it comes to allegations of financial conflicts, the Complaint seems to use the terms interchangeably. More to the point, these allegations of the Complaint are entirely divorced from context. The Complaint says nothing more about State Street as a business than that it is a "trust company"

47

(Complaint ¶ 38) and omits all of the potentially pertinent considerations that would inform a context-specific consideration of SSGA's ownership of shares in AT&T and Apollo.

Context here is essential. It is evident from the Complaint that State Street is indeed a large investment manager and/or custodian of corporate shares, large enough to be "the third largest institutional shareholder of AT&T." Complaint ¶ 127. But again, we have a numerator without a denominator. The Complaint is silent on the pertinent question, which is whether those shares of AT&T account for a significant share of SSGA's total assets under management, or—indeed—whether SSGA even holds those shares for its own benefit. No doubt State Street holds some large number of shares of AT&T and of Apollo. The pertinent questions are: whether shares of AT&T or Apollo make up a significant portion of State Street's overall portfolio; whether State Street also holds even larger stakes in those companies' competitors; whether State Street holds such shares for its own benefit; and whether those shares were acquired or held through an active portfolio management strategy (*i.e.* buying and selling assets based on investment judgment).

On these points, Plaintiffs' counsel provided helpful clarifications at oral argument, which supply the critical context—and take all the air out of the balloon. Plaintiff's counsel conceded that the Complaint contains no reference to any ownership interests by SSGA in AT&T apart from shares held as part of indexed products,[18] or products administered or

---

[18] An index-fund or exchange traded fund consists of an aggregation of direct or indirect ownership interests in all companies within a particular published index – which may pertain to an entire market, such as the S&P 500, or a sector of that market. *See* U.S. Sec. & Exch. Comm'n, Office of Inv. Educ. & Advoc., *Investor Bulletin: Index Funds*, https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-26 (Aug. 6, 2018) (explaining index funds). Thus, the purveyor of an indexed product that included AT&T or Apollo would also be holding shares in those

*Footnote continues on following page.*

managed by others, for which SSGA serves as a custodian. Transcript of Oral Argument, Docket No. 129 at 50–52 (July 30, 2025). Similarly, Plaintiff's counsel conceded that the Complaint contains no allegation that SSGA's ownership of Apollo shares involved anything other than routine handling of indexed products or providing custodial services. *Id.* at 52.

Mere ownership of shares is insufficient to establish a conflict; still less so when the allegations do not specify the nature of the ownership and how such ownership would give rise to an inference that SSGA's motive was to further its own interests. *See Singh v. RadioShack Corp.*, 882 F.3d 137, 149–50 (5th Cir. 2018) ("We decline to adopt a rule that would make stock ownership, without more, synonymous with a plausible claim of fiduciary disloyalty.").

In short, the Complaint's bare allegations that SSGA owned shares in AT&T and Apollo fail to provide any plausible basis for an inference that SSGA "served an interest or obtained a benefit at the expense of the plan beneficiaries." *See Ellis*, 257 F.Supp.3d at 126.

Plaintiffs' last-ditch attempt to salvage the point in their opposition to the motion to dismiss adds nothing to the mix. Plaintiffs point to the truism that fund managers are commonly compensated based on a percentage of assets under management. Plaintiffs' Opp., Docket No. 91 at 41. Thus, other things being equal, higher valuations of the aggregate shares held in an investment fund will translate into additional fees for the trustee or custodian. Missing from this equation, however, is any hint about the size of the relevant numerators or denominators, let alone any plausible allegation that fees collected by an index fund manager or administrator could be expected to vary materially based on the fortunes of any single company in an index.

---

companies' competitors, in fixed proportions. The index fund sponsor is not placing bets, one way or the other, on the success of any particular company.

As a custodian for funds administered by other investment managers, State Street would have still less stake in the fortunes of particular companies.

### B.    Duty of Prudence

#### 1.    Overview

Plaintiffs allege that, in identifying and selecting an annuity provider, Defendants failed to exercise due care and did not meet the standards of diligence, attention, knowledge, and skill required for such a decision. Plaintiffs do not have access to the actual decision-making process. Accordingly, their imprudence allegations rest upon circumstantial evidence. Plaintiffs' premise is that Athene was unfit to serve as annuity provider. Upon this premise, Plaintiffs ask the Court to infer that any decision-making process that ultimately selected Athene must necessarily have fallen short of the standards of care and skill required for a fiduciary under ERISA. To support this theory, the Complaint features a litany of factual allegations regarding Athene, such as: its history, its financial structure, its reinsurance and regulatory arrangements, and the pricing of its bonds. These facts, Plaintiffs contend, show Athene to be such an unreliable annuity provider that no responsible fiduciary could have selected Athene.

As detailed below, taking Plaintiffs' non-conclusory factual allegations as true, the Complaint identifies various factors that a diligent fiduciary would be required to consider in evaluating Athene as a potential annuity provider. But the outcome of the process—the selection of Athene—does not by itself support an inference that the decision makers who selected Athene failed to give due consideration to the factors that Plaintiffs enumerate.

One obstacle to the circumstantial inference that Plaintiffs urge is that Plaintiffs offer only general references to "traditional annuity providers," leaving the Court to speculate about whether there are apt comparators that any reasonable fiduciary would have preferred over Athene. Assuming this obstacle can be surmounted, an inference of fiduciary misfeasance would be plausible *if* all relevant factors militated against selecting Athene. But no such inference arises when Plaintiffs' circumstantial case omits a substantial factor that may have weighed in Athene's

favor. When relevant factors point in multiple directions, the mere fact that Plaintiffs dislike the outcome does not by itself show that the decision-making process was faulty.

It is evident on the face of the Complaint that there indeed was a substantial factor that evidently supported the selection of Athene: There was a separate account set aside to guarantee the annuity obligations in question. *See* Complaint ¶ 102–03. Although Plaintiffs attempt to elide the point, IB 95-1 (DOL's description of the relevant fiduciary standard), on which Plaintiffs rely, expressly recognizes the importance of considering such separate accounts. Apart from mis-describing IB 95-1 in the Complaint, Plaintiffs offer only the barest of conclusory assertions about the significance of the separate account itself. By omitting this important factor, Plaintiffs' circumstantial case for fiduciary dereliction falls apart. Unless all major factors, considered together, pointed against selecting Athene, the mere fact that Athene was ultimately selected does not by itself show that the decision-making process was defective.

### 2.    Factors for consideration in Selecting an Annuity (IB 95-1)

ERISA requires that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character." 29 U.S.C. § 1104(a)(1)(B). To prevail on a prudence claim, a plaintiff must establish that the fiduciary fell below this standard.

In considering a claim that a fiduciary breached its duty of prudence, the focus is on the *conduct* of the fiduciary, that is, the process that was actually employed by the fiduciary. As the First Circuit has noted. "[t]he test of prudence—the Prudent [Person] Rule—is one of *conduct*, and not a test of the result of performance of the investment. Whether a fiduciary's actions are prudent cannot be measured in hindsight." *Ellis*, 883 F.3d at 10 (quoting *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009) (cleaned up)). "The 'prudent person' standard is an objective

standard which focuses not on the results of an investment strategy but on the fiduciary's decision making process." *Tracey v. Massachusetts Inst. of Tech.*, 404 F.Supp.3d 356, 361 (D. Mass. 2019) (Gorton, J.) (citing *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013)). *See also Lee*, 837 F.3d at 541–42 ("[T]he test of fiduciary prudence is one of conduct, not results.") (internal quotation marks and citation omitted).

Thus, review of fiduciary conduct must focus on the process employed: What options were considered? How were those options identified? What sources of information were used? Were appropriate consultants and experts used to weigh the options? In considering an alleged breach of the duty of prudence, the key question is "whether the fiduciary took into account all relevant information" in performing its duties under ERISA." *Turner v. Schneider Elec. Holdings, Inc.*, 530 F. Supp. 3d 127, 133 (D. Mass. 2021) (Gorton, J.) (citing *Moitoso*, 451 F. Supp. 3d at 204 (internal citations and quotation marks omitted)).

The key considerations that a fiduciary must weigh in selecting the annuity provider for a PRT are spelled out in IB 95-1, which Plaintiffs treat as an authoritative description of the duty of care applicable in this case. *See* Complaint ¶¶ 68–71, 107, 134, 147, 179, 229. In Plaintiffs' words, "IB 95-1 is an explication and summary of the fiduciary duty set forth in ERISA as that duty pertains to a defined-benefit plan's selection of an annuity provider for an annuitization." Complaint ¶ 69.

IB 95-1 sets forth six factors for fiduciaries to consider in selecting an annuity provider in a PRT transaction:

1. The quality and diversification of the annuity provider's investment portfolio.

2. The size of the insurer relative to the proposed contract.

3. The level of the insurer's capital and surplus.

4. The lines of business of the annuity provider and other indications of an insurer's exposure to liability.

5. The structure of the annuity contract and guarantees supporting the annuities, such as the use of separate accounts.

6. The availability of additional protection through state guaranty associations and the extent of their guarantees.

29 C.F.R. §§ 2509.95-1(c)(1)–(6).

One aspect of IB 95-1 is sharply disputed in this case. IB 95-1 indicates that a fiduciary is required to purchase the "safest annuity available" in connection with a PRT. 29 C.F.R. § 2509.95-1(c) ("fiduciaries choosing an annuity provider for the purpose of making a benefit distribution must take steps calculated to obtain the safest annuity available"). The Bulletin does not define this term and Courts that have considered the point have rejected this assertion as untethered to any statutory provision in ERISA. As the Fifth Circuit noted in *Bussian*:

> [W]e are not persuaded that §1104(a) imposes on fiduciaries the obligation to purchase the "safest available annuity" in order to fulfill their fiduciary duties. We hold that the proper standard to be applied to this case is the standard applicable in other situations that involve the potential for conflicting interests: fiduciaries act consistently with ERISA's obligations if "their decisions [are] made with an eye single to the interests of the participants and beneficiaries." . . . [multiple citations omitted] That standard does not require that a fiduciary under the circumstances of this case purchase the "safest available annuity." *Cf. Riley v. Murdock*, No. 95–2414, 1996 WL 209613, at *1 (4th Cir. Apr.30, 1996) (unpublished) (rejecting the standard advocated by the Department of Labor).

223 F.3d at 298.

In any event, Plaintiffs' allegations do not depend on the "safest available annuity" language from IB 95-1. Whether or not Defendants were required to purchase the "safest" available annuity, Plaintiffs allege, they failed to purchase a suitably safe annuity. *See* Complaint ¶ 3 ("Defendants selected Athene, which is substantially riskier than numerous traditional annuity providers, instead of a safe annuity (much less the safest available annuity)."). Although

the Complaint uses the term "safest available annuity" at various points, it alleges more generally that Defendants failed diligently to consider the factors enumerated in IB 95-1.

### 3. Use of Circumstantial Evidence to Show Fiduciary Breach

The Complaint does not describe the process that was actually employed in selecting Athene as the annuity provider for the PRT in this case.[19] This is hardly unusual in cases like this. Plaintiffs are not in a position to allege with any specificity what it is that Defendants[20] did, or failed to do, in the course of selecting Athene. Nor are Plaintiffs in a position to describe precisely how the process employed by Defendants constituted a breach of Defendants' duty of prudence. As outsiders to the process, the beneficiaries of ERISA plans of all stripes (including both defined-contribution and defined-benefit plans) are rarely privy to the particular procedures that were followed, or not followed, in considering investment decisions. In Plaintiffs' words, they "could not possibly have – the facts about which insurers submitted bids, which were invited to do so, and what drove the selection process." Docket No. 91 at 46.

ERISA beneficiaries are usually not in the "room where it happens," and thus cannot directly assess a fiduciary's procedures, methodology and thoroughness. Thus, allegations of fiduciary misconduct frequently must rely on circumstantial evidence. *See Brookins v. Northeastern Univ.*, 731 F. Supp. 3d 112, 118 (D. Mass. Apr. 17, 2024) (Gorton, J.) ("It is well-

---

[19] Defendants' motion papers offer a few hints, such as mentioning the hiring of a consulting firm, Mercer, to review options (*see* Docket No. 78 at 9 (Declaration of G. Goeke in Support of AT&T's Motion to Dismiss)), but such factual matters are beyond the proper scope of a motion to dismiss under Rule 12(b)(6). Indeed, if such factual matters were needed to make a decision, that would militate strongly *against* dismissal. It would be unfair to base a ruling on one side's factual assertions, without allowing the other side the opportunity to conduct discovery into the facts at issue.

[20] Throughout this section I will refer to "Defendants" (plural), to recognize that the Complaint alleges that all Defendants were responsible for breaches of fiduciary duty.

established that if plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer.") (quotation omitted) (citing *Tracey v. Mass. Inst. of Tech.*, No. 16-11620-NMG, 2017 WL 4453541, at *11 (D. Mass. Aug. 31, 2017) ("No matter how clever or diligent, ERISA plaintiffs generally lack the insider information necessary to make out their claims in detail unless and until discovery commences.")).

Given that direct evidence is often unavailable, courts have considered whether the allegations of an ERISA complaint adequately spell out circumstantial evidence from which one can infer that a breach of fiduciary duty has occurred. This is consistent with the courts' duty, at the pleading stage, to "draw every reasonable inference in favor of the plaintiffs." *Lucey v. Prudential Ins. Co. of Am.*, 783 F. Supp. 2d 207, 211 (D. Mass. 2011). *See generally Sellers*, 647 F. Supp. 3d at 21 (noting the appropriateness of considering at the pleading stage, in the ERISA context, whether "'a material part of the information' required is controlled by defendants.") (quoting *García-Catalán v. United States*, 734 F.3d 100, 104 (1st Cir. 2013) and *Menard v. CSX Transp. Inc.*, 698 F.3d 40, 45 (1st Cir. 2012)). As the Second Circuit has noted, "Even when the alleged facts do not 'directly address[ ] the process by which the Plan was managed,' a claim alleging a breach of fiduciary duty may still survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged that the process was flawed.'" *Pension Ben. Guar. Corp.*, 712 F.3d at 718 (quoting *Braden v. Wal–Mart Stores, Inc.,* 588 F.3d at 596).

Of course, even circumstantial evidence—by which we mean, at the pleading stage, factual allegations regarding circumstantial evidence—must have persuasive force. The teachings of *Iqbal* and *Twombly* still apply. As the First Circuit has noted, "allegations must be

enough to render the claim plausible: "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between [mere] possibility and plausibility of entitlement to relief.'" *Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 43 (1st Cir. 2013) (quoting *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557)).

In the words of the Supreme Court, under Rule 12(b)(6) the district court is required in an ERISA case to "divide the plausible sheep from the meritless goats." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). Doing so requires, the Court noted, "careful, context-sensitive scrutiny of a complaint's allegations." *Id.* The Supreme Court's decision in *Fifth Third Bancorp* offers critical guidance about how to apply the Rule 12(b)(6) "plausibility" standard in the context of an ERISA claim for breach of fiduciary duty. In *Fifth Third Bancorp*, as in this case, the plaintiffs had alleged that the ultimate choice made by ERISA fiduciaries (in that case a decision to hold continue holding shares in an ESOP) was inappropriate. 573 U.S. at 413–14. But the Supreme Court's decision makes clear that the plaintiff could not state a claim based on the mere allegation that a fiduciary who relied on market prices should nonetheless have avoided investing in a bank that was "engaged in lending practices that were equivalent to participation in the subprime lending market." *See id. at* 427.

Absent direct evidence of dereliction or disloyalty, circumstantial allegations of fiduciary breach will suffice if they point to a plausible inference that such dereliction occurred. In the words of the Supreme Court, an adequate allegation needs to support an inference that "a prudent fiduciary in the defendant's position *could not have* concluded that" the choice that was actually made was appropriate. *Fifth Third Bancorp*, 573 U.S. at 429–30 (emphasis added). It is not enough to allege facts tending to show that a different fiduciary *might* have reached a different conclusion. Nor is it enough to allege facts that merely engender doubt about whether the

fiduciary's decision was prudent. Such circumstances may leave open the possibility that there was a fiduciary failure, but they do not state a claim for relief. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ocasio-Hernández*, 640 F.3d at 12 (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).

The Second Circuit, in language that prefigured the Supreme Court's instruction in *Fifth Third Bancorp,* spelled out the 12(b)(6) screening task for ERISA claims in *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013). As the Second Circuit explained: "if the complaint relies on circumstantial factual allegations to show a breach of fiduciary duties under ERISA, those allegations must give rise to a '*reasonable* inference' that the defendant committed the alleged misconduct . . . ." *Id.* 718–19. (2d Cir. 2013) (quoting *Iqbal,* 556 U.S. at 678) (emphasis supplied by Second Circuit). More particularly:

> Whether a particular complaint satisfies this standard is "context-specific." *Id.* For a plaintiff alleging a breach of fiduciary duty under ERISA, this standard generally requires the plaintiff to allege facts that, if accepted as true, would show that a prudent fiduciary in like circumstances would have acted differently.

*Id.* at 727.

### 4.    *Plaintiff's Allegations regarding Athene*

In this case, the heart of Plaintiffs' circumstantial case is the fact that Athene was ultimately selected as the annuity provider for the AT&T PRT:

> In light of the extensive information available to Defendants regarding the creditworthiness of Athene, and other deficiencies relative to traditional annuity providers, it is evident that Defendants either (i) did not solicit bids from a large number of providers or (ii) did not engage in an independent and reasoned decision-making process prior to selecting and transferring pension benefits to Athene. Had they done so, the bids and other information would have revealed that Athene was not the safest available annuity provider. Thus, they would not have placed retirees and beneficiaries' retirement assets at risk of Athene's insolvency.

Complaint ¶ 144.

Plaintiffs contend, in other words, that no fiduciary who exercised due care and skill would have selected Athene. Thus, the legal sufficiency of the Complaint (its "plausibility" in the language of *Iqbal* and *Twombly*) depends on whether the facts that Plaintiffs have alleged about Athene—its history, its dealings with its parent company, its arrangements with offshore re-insurers, the nature of its investments—are sufficient, separately or in the aggregate, to support the inference that a prudent fiduciary "could not have: chosen Athene.

To support the inference that no reasonable fiduciary could have selected Athene, Plaintiffs point to a smorgasbord of background information, much of it from publicly available sources. These allegations cover: (1) the history of the annuity market as it pertains to PRTs; (2) the history of Athene and its parent company; (3) descriptions of the kinds of private equity investments employed by Athene and its parent company; (4) re-insurance arrangements; (5) differences between Bermuda-based re-insurance regulation and re-insurance regulation in the various U.S. states; and (5) a comparison of market returns on bonds issued by Athene; and (6) the practices of some credit rating agencies' in rating some of debt offerings that Athene invests in. *See* Complaint at ¶¶ 59–126.

In their memorandum opposing Defendants' motions to dismiss, Plaintiffs summarize these allegations as follows:

> . . . Athene: is a private-equity backed insurer with a "shadow banking business" that originates risky loans and then securitizes them; exploits Bermuda's lax capital requirements and accounting standards to make risky investments and minimize transparency; relies on affiliated, Bermuda-based reinsurance and "modified co-insurance" ("ModCo"), allowing Athene to unshackle capital for profit but not decreasing risk to policyholders; maintains a 1.44% surplus-to-liabilities ratio, substantially lower than its peers; has dramatically increased its liabilities in recent years, relative to peers; holds a very high concentration of risky assets (*e.g.*, "other loan-backed and structured securities" and "Deposit Type Contracts") against its liabilities; understates its affiliated transactions; pays the pension benefits from an

account that is not meaningfully insulated (or, "ring-fenced") from Athene's general liabilities, including because (a) the account holds assets available for Athene's payments to retirees annuitized by other employers, and (b) Athene can routinely transfer the assets supposedly set aside for Plaintiffs to its general account; imposes a substantial cost on annuitized pensioners because it is much riskier than peers, according to bond market measurements; and has an express and implied credit rating inferior to its peers . . . .

Plaintiffs' Opp., Docket No. 91 at 23–24.

Given the requirement that the Court conduct "careful, context-sensitive scrutiny of a complaint's allegations" (*Fifth Third Bancorp*, 573 U.S. at 425), I begin by reviewing Plaintiffs' factual allegations.

a.    Historical Background

The Complaint features an extended discussion of the history of the collapse of the Executive Life Insurance Company in the 1990's and its aftermath. Complaint ¶¶ 59–66. As a result of that failure, "a large number of annuitants experienced losses of 50% of more of their annuity payments." *Id.* ¶ 66. The Complaint notes that Congress, in the aftermath of the Executive Life debacle, amended ERISA to expressly permit lawsuits by former ERISA plan beneficiaries to ensure their receipt of benefits after a PRT. *Id.* ¶¶ 67–71. The Complaint also highlights the Department of Labor's promulgation in 1995 of Interpretive Bulletin 95-1, which enumerates six factors for a fiduciary to consider in selecting an annuity provider for a PRT. *Id.* ¶ 71.

As discussed below, the Complaint's description of IB 95-1 is notably incomplete. The Complaint alleges that fiduciaries are required to evaluate each of the six factors set forth in IB 95-1, listing all six and quoting a couple verbatim. For the last two factors, the Complaint eschews direct quotation and instead recites: "(5) the structure of the annuity contract and guarantees supporting them; and (6) the availability of additional protection through state guaranty associations." Complaint ¶ 71 (citing IB 95-1). Tellingly, this paraphrase of IB 95-1

leaves out the last clause of factor number 5. What IB 95-1 actually says is that fiduciaries should consider: "(5) The structure of the annuity contract and guarantees supporting the annuities, *such as the use of separate accounts.*" 29 C.F.R. § 2509.95-1(c) (emphasis added).

> b.    Involvement of Leon Black

One through-line of the narrative in the Complaint is that Leon Black, a well-known and sometimes reviled financier, who was a founder of Apollo (which is now the parent-company of Athene), was previously a very senior officer of the failed Drexel Burnham Lambert Investment Bank. Black later purchased some Executive Life assets after Executive Life collapsed. Complaint ¶¶ 60–61, 78. These allegations highlight that annuities are financial products and are subject to a variety of market risks which can expose annuitants—who are typically retirees—to potentially catastrophic losses. These allegations do not, however, provide any basis for concluding that Athene, in 2022 was a uniquely risky annuity provider.

> c.    Private Equity in Insurance

Against the backdrop of the Executive Life collapse, the Complaint reviews developments in the market for annuities issued in connection with PRTs. Complaint ¶¶ 72–77. The Complaint contrasts what it calls "traditional annuity providers" (a term that is not defined) with "a new class of annuity providers, backed by private equity firms" which the Complaint dubs "the 'Risk-Taking Insurers.'" Complaint ¶ 72. The presence of private equity investors has grown precipitously so that "[a]s of 2023, private equity firms had spent almost $40 billion on insurance company purchases and controlled over 7% of the industry's assets." Complaint ¶ 73.

The Complaint quotes various commentators who have voiced concerns about potential risks associated with private equity-backed insurance firms, including an appetite for riskier securities (including private-label assets backed securities). Complaint ¶¶ 74–77. The Complaint also quotes other commentators who have voiced concerns that loan-based investments

(characterized as "shadow banking business") could create exposures to systemic risks, including "run risk." *Id.* at ¶ 77.

Notably, while the Complaint—predictably—focuses on commentary that would emphasize potential downsides to the growing role of private-equity-backed insurers, none of the materials that Plaintiffs quote suggest that private-equity-backed insurers are, per se, unsafe and unsuitable.

### d.     Use of Captive Reinsurers

The Complaint emphasizes that much of Athene's reinsurance is obtained through captive reinsurers located in Bermuda, that Bermuda's insurance regulatory regime uses different accounting standards than United States Statutory Accounting Principles (U.S. SAP), and that reinsurance arrangements can be complex and can have the effect of reducing an insurers' reserve requirements, without reducing overall risk. Complaint ¶¶ 80–86. Apart from noting the difficulty of making comparisons among financial reports based on differing accounting rules, the Complaint emphasizes the complexity of Athene's financial arrangements *Id.* Thus, the Complaint alleges, albeit in conclusory terms, that "Athene's use of complex investment structures under lax regulatory standards has contributed to its higher risk as an annuity provider." *Id.* ¶ 81.

The Complaint does not offer information about whether insurers other than Athene also utilize complex re-insurance arrangements, the degree to which such other insurers also use "captive" re-insurers, or the degree to which other insurers have commercial ties to Bermuda-regulated re-insurers.

### e.     Bond Rating Comparisons

In a slightly different vein, the Complaint looks to a report by an investment advisory firm, NISA, which uses the bond market as a proxy for measuring risk by comparing market

pricing of bonds offered by a group of insurers. Complaint ¶ 107–117. The analysis compares the prices of bonds to the price of U.S. Treasuries and purports to assign "Economic Loss to Beneficiaries (ELB) of Choosing Insurer. *Id.* ¶ 107. This chart indicates that selecting any annuity provider other than New York Life results in "economic loss," in amounts that range from 0.2% for Prudential to 14.0% for Athene. *Id.* Notably absent, however, is any measuring-stick or scale by which to link these percentages to any identifiable measure of harm or loss. The Complaint states that "[t]he reports conclude that Athene is substantially riskier than multiple traditional annuity providers and approximately 14% riskier than, for example, New York Life[.]" *Id.* Does this mean, for instance, that New York Life has a 1% chance of failure while Athene has a 1.14% chance of failure? If so, is that difference material? The Complaint does not say. The 14% figure stands out in its isolation.

Reviewing the NISA report itself,[21] the limitations of the analysis are doubly apparent. In the first place, NISA acknowledges that it has not been able to identify bonds that closely match the time frame of the annuities which NISA seeks to analogize:

> It is important to note that ideally the bonds used in this analysis would be the exact issuing entity of the annuity or an entity that is *pari passu* to the issuer. Given the intricate nature of many insurers and which entities issue in the public markets, that may not always be possible. Accordingly, we have made our best efforts to do that. Either way, we believe our analysis is instructive and can be adjusted for different issuing entities as needed.

*Pension Risk Transfers May Be Transferring Risk to Beneficiaries*, October 13, 2022

(Contributors: David G. Eichhorn, CFA).

---

[21] Given Plaintiffs' explicit citation of the NISA report in the Complaint and inclusion of a publicly-available link to the report, it is fairly treated as being incorporated by reference. *Cf. Lister*, 790 F.3d at 22.

The larger problem with the focus on the bond market as a proxy for the risks Athene's annuities, is in the failure to address the fifth factor enumerated in IB 95-1, "(5) [t]he structure of the annuity contract and guarantees supporting the annuities, *such as the use of separate accounts*[.]" 29 C.F.R. § 2509.95-1 (emphasis added). As discussed below, unlike bonds that may be traded in the market, Athene's payment obligations for the annuities at issue in this case are—at least to some degree—secured by assets held in a dedicated ("ring-fenced") separate account. *See* Complaint ¶¶ 102–03. Depending on the nature of that security arrangement, the risk-profile for the annuities at issue in this case may be wholly uncorrelated to the bond rating of the issuer.

f.    Bond Ratings for Private Debt Offerings

The Complaint goes off on a tangent to discuss the fact Athene invests in structured debt offerings, which tend to be rated by smaller ratings agencies, such as DBRS, KBRA and Morningstar, and not always by the three largest ratings agencies, S&P, Moody's and Fitch. The Complaint notes as well that smaller debt issues may be covered by private letter ratings from those ratings agencies, rather than public ratings. Complaint ¶¶ 118–124. The Complaint cites a Wall Street Journal article which suggests that private letter ratings from the smaller ratings agencies tend to be rosier than private letter ratings from the larger rating agencies. *Id.* at ¶ 120. Plaintiffs further point out that both DBRS and KBRA have been fined by the Securities and Exchange Commission for rules violations. *Id.* ¶¶ 123–24.

Notably absent from the Complaint's discussion of ratings agencies is any acknowledgement that both DBRS and KBRA are among the 10 rating agencies in the United States that the SEC has permitted to register as a "nationally recognized statistical rating organization" (NRSRO), under the Credit Rating Agency Reform Act of 2006, Pub.L. No. 109–291, 120 Stat. 1327, 1337 (2006). *See* 15 U.S.C. § 78o–7(a); United States Securities and

Exchange Commission, *Current NRSROs*, https://www.sec.gov/about/divisions-offices/office-credit-ratings/current-nrsros (listing registered NRSROs).[22] Equally conspicuous is the absence of any comparison between or among the disciplinary histories of other rating agencies alongside those of DBRS and KBRA.

The short of it is that the discussion of the various credit ratings agencies amplifies one way in which investments in private debt offerings carry risks that differ from the risks of other kinds of investments. It is not clear, however, that the extended discussion of the purported strengths/weaknesses of the smaller ratings agencies adds anything to the overall picture of Athene as an insurer that invests in corporate debt offerings at various risk levels, including higher risk tranches of multi-layer offerings. *See* Complaint ¶ 119.

g.    History of Regulatory Discipline

Finally, the Complaint alleges that Athene received a monetary sanction from the New York State Department of Financial Services 2019 for a licensure violation. Complaint ¶ 126. This was, it seems, three years before Apollo acquired Athene.

---

[22] Defendants have suggested that the Court should take judicial notice of a broad array of matters found in SEC filings. *See, e.g.,* AT&T Mem., Docket No. 76 at 20 & n.42 (asking Court to consider SEC filings as judicially noticeable materials); Docket No. 81 (attaching various SEC filings as exhibits to declaration filed in support of AT&T's motion to dismiss); Docket No. 56 (attaching various SEC filings as exhibits to declaration filed in support of SSGA's motion to dismiss). I have generally refrained from doing so in this report, in order to avoid prematurely evaluating contested factual issues. The bare fact of NRSRO registration stands on a different footing, however. The SEC's public listing of the 10 recognized NRSROs in the United States is definitive. *See* 15 U.S.C. § 78*o*–7(a)(b). *Cf. In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630, 650 (S.D. Ohio 2008) (taking judicial notice that Moody's is recognized by the SEC as an NRSRO).

5.    *Analysis of Plaintiffs' Factual Allegations*

As summarized in the preceding sub-sections, the Complaint includes a variety of factual allegations regarding Athene that must, for purposes of Rule 12(b)(6) be taken as true. These facts, Plaintiffs contend, show Athene to be such an egregiously bad insurer that it may plausibly be inferred that any fiduciary who selected Athene must have failed to conduct a proper search and selection process. In effect, Plaintiffs contend, Athene should be barred from the PRT annuity market.

a.    The Complaint Identifies Significant Concerns that a Reasonably Fiduciary Would Need to Consider

So, what inferences can be drawn from Plaintiffs' factual allegations?

It seems obvious that most, perhaps all, of the factual matters that Plaintiffs list are matters that a diligent fiduciary, acting in accordance with the guidance of IB 95-1, would need to *consider*. These various allegations about Athene's history and business model plainly bear on such factors as "[t]he quality and diversification of the annuity provider's investment portfolio"; "[t]he level of the insurer's capital and surplus"; and "[t]he lines of business of the annuity provider and other indications of an insurer's exposure to liability." 29 C.F.R. §§ 2509.95-1(c).

It is not enough, however, to allege that Defendants should have considered various factual matters. Plaintiffs need to make out an inference that Defendants actually failed to do so, and thus did not diligently conduct the kind of fiduciary inquiry that is outlined in IB 95-1. In the words of the Supreme Court in *Fifth Third Bancorp*, that "a prudent fiduciary in the [Defendants'] position *could not have* concluded that" Athene was a suitable annuity provider (emphasis added).

Given Plaintiffs' focus on the fiduciary standards outlined in IB 95-1, useful context can be found in the DOL's recent, Congressionally-mandated report on the subject, which addresses

Congressional inquiries about whether amendments to IB 95-1 (IB 95-1) are needed. Department of Labor Report to Congress on Employee Benefits Security Administration's Interpretive Bulletin 95-1 (Julie A. Su, Acting Secretary of Labor) June 2024 ("DOL June 2024 Report").[23]

Precisely the same issues that Plaintiffs emphasize in the Complaint feature prominently in the DOL June 2024 Report, which notes, among other things:

- the increasing prevalence of defined benefit PRT (*id.* at 5)

- the acceleration of private equity involvement in insurance companies (*id.* at 6–7)

- the shifts in private equity strategies in the insurance industry (*id.*)

- the "potential misalignment" of private equity's shorter-term asset management objectives and long-term annuity commitments (*id.* at 7, 8–9)

- the possibility that inadequate transparency of risks might create risks of insurer failure (*id.* at 7)

- the growing role of off-shore captive reinsurance, particularly involving Bermuda-based re-insurers (*id.* at 8, 16–18)

- lack of independence between private equity-backed insurers and affiliated entities (*id.* at 10)[24]

---

[23] The SECURE 2.0 Act of 2022 directed the DOL to consult with the Advisory Council on Employee Welfare and Pension Benefit Plans (ERISA Advisory Council) on the issue and to report back to Congress.  Consolidated Appropriations Act, 2023, Div. T, Pub. L. No. 117-328, 136 Stat. 4459, 5378 (2022). The DOL June 2024 Report is available at https://www.dol.gov/sites/dolgov/files/EBSA/laws-and-regulations/laws/secure-2.0/report-to-congress-on-interpretive-bulletin-95-1.pdf (last visited August 26, 2025).

[24] The Report mentions Athene, along with several of the annuity providers that the Complaint identifies as "traditional annuity providers" (Mass Mutual, MetLife, and Prudential), in noting the view of some council members that, "[a]cross the insurance industry, the use of affiliated asset management is the norm." *Id.* at 41.

- the prevalence of "non-traditional/risky investments" among private equity-backed insurers, with emphasis on "private label resident and commercial mortgage-backed securities" (*id.* at 11–13)

- the prevalence of private equity-backed investments in funding agreement-backed securities (*id.* at 14)

In addition, the DOL June 2024 Report reviews an issue that is enumerated in IB 95-1, but which Plaintiffs elide in the Complaint's selective paraphrase of IB 95-1 (Complaint ¶ 71). This is the role that "separate accounts" may play in protecting particular annuity obligations, apart from the insurer's general account. *Id.* at 19–20.

The DOL Report tells us a few important things.[25]

First, it reinforces that the considerations raised by Plaintiffs in the Complaint are indeed matters of meaningful concern that cannot lightly be ignored.

Second, it underscores that questions about the suitability of private equity-backed insurers for PRT annuities implicate broad legislative and rulemaking considerations. This does not preclude judicial decision-making; the mere fact that a course of conduct has not been enjoined or endorsed by statute or rule does not imply that it is prudent. However, the extent of administrative and congressional interest does serve as a caution against broad-brush judicial pronouncements on matters of policy and emphasizes the need for particularized focus on the case at hand.

---

[25] As noted above with respect to IB 95-1, such DOL guidance is not authoritative, but it may properly be considered for its persuasive force. *See Christensen*, 529 U.S. at 587.

Third, it is apparent from the DOL June 2024 Report that there is no consensus that the risks associated with private equity-backed insurance should disqualify such companies from competing for PRT annuity business.

That brings us back to the case at bar and the strength of the Plaintiffs' circumstantial allegations regarding Defendants' fiduciary conduct. Nothing in the DOL June 2024 Report suggests that the various risk factors that Plaintiffs identify are *per se* dealbreakers. There is plainly no policy in ERISA, or in DOL's interpretations of ERISA, that would preclude private equity-backed insurers from competing for PRT annuity business. Nor is there any consensus that such a policy could or should be adopted.

> b.    The Mere Existence of Identifiable Weaknesses Does Not Automatically Disqualify an Insurer

The mere fact that any given insurer may have identifiable drawbacks does not by itself support an inference that a fiduciary actually *failed* to consider such drawbacks. On the contrary, as the Fifth Circuit noted in *Bussian*, virtually every annuity selection process will require consideration of negative information about the various candidates:

> As a general matter, we expect that a proper investigation of potential annuity providers will reveal that each has its own "warts." We do not view the presence of such blemishes, by itself, to be sufficient to cause a fiduciary to eliminate those providers from further consideration. The issue is whether a provider's warts, viewed qualitatively and quantitatively, are such that a prudent person in like circumstances would determine that the purchase of that provider's annuity was not in the best interests of plan beneficiaries and participants.

223 F.3d at 302.

Experience and common sense bear out the *Bussian* court's observation that virtually any real-world financial option will have its "warts." That is why we require fiduciaries to make such judgments in the first place. If these were simple, unifactorial determinations, fiduciary judgment would not be implicated. The DOL June 2024 Report reflects the fact that experts and

stakeholders assembled by the DOL to review IB 95-1 have differing views on the weight and significance of the various "warts" identified in the Complaint. But the mere fact that experts may differ does not make out an ERISA violation. Such differences may show that prudent fiduciaries *should* have considered these matters, but they do nothing to suggest that Defendants failed to do so. This is a far cry from showing, even circumstantially, that "a prudent fiduciary in the [Defendants'] position *could not have* concluded that" Athene was a suitable annuity provider.

The bare fact that there are a variety of competing considerations to be weighed in making fiduciary decisions cannot by itself be taken as circumstantial evidence of fiduciary failure. Otherwise, there would be no end to the re-litigation of investment decisions. And, as the Supreme Court emphasized in *Thole*, given the sheer dollar-size of many ERISA transactions, there are incentives galore to generate litigation in any colorable case. *See* 590 U.S. at 540–41 (contrasting the attenuated risks for plan participants with the hefty legal fees at stake). This is part of the context that must be considered. As the Supreme Court has noted:

> [T]o interpret ERISA's fiduciary duties . . . courts may have to take account of competing congressional purposes, such as Congress' desire to offer employees enhanced protection for their benefits, on the one hand, and, on the other, its desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place.

*Varity Corp. v. Howe,* 516 U.S. 489, 497 (1996) (cited in *Fifth Third Bancorp*, 573 U.S. at 425).

If conclusory allegations sufficed to make out a claim of misfeasance, every ERISA fiduciary would be trapped in damned-if-you-do-damned-if-you-don't litigation whenever a large PRT is contemplated. It bears noting, for example, that in *Lee* another big telephone company (Verizon) was sued in connection with a PRT. In that instance, the PRT used annuities provided by Prudential, which is presumably among the "traditional annuity providers" that

Plaintiffs identify as suitable providers for PRT annuities.[26] *See* 837 F.3d at 532. In *Lee*, the key allegations were (1) that the selection of Prudential was too expensive, that the $8.4 billion price tag included $1 billion in unnecessary expense; and (2) and that it was imprudent to select only one annuity provider, rather than diversify the risk of non-payment. *Id.* at 540–42. Against a similar backdrop, two years before the *Lee* decision, the Supreme Court pointed out in *Fifth Third Bancorp* an instance where ERISA fiduciaries had been sued—in separate lawsuits—both for failing to sell shares in an ESOP and for failing to buy more shares. *Fifth Third Bancorp*, 573 U.S. at 424 (citing *Evans v. Akers*, 534 F.3d 65, 68 (C.A.1 2008)).

The point is, it is almost always possible to identify a point of concern that, taken in isolation, might form the seed for an ERISA complaint. Hence the need for "careful, context-sensitive scrutiny of a complaint's allegations." *Fifth Third Bancorp*, 573 U.S. at 425. The mere existence of various warts cannot, by itself, support an inference that "a prudent fiduciary in the defendant's position *could not have* concluded that" Athene was an appropriate annuity provider. *See Fifth Third Bancorp*, 573 U.S. at 429–30.

> c.    The Well-Pleaded Factual Allegations of the Complaint Must be Taken as True

Faced with the Complaint's catalogue of Athene's alleged demerits, it is tempting to say "we need to know more." That is, in significant part, the path Defendants propose. Defendants' briefs are replete with invitations to take judicial notice of various facts and circumstances that might cast into a different light the aspersions that the Complaint casts on Athene. Defendants point to a plethora of publicly-available documents that, they say, show that Athene is well capitalized, and that other insurers—including ones that Plaintiffs have characterized as

---

[26] The Complaint includes a NISA graphic identifying Prudential as one of the "clear candidates" that would, presumably, have been a better choice than Athene. Complaint ¶ 107.

"traditional" insurers—employ comparable financial and organizational strategies, such as the use of private equity investment, Bermuda-based re-insurers, or comparable risk-based capital ratios. *See* Docket No. 74 at 3–4 & n.15; 16 & n. 30–31; AT&T Mem., Docket No. 76 at 10–11; Docket No. 111 at 6–7.

Effectively, Defendants invite the Court to evaluate, substantively, the various factors that Plaintiffs cite as danger signs for Athene, and to conclude that these are not nearly so problematic as Plaintiffs suggest. Such an open-ended evaluation, however, is a fact-intensive inquiry that does not comport with the strictures of Rule 12(b)(6). Defendants' invitation to prematurely weigh the merits of their annuity selection risks drawing the Court into a balancing of the probable weight of the evidence, which is decidedly *not* what Rule 12(b)(6) is for. *Iqbal* and *Twombly* make clear that the plausibility standard for 12(b)(6) "is not akin to a '"probability requirement."'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

There may be some subtle gradations between the "careful, context-sensitive scrutiny of a complaint's allegations" that is required under *Fifth Third Bancorp* and premature consideration of factual disputes. In this instance, however, Defendants' invitation to weigh the allegations of the Complaint against publicly available financial data falls decidedly on the side of premature factfinding. In the language of *Iqbal* and *Twombly*, it would be more an evaluation of "probability" than "plausibility" (meaning legal sufficiency).

In a related context (complaints alleging fiduciary failures in defined-contribution plans), another session of this court has commented on the perils of attempting to conduct—at the motion to dismiss stage—nuanced and fact intensive comparisons:

> [T]he First Circuit has not adopted this approach [of requiring a meaningful benchmark by which to compare fees], and numerous sessions in this District have rejected it. *See, e.g., Brookins v. Ne. Univ.*, No. 22-cv-11053-NMG, 2024 WL 1659507, at *4 (D. Mass. Apr. 17, 2024) ("To engage in meaningful benchmark

> analysis, this Court would be required to consider the merits substantively in a manner that would conflict with the Court's obligation to draw all reasonable inferences in favor of the plaintiff."); *Somers*, 2024 WL 4008527, at *5 ("[T]he Court will not delve into disputes regarding the appropriateness of benchmarks at this stage."); *Daggett*, 2024 WL 1677421, at *10 (same); *Sellers v. Trs. of Coll.*, 647 F. Supp. 3d 14, 30 (D. Mass. 2022) (same); *In re Biogen, Inc. ERISA Litig.*, No. 20-cv-11325-DJC, 2021 WL 3116331, at *6 (D. Mass. July 22, 2021) (same).

*Cure v. Factory Mut. Ins. Co.*, No. 1:23-CV-12399-JEK, 2025 WL 360622, at *5 (D. Mass. Jan. 31, 2025) (Kobick, J.).

In short, Defendants' invitation to compare Plaintiffs' allegations with materials that can be found in public records,[27] would entangle the Court in an protracted factual inquiry based upon a record of uncertain dimensions: What public documents can/should the Court consider? To what degree are the parties entitled to notice and an opportunity to object to consideration of such materials? How is the Court to weigh competing factual claims in such circumstances? Such questions highlight that the inquiry that Defendants propose is very much an evaluation of the *probability* that Plaintiffs' factual claims are true, when the Court's task is only to gauge their *plausibility*. *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

The proper question for the Court is *not* whether Plaintiffs' factual allegations are likely rebutted by various publicly available materials and, hence, improbable. Rather, the proper question is whether Plaintiffs' factual allegations, considered on their face and taken as true,

---

[27] As Plaintiffs point out, the mere fact that particular information may appear within a public filing does not necessarily mean the fact itself is subject to judicial notice. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (stating that although a court may take judicial notice of matters of public record, "a court cannot take judicial notice of disputed facts contained in such public records"); *Lopes v. Riendeau*, 177 F. Supp. 3d 634, 667 (D. Mass. 2016) ("Taking judicial notice of a decision in another court, however, is not the same as taking judicial notice of a fact within the decision."). It is one thing for the Court to take judicial notice of the fact that a corporation has publicly filed its financial statements, or even to take judicial notice of the fact that a corporation has reported certain results of operations. It is another thing altogether conclude that the figures reported are themselves accurate.

support an inference that no responsible fiduciary could have selected Athene as an annuity provider and, thus, that Defendants must have failed to exercise due care and skill.

### d.    Lack of Comparators

It is a truism that circumstantial evidence may be just as probative as direct evidence. But there is also an important caveat; the inferences to be drawn from circumstantial evidence must follow logically from the observed facts (in the case of a complaint, from the well-pleaded facts). This basic logic helps make sense of the various cases in which courts have found, or have declined to find, that circumstantial allegations were sufficient to state claims that ERISA fiduciaries had violated their duties of prudence.

The first thing that emerges from reviewing cases within this circuit is that the existence of meaningful comparators is important—possibly essential—when there is no direct evidence about the fiduciary's actual decision-making process. One judge in this district has noted—in the considering investment decisions for a defined contribution plan—that "showing that any given fund had cheaper alternatives or that it had unreasonably excessive fees ... may allow a trier of fact to 'reasonably infer' ... that the [defendants'] process was flawed." *In re Biogen, Inc. ERISA Litig.*, 2021 WL 3116331, at *8 (D. Mass. July 22, 2021).

In numerous cases in this district, ERISA plaintiffs have stated claims based on allegations that a plan paid recordkeeping fees that were excessive compared to other available service providers (*Sellers v. Trs. of Coll.*, 647 F. Supp. 3d 14, 25–27 (D. Mass. 2022)); or that fiduciaries held on to more expensive share classes when identical investments were available at a better price (*Brookins v. Northeastern Univ.*, 731 F. Supp. 3d 112, 119 (D. Mass. 2024); or that fiduciaries overlooked cheaper and better performing target-date funds (*Daggett v. Waters Corp.*, 731 F. Supp. 3d 121, 132, 138–141 (D. Mass. 2024)).

On the other hand, broad-brush comparisons between a particular fiduciary choice and generalized industry averages do not suffice. *See Lalonde v. Massachusetts Mut. Ins. Co.*, 728 F. Supp. 3d 141, 156 (D. Mass. 2024) ("Industry average ratios are an insufficient benchmark because 'the mere fact that a fund charges an expense ratio higher than the mean or median ... does not imply that the cost was excessive ... [o]therwise, by definition, half of all funds would charge excessive fees.'") (quoting *Singh v. Deloitte LLP*, 650 F. Supp. 3d 259, 268 (S.D.N.Y. 2023)). In *Barchock v. CVS Health Corp.*, the First Circuit found that a complaint was insufficient where the plaintiffs sought to infer imprudence "solely from their complaint's charge that [a fiduciary's] cash-equivalent allocation 'departed radically' from both industry averages and the underlying financial logic of stable value management." 886 F.3d 43, 52 (1st Cir. 2018)*; id.* at 55 (ruling that plaintiff failed to state viable claim when "we are left with 'just cavils about deviation from industry standards'"). By way of analogy, in discrimination cases, generalized references to hypothetical situations are no substitute for meaningful comparators. *Waleyko v. Phelan*, No. 24-1310, 2025 WL 2092297, at *4 (1st Cir. July 25, 2025) (ruling that complaint was inadequate where "comparisons are entirely speculative and do not assert any actual disparate treatment as such a comparator analysis requires").

In this case, the Complaint relies on generalized references to "traditional annuity providers"—an undefined term—and names a few companies that, presumably, meet Plaintiffs' standards. *See* Complaint ¶ 72 ("Since Executive Life's collapse, the PRT market had been dominated by traditional annuity providers, including household names such as MassMutual Insurance Company ("MassMutual") and New York Life Insurance Company ("New York Life")); ¶ 88 (graphic comparing Athene's "ratio of surplus to liabilities at 12/31/2022" with other life insurance companies: New York Life, Pacific Life, Nationwide Life, and TIAA); ¶¶

107, 111 (NISA charts purporting to show "economic loss to beneficiaries due to credit risk" and "provider creditworthiness" for NY Life, Prudential, Mass Mutual, AIG, MetLife, Principal, PacLife, F&G, and Athene).

The Complaint does not endeavor to identify which of these companies may be apt comparators. Nor does it spell out the ways these companies may differ from, or be similar to, Athene.[28] *See Cure*, 2025 WL 360622 at *5 (finding that Plaintiffs plausibly allege that fees were higher than five other similarly-sized, comparable plans where plaintiffs alleged membership sizes of other plans using publicly-available Form 5500's and used the same methodology to compare the fees of the plans to ensure "apples-to-apples comparisons").

      e.      Failure to Address the Separate Account

Considered in the aggregate, Plaintiffs' various factual allegations about Athene's financial arrangements point toward an inference that, Athene, as a company, may be less creditworthy than some other insurance companies. If this inference, standing alone, were sufficiently probative, the Complaint might arguably be viable, notwithstanding the absence of any cogent identification of apt comparators. But there is a bigger, fatal, problem.

Even with strategic elisions, the Complaint cannot disguise the major gap in its chain of circumstantial inference. In selecting an annuity provider in this case, the fiduciaries plainly did not limit their inquiry to the creditworthiness of Athene as a company, but instead considered the safety and soundness of the particular annuities being purchased. It is evident from the Complaint that, in the case, the annuities at issue were *not* simply backed by the creditworthiness

---

[28] As noted above, the DOL June 2024 Report cites Mass Mutual, MetLife, and Prudential, along with Athene, as exemplars of companies that use "affiliated asset management." DOL June 2024 Report at 41. I raise this point, not to find facts on the basis of hearsay, but to highlight the absence of meaningful comparators in the Complaint.

of Athene itself. The annuities were also backed by a separate account, evidently dedicated to holding assets to secure the annuity obligations.

The Complaint is coy on this point, and mentions the separate account only in passing in only two paragraphs:

> 102. The interdependence between Athene and its in-house reinsurer exposes each of these entities to a heightened risk of failure. The risks that Athene's separate account (for the AT&T PRT at issue here), and then its general account would be insufficient to cover its liabilities, forcing Athene to seek payment from its affiliated reinsurer for a portion of the annuity liabilities, are closely correlated events that are tied to Athene's weak financial condition relative to other insurers. . . .

> 103. Moreover, Athene's separate account used to pay benefits to AT&T retirees is not truly "ring-fenced" or insulated from Athene's general liabilities. According to GACs issued by Athene for other similar PRTs, the separate account holds assets supporting the contract. However, the separate account assets may *also* be used to support Athene's payment obligations under other separate GACs issued by Athene. And on a quarterly basis but no less frequently than annually, Athene may also withdraw assets from the separate account and transfer them to its general account if the market value of the assets in the separate account exceed Athene's liabilities under the GAC.

Complaint ¶¶ 102–03.

As AT&T points out in its reply memorandum, Plaintiffs never allege that the assets in the separate account "have ever fallen below (or are likely to fall below) the amount necessary to fully pay all of their future pension obligations." AT&T Reply Mem., Docket No. 113 at 10. The short of it is that the Complaint offers nothing beyond the bare, conclusory assertions of paragraph 103, to support its contention that the separate account is somehow inadequate to secure the annuities.

AT&T asserts that $8 billion are "'ring-fenced' in a separate account and shielded from all of Athene's other liabilities." AT&T Mem., Docket No. 76 at 11 & n. 21. But that assertion is based on facts outside the Complaint, which are not ripe for consideration at the motion to dismiss stage. What *is* evident from the Complaint is that there is a separate account and—

whether the amount in the separate account is large or small—the fact that a separate account exists cannot be swept under the proverbial rug.

Central to Plaintiffs' allegations about alleged fiduciary breaches is their assertion that IB 95-1 is the authoritative list of considerations that a fiduciary should consider in connection with a PRT. But in the face of an inconvenient fact, Plaintiffs not only gloss over the existence of the separate account, they also camouflage the applicable legal standard. It cannot be coincidence that when the Complaint recites the IB 95-1's six factors for evaluating annuity issuers, they omit the language that expressly directs fiduciaries to consider "(5) The structure of the annuity contract and guarantees supporting the annuities, *such as the use of separate accounts*[.]" 29 C.F.R. § 2509.95-1(c) (emphasis added). *Compare* Complaint ¶ 78 ("(5) The structure of the annuity contract and guarantees supporting them[.]").

The DOL June 2024 Report  to Congress on IB 95-1 reinforces the importance of considering separate accounts in evaluating annuities. At some length, the Report recounts some of the competing views expressed at stakeholder meetings:

> Group annuity contracts used in pension risk transfer annuity purchase transactions can be supported by either the insurance company's general account or by a separate account (which can be dedicated to a single employer's pension risk transfer or commingled). Separate accounts are protected from the liabilities of the insurer's general account, yet they generally benefit from support from the general account.
>
> * * *
>
> In EBSA's stakeholder meetings, some stakeholders said that separate account protections are valuable due to their structure, lack of exposure to general account liabilities, and additional backing by the insurance company's general account. Several stakeholders explained that, in the event of insolvency, annuitants would have a claim on the insurer's general account after the separate account's assets are depleted.
>
> However, a few stakeholders questioned the protections that separate accounts offer. They said the insurer's investment strategy for the separate account is the more important determinant of the risks. More than one stakeholder expressed the

view that a very safe general account investment strategy is more protective than a separate account, if the separate account is invested in riskier assets.

DOL June 2024 Report at 19–20.

The DOL June 2024 Report, like IB 95-1 itself, is not a controlling source of authority. Its significance is that it reflects DOL's synthesis of current fiduciary considerations and compiles the views of various stakeholders.

The plausibility of the Complaint in this case depends upon a circumstantial inference that runs as follows: Because all the various listed factors that Plaintiffs highlight appear to disfavor Athene, any fiduciary who selected Athene must have overlooked or mis-weighed those factors. That inference loses its persuasive force, however, when the list of factors is materially incomplete. In this case, the Complaint skips over a potentially-critical factor, one that IB 95-1 has expressly identified as requiring consideration. IB 95-1, which Plaintiffs identify as the benchmark for assessing fiduciary prudence, directs fiduciaries to consider "(5) The structure of the annuity contract and guarantees supporting the annuities, *such as the use of separate accounts*[.]" 29 C.F.R. § 2509.95-1(c) (emphasis added). The fiduciaries clearly paid attention to this point, as the Complaint acknowledges that such a separate account has been created. Hiding the ball, as the Complaint attempts to do, does not change this.

IB 95-1's listing of considerations that fiduciaries must weigh in selecting a PRT annuity provider reflects DOL's expertise and comports with the requirements of ERISA. It also fits with common sense. Plainly it matters whether the security for an annuity depends entirely on the economic strength of the issuer, or whether there are other guarantees, such as a separate account, to secure the obligations. The Complaint focuses exclusively on alleged weaknesses in Athene's creditworthiness. But the significance of those allegations hinges on whether the annuity contracts are dependent on Athene's general account. As the DOL June 2024 Report

notes, annuity obligations "can be supported by either the insurance company's general account or by a separate account (which can be dedicated to a single employer's pension risk transfer or commingled)." DOL June 2024 Report at 19.

Ordinary life experience teaches that, in a broad array of transactions, the value of a particular obligation may depend on the creditworthiness of the borrower, or it may depend on the amount and liquidity of posted collateral, or it may depend to some extent on both. International commercial bankers take this into account when they honor letters of credit. Pawn shop owners take this into account when they take a diamond ring in hock for a payday loan. The character and overall credit-worthiness of a particular counterparty may be critical, or it may be largely irrelevant, depending on the particulars of a given transaction.

The Complaint does not tell us much about the separate account. But it does tell us that the PRT in this case was accomplished using annuities secured by a separate account. Plainly, in arranging to purchase annuities with a specialized form of security like a separate account, the selection process encompassed more than just Athene's creditworthiness as a company: Plainly the decision makers also included considered, as IB 95-1 advises, "(5) The structure of the annuity contract and guarantees supporting the annuities, *such as the use of separate accounts*[.]" 29 C.F.R. § 2509.95-1(c) (emphasis added).

The fact that there was a separate account does not by itself exclude the possibility that the selection process was flawed. But that is not the standard. The burden is on Plaintiffs to allege facts that support a plausible inference—not a mere possibility—that Defendants failed to conduct a diligent and prudent selection process. The separate account is significant factor that may have weighed strongly in Athene's favor. That being so, the mere fact that the Complaint

lists various factors that may have disfavored Athene cannot be taken as plausible evidence that Defendants failed in their fiduciary duty to consider all the pertinent facts.

> f.    The Complaint Fails to State a Claim for Breach of the Duty of Prudence

In sum, taken as true, the factual allegations in the Complaint provide no factual basis upon which to plausibly infer that Defendants failed to conduct a diligent and prudent decision-making process. The Complaint fails, in the terms of *Fifth Third Bancorp*, to establish the inference that "a prudent fiduciary in the [Defendants'] position could not have concluded that" Athene was an appropriate annuity provider. 573 U.S. at 429–30.

## C.    *Absent a Viable Claim of Fiduciary Breach, Counts I-IV and X Should Be Dismissed*

As discussed above, Plaintiffs have failed to plausibly allege breaches of fiduciary duty: either the duty of loyalty or the duty of prudence. Accordingly, Counts I through IV should be dismissed. Counts I, II assert that the AT&T defendants either breached their fiduciary duty by selecting annuity contracts sold by Athene, or that they participated in a breach of fiduciary duty in connection with the selection process; absent factual allegations to support a plausible inference of fiduciary breach, these counts fail. The same is true with respect to Count IV, which asserts that SSGA defendants breached their fiduciary duty by selecting Athene.

Count III, which asserts that AT&T breached its fiduciary duty by selecting SSGA to serve as an independent fiduciary is a slightly different charge. But, as discussed above, Plaintiffs have failed allege facts that would support a plausible inference that AT&T was disloyal in selecting SSGA, or that SSGA was disloyal or suffered from conflicts of interest that disqualified it as a fiduciary. Nor do Plaintiffs allege *any* facts that would suggest that AT&T acted imprudently in selecting SSGA, *i.e.*, that SSGA lacks the experience or skill to undertake a selection process like the one at issue in this case. Without any plausible allegation that SSGA

was either disloyal or unqualified, there is no basis for a claim that AT&T's selection of SSGA was itself a breach of fiduciary duty.

Count X of the Complaint—the claim for failure to monitor fiduciaries—is derivative of Count I. *See Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016) (requiring an underlying breach of the ERISA duties for plaintiffs to maintain a claim of for breach of the duty to monitor); *Tracey*, 404 F. Supp. 3d at 364 ("Ordinarily, a duty to monitor other fiduciaries is derivative of plaintiffs' other claims."); *Velazquez v. Massachusetts Fin. Servs. Co.*, 320 F. Supp. 3d 252, 260 (D. Mass. 2018) ("A claim for failure to monitor is derivative of the underlying breach."). If the Court dismisses the Complaint's claims for breach of fiduciary duty (Counts I-IV), Count X should be dismissed as well.

## VI. Prohibited Transactions

### A. Legal Standards

ERISA "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries ... by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Cunningham v. Cornell Univ.*, 145 S. Ct. at 1025, *quoting Harris Trust and Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 152, 160 (1993). At issue here are two types of prohibited transactions: transactions between the Plan and a "party in interest," and transactions between the Plan and a fiduciary.

As to transactions between a plan and a party in interest, 29 U.S.C. § 1106(a)(1) states:

A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect--

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

….

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1).

29 U.S.C. § 1002(14) defines "'party in interest' to include various plan insiders," including "any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan" or "a person providing services to such plan." *Cunningham*, 145 S. Ct. at 1025 (2025).

As to prohibited transactions between a plan and its fiduciary, ERISA prohibits various forms of self-dealing by a fiduciary. *See In re Fid. ERISA Float Litig.*, 829 F.3d 55, 58–59 (1st Cir. 2016); *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995), *amended* (Sept. 8, 1995). 29 U.S.C. § 1106(b)(1)–(2) states:

A fiduciary with respect to a plan shall not--

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries.

29 U.S.C. § 1106(b)(1)–(2). In other words, ERISA prohibits those transactions by a fiduciary that are "tainted by a conflict of interest and thus highly susceptible to self-dealing." *See Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987).

### B. *Plaintiffs Factual Allegations are Insufficient to Support a Claim allege that Defendants Engaged in Prohibited Transactions*

Plaintiffs claim that Defendants engaged in prohibited transactions under § 1106(a) when AT&T engaged SSGA as the Plan's independent fiduciary (Count V), and further when AT&T (Count VI) and SSGA (Count VIII) caused the Plan to engage in the PRT with Athene. Plaintiffs

also allege that AT&T (Count VII) and SSGA (Count IX) committed prohibited self-dealing transactions under § 1106(b).

For the following reasons, I recommend that the Court dismiss Counts V through IX.

> 1.    *AT&T's Engagement of SSGA was not a Prohibited Transaction because SSGA was not a "Party in Interest."*

Plaintiffs allege that AT&T's engagement of SSGA was a prohibited transaction (Count V) because AT&T "caused the Plan to engage in a transaction resulting in a direct or indirect furnishing of services between the Plan and [SSGA]," and that SSGA was a "party in interest" who "provided services to the Plan." Complaint ¶ 202.

There is no dispute that AT&T was subject to fiduciary standards when it selected SSGA to serve as an independent fiduciary for purposes of identifying an annuity provider for the PRT. *See Beaumont Glass Co.,* 62 F.3d at 579 ("ERISA's fiduciary duties control the termination procedures"); Transcript of Oral Argument, Document No. 129 at 32 (July 30, 2025), (counsel for AT&T acknowledging that AT&T acted as fiduciary in selecting SSGA as independent fiduciary). But Plaintiffs fail to plausibly allege that SSGA was a "party in interest" who had previously "provided services to the Plan." Notably, the Complaint contains no allegations that SSGA had ever previously provided services to the Plan itself. As described in the discussion of loyalty, the Complaint instead outlines a generalized "corporate relationship" between SSGA and AT&T (the company, not the Plan), including that SSGA is an institutional shareholder of AT&T shares and that SSGA "and its affiliates" provided services for other benefit plans associated with AT&T, such as the stock fund in AT&T's defined contribution plan and the AT&T Savings Plan Master Trust. Complaint ¶ 127–28.

Whatever atmospherics Plaintiffs hope to invoke, the statutory language controls. ERISA defines a "party in interest . . . as to an employee benefit plan" as "a person providing services to

*such* plan." 29 U.S.C. § 1002(14) (emphasis added). To make out a claim that SSGA is a party in interest, the Complaint would need to identify a pre-existing relationship with the Plan. *See D.L. Markham DDS, MSD, Inc. 401(K) Plan v. Variable Annuity Life Ins. Co.*, 88 F.4th 602, 610 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 2525 (2024) ("The word 'providing,' used here as a present participle, most commonly describes a person who is *currently* providing services. Further, the modifying phrase 'to such plan' limits the definition to entities providing services to the plan at issue—not service providers in general.").[29]

Factual allegations that merely show that SSGA had relationship(s) with other plans that have some affiliation with AT&T do not satisfy the statute, under which only enumerated transactions are "categorically barr[ed]" as "'likely to injure the pension plan.'" *Cunningham v. Cornell Univ.*, 145 S. Ct. at 1025 (2025), *quoting Harris Trust and Sav. Bank*, 530 U.S. at 160. Plaintiffs attempt to sidestep the issue by including in the Complaint a conclusory assertion that "State Street was a party in interest because it provided services to the Plan." Complaint ¶ 202. But, as the First Circuit has instructed, the Court must follow a "two-step approach": constructively stripping the Complaint of merely conclusory allegations and then assessing plausibility based on well-pleaded factual allegations. *See Medina-Velázquez*, 767 F.3d at 108.

---

[29] Plaintiffs, in their opposition, cite *Ramos v. Banner Health* for the proposition that corporate dealings between SSGA and AT&T somehow make SSGA a party in interest. 1 F.4th 769, 787 (10th Cir. 2021). Plaintiffs take out of context the *Ramos* decision's comment that "some prior relationship must exist between the fiduciary and the service provider." Docket No. 91 at 53; 1 F.4th at 787. *Ramos*, however, does not support Plaintiff's claims. *Ramos* dealt with—and rejected—an argument that an initial service agreement with a provider would transform that party into a party in interest, and thus prohibit the very same transaction. 1 F.4th at 787. The Tenth Circuit held that such an interpretation would lead to an absurd result and underscored the necessity that there be some *pre-existing* relationship. *See id.*

Plaintiffs fail to allege any factual basis for their assertion that SSGA was a "person providing services to such plan" and was therefore a "party in interest." 29 U.S.C. § 1002(14). A key element is missing for Plaintiffs' prohibited transaction claims.

At oral argument, Plaintiffs' attorney suggested that Plaintiffs could meet the threshold for pleading a prohibited transaction by alleging merely that the Plan had entered into a transaction with any service provider, without having to allege that there was a pre-existing relationship between the service provider and the Plan. Transcript of Oral Argument, Document No. 129 at 61–63 (July 30, 2025). In support, Plaintiffs cited the Supreme Court's recent decision in *Cunningham v. Cornell University* which holds that the "reasonable compensation" rule (a statutorily-defined exception to the prohibited transaction rule) is an affirmative defense only, so that an ERISA complaint need not, on its face, refute this widely-invoked exception to the prohibition on transactions with entities that provide services to a plan. 145 S. Ct. at 1031.

Plaintiffs ask the Court to take the holding of *Cunningham* a giant step further, and rule that any allegation that a plan sponsor has hired a service provider is, on its face, sufficient to state a prohibited transaction claim, subject to a defendant's assertion of "reasonable compensation" as an affirmative defense. *See* Plaintiffs' Opp., Docket No. 91 at 54. *Cunningham*, however, says no such thing. It is one thing to hold, as *Cunningham* does, that identifying a prohibited transaction is sufficient to state a claim and that it is up to the defendant to assert common exceptions, such as reasonable compensation, as affirmative defenses. It is another thing altogether to suggest that a plaintiff does not even need to identify a prohibited transaction. At no point does *Cunningham* suggest that any and every transaction with any and every third party somehow meets the definition of a prohibited transaction. On the contrary,

*Cunningham* notes that § 1106 categorically bars only "certain transactions," those which Congress has identified as "'likely to injure the pension plan.'" *Cunningham*, 145 S. Ct. at 1025.

To state a claim, Plaintiffs must allege facts that would support a finding that SSGA was a "party in interest" as defined by 29 U.S.C. § 1002(14). Here, the critical missing factor is that the Complaint does not plausibly allege that SSGA had a pre-existing relationship with the Plan. The Complaint's conclusory assertion that the engagement of SSGA constituted a prohibited transaction does not state a plausible claim.

Accordingly, Count V should be dismissed.

### 2. AT&T and SSGA Did Not Engage in a Prohibited Transaction with Athene in the Pension Risk Transfer Because Athene was not a "Party in Interest."

Plaintiffs allege that AT&T (Count VI) and SSGA (Count VIII) committed a prohibited transaction by causing the Plan to engage in the GAC transaction between the Plan and Athene in violation of 29 U.S.C. § 1106(a). As discussed above, there is no plausible allegation that AT&T was acting as a fiduciary, rather than as a settler, when it entered into the transaction with Athene.[30] That AT&T and/or the Plan wrote the check to pay for the annuities, does not transform AT&T into a "fiduciary with respect to a plan," so a key element of a prohibited transaction claim is missing. *See* 29 U.S.C. § 1106(a)(1). Count VI should be dismissed.

Furthermore, both Count VI and Count VIII rest on a conclusory, and wholly unsupported, assertion that "Athene was a party in interest because it provided services to the

---

[30] It is worth noting the important contrast with the facts developed in *Bussian*, where the settlor, RJR Nabisco, directly interfered with the selection process and put Executive Life on the candidate list for consideration as an annuity provider, after the consultant had already rejected Executive Life as a suitable candidate. *See Bussian*, 223 F.3d at 303.

Plan." Complaint ¶¶ 206, 218. The Complaint is devoid of factual allegations to support its naked assertion that that Athene "provided services to the Plan."

In the first place, it is doubtful whether the sale of a financial instrument, such as an insurance or annuity contract, constitutes "providing services." There are plenty of situations in which insurance companies may provide services to benefit plans—for instance, by managing a disability insurance program for plan members (*see, e.g., Sellers v. Anthem Life Ins. Co.*, 316 F. Supp. 3d 25, 29, 38 (D.D.C. 2018))—but the Complaint includes no allegation that Athene did anything of the sort in this case. The factual allegations of the Complaint portray Athene only as a seller of a financial instruments, namely annuities that were never even held by the Plan. Apart from conclusory assertions, the Complaint offers no factual allegation that Athene provided any services to the Plan. Indeed, the whole point of Plaintiffs' claims is that Athene is now responsible for annuity payments that are wholly outside of the Plan and outside ERISA's framework.

As SSGA points out in its memorandum, the DOL has endorsed the view that merely selling an insurance product does not constitute the provision of services within the meaning of ERISA. *See* SSGA Mem., Docket No. 74 at 25. In a 1976 Opinion Letter, the DOL concluded that "the sale by an insurance company of a group insurance policy to an employer to fund an employee benefit plan would not alone cause the insurance company to become a party in interest to the plan." Office of Pension and Welfare Benefit Programs (ERISA), 1976 WL 5051, at *1. Again, DOL guidance is not controlling authority, but the reasoning is persuasive; it makes no sense to say that each and every purchase of insurance products transforms the insurer into a "party in interest" within the meaning of ERISA.

Second, and conclusively, Plaintiffs' assertion that Athene was a "party in interest" fails for the same reason as the assertion that SSGA was a "party in interest." The Complaint is devoid of any factual allegation that there existed any prior relationship between Athene and the Plan.

In an effort to salvage their prohibited transaction claims, Plaintiffs point to the allegations in the Complaint that there was a separate business deal between an AT&T subsidiary and Athene's parent company, Apollo. Complaint ¶ 128. On this foundation, Plaintiffs argue vaguely that Athene had "precisely the sort of relationship" that would support a prohibited transaction claim. Plaintiffs' Opp., Docket No. 91 at 55. This is a nonstarter. Plaintiffs' reliance here on relationships between corporate affiliates of AT&T (as opposed to the Plan) fails of its own weight. By ERISA's statutory definition, a party in interest must have some pre-existing relationship with *the Plan*. There is no allegation of any such pre-existing relationship between Athene and the Plan itself.

To bridge this chasm, Plaintiffs cite the Supreme Court's decision in *Harris Tr. & Sav. Bank*, 530 U.S. at 242, as somehow suggesting that relationships between related entities could make an entity a party in interest. Docket No. 91 at 53, 55. But that case cannot bear the weight Plaintiffs put on it. In *Harris* the Court noted that in ERISA Congress had "defined 'party in interest' to encompass those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries." 530 U.S. at 242. This is an entirely accurate description of Congress's intent when it listed, in subsections (A) through (I), the various kinds of insiders who fall within the definition of "party in interest." *See* 29 U.S.C. § 1002(14). But nothing in the statute—and nothing in the *Harris* decision—remotely suggests that entities will also be deemed insiders because they are said to have "the sort of relationship" that might have—in Plaintiffs' view—

warranted inclusion in the statute. ERISA's list of presumptively prohibited insiders does not contain any terms like "includes" or "such as" that might indicate that additional, unlisted entities are also covered. *Cf. Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008) (discussing use of exclusive and inclusive terms in statutory language).

By the same token, Plaintiffs' cannot look to *Cunningham* to for help. Without a plausible factual allegation that Athene was a "party in interest" there is no claim. The question of affirmative defenses does not even come into play.

Finally, betraying the weakness of their position, Plaintiffs strain to argue that Athene had a pre-existing relationship with AT&T (and presumably the Plan) based on the one-week interval between the formalization of the annuity sales and the closing of the deal. Plaintiffs proclaim that there was a commercial relationship between AT&T and Athene "at least as early as April 26, 2023, which precedes May 3, 2023, the date on which the annuitization was finalized." Plaintiffs' Opp., Docket No. 91 at 55. This is not a serious argument. The Complaint alleges that April 26, 2023, was the date on which AT&T entered into the agreement with Athene for the transaction that closed on May 3, 2023. Complaint ¶ 138. Unless ERISA prohibits transactions that do not close immediately (it does not), the idea that a third party becomes a party in interest in the interval between contract signing and closing defies common sense.

In sum, the Complaint includes no well-pleaded factual allegations to support the conclusory assertion that "Athene was a party in interest because it provided services to the Plan." Complaint ¶ 206, 218.

I recommend that the Court dismiss Counts VI and VIII.

3.    *Plaintiffs Fail to Allege that AT&T and SSGA Engaged in Self-Dealing or Otherwise Dealt with Plan Assets to Benefit Themselves*

Plaintiffs allege that AT&T (Count VII) and SSGA (Count IX) engaged in self-dealing transactions prohibited under §1106(b) by using Plan assets to purchase annuities from Athene. Complaint ¶ 213, 223. These claims do not withstand scrutiny.

First, as explained above, AT&T was acting as a settlor, and was not acting in a fiduciary role, when it contracted with Athene to provide annuities. ERISA section 406(b)'s prohibitions on self-dealing, which apply to "fiduciar[ies] with respect to a plan" are thus inapplicable. 29 U.S.C. § 1106(b). As discussed above, the assumption—which seems entirely probable—that AT&T was motivated to enter into the PRT in order to save money, does not change the fact that this is a *settlor* decision. Indeed, the inherent monetary motivation for such transactions underscores the rationale for engaging an independent fiduciary. *See Bussian*, 223 F.3d at 299 (suggesting that the presence of conflicting interests may require the appointment of an independent fiduciary).

As to SSGA, Plaintiffs fare no better. The Complaint alleges conclusorily that SSGA committed a prohibited transaction by using Plan assets to purchase annuities "so as to increase AT&T's corporate profits" and thereby SSGA dealt with the assets "for its own interest" and "acted on behalf of a party (State Street) whose interest . . . were adverse to the interests of the [Plan]." Complaint ¶ 223. At best, the Complaint suggests that SSGA's general desire to attract business as an independent fiduciary for PRTs created an incentive to help its clients, including AT&T, save money. Complaint ¶ 154–56. The same could be said of any and every investment

adviser that has ever provided services in connection with a PRT. This is not the kind of factual allegation that can be said to plausibly support an inference of wrongdoing.[31]

Plaintiffs miss the point by pointing to hypothetical motivations (which are, in any event, speculative) and not to anything in the transaction itself that suggests self dealing. Section 1106(b) categorically and presumptively prohibits certain transactions that on their face are "tainted by a conflict of interest and thus highly susceptible to self-dealing." *See Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987). Accordingly, "the transaction, itself, should communicate the breach," regardless of motive or process. *See Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1465–66 (9th Cir. 1995); *Waller*, 32 F.3d at 1345–46. Similar to the plan terminations that the Courts considered in *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449 and *Waller v. Blue Cross of California*, 32 F.3d 1337, the transaction at issue here is a partial termination of a plan by purchasing annuities, which is expressly permitted by ERISA. *See* 29 USC § 1341(b)(3)(A)(i). As the Ninth Circuit in *Kayes* explained:

> Absent [allegations of transactions with parties in interest], we fail to see how purchasing annuities to terminate plaintiffs' Plan constitutes a per se violation of ERISA, even if accomplished through an infirm bidding process or for improper purposes.

51 F.3d at 1466.

I recommend the Court dismiss Counts VII and IX.

---

[31] By the same token, as discussed above with respect to the duty of loyalty, the Complaint's various allegations about corporate relationships and about SSGA's ownership of shares do not make out a plausible claim that SSGA impermissibly acted in its own interest.

<u>CONCLUSION</u>

For the foregoing reasons, I recommend that the Court dismiss all claims (Counts I through X) of the Complaint.

/s/ Paul G. Levenson_____<br>Paul G. Levenson

Dated: August 29, 2025                    U.S. MAGISTRATE JUDGE

<u>NOTICE OF OBJECTION PROCEDURE</u>

The parties are advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Sec'y of Health & Hum. Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378–79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).