UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

)
LANELL PIERCY, et al.,            )
                                  )
        Plaintiffs,               )
                                  )        Civil Action
v.                                )        No. 1:24-cv-10608-NMG
                                  )        Pages 1 to 96
AT&T INC., et al.,                )
                                  )
        Defendants.               )
                                  )

BEFORE THE HONORABLE PAUL G. LEVENSON
UNITED STATES MAGISTRATE JUDGE

MOTION HEARING
(Digital Recording)

April 6, 2026
10:24 a.m.

John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts 02210

Linda Walsh, RPR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts 02210
lwalshsteno@gmail.com

APPEARANCES:

On Behalf of the Plaintiffs:

    LIBBY HOOPES BROOKS & MULVEY, P.C.
    By: Douglas S. Brooks, Esq.
    260 Franklin Street, Suite 1920
    Boston, Massachusetts 02110
    617-338-9300
    dbrooks@lhbmlegal.com

    SCHLICHTER BOGARD LLC
    By: Sean E. Soyars, Esq.
    100 South 4th Street, Suite 1200
    St. Louis, Missouri 63102
    314-621-6115
    ssoyars@uselaws.com

    ZUCKERMAN SPAEDER LLP
    By: Bryan M. Reines, Esq.
    2100 L Street NW, Suite 400
    Washington, DC 20037-1525
    202-778-1800
    breines@zuckerman.com

    ZUCKERMAN SPAEDER LLP
    By: Cyril Smith, III, Esq.
    100 E. Pratt Street, Suite 2440
    Baltimore, Maryland 21202
    410-949-1145
    csmith@zuckerman.com

On Behalf of the Defendants State Street Global Advisors Trust
Company and Ms. Sisk:

    GOODWIN PROCTER, LLP
    By: James O. Fleckner, Esq.
    100 Northern Avenue
    Boston, Massachusetts 02210
    617-570-1000
    jfleckner@goodwinlaw.com

    GOODWIN PROCTER LLP
    By: Benjamin S. Reilly, Esq.
    1900 N Street, NW
    Washington, DC 20036
    617-570-8349
    breilly@goodwinlaw.com

APPEARANCES (Continued):

On Behalf of the Defendant AT&T:

    O'Melveny & Myers LLP
    By: Meaghan VerGow, Esq.
    1625 Eye Street, NW
    Washington, DC 20006
    202-383-5504
    mvergow@omm.com

    NUTTER, MCCLENNEN & FISH LLP
    By: Mark C. Jensen, Esq.
    155 Seaport Boulevard
    Boston, Massachusetts 02110
    617-439-2237
    mjensen@nutter.com

Proceedings recorded by sound recording and
produced by computer-aided stenography.

                    P R O C E E D I N G S

THE CLERK:  The United States District Court for the District of Massachusetts is now in session, the Honorable Paul G. Levenson presiding.

You may be seated.

Today's date is April 6th, 2026.  This is docket 24-CV-10608, Piercy, et al. versus AT&T Inc., et al.

Counselors, can you please identify yourselves for the record?

MR. BROOKS:  Good morning, Your Honor.  On behalf of the plaintiffs, Doug Brooks, Libby Hoopes Brooks & Mulvey; with me, Cy Smith and Brian Reines from Zuckerman Spaeder; and Sean Soyars from Schlichter Bogard.

And with the Court's permission, Mr. Smith will be doing the arguing today.

THE COURT:  Okay.  Good morning.

MR. SMITH:  Good morning, Your Honor.

MR. JENSEN:  Mark Jensen from Nutter, McClennen & Fish for 18 AT&T defendants.

And Meaghan VerGow of O'Melveny & Myers will also be doing the argument.  Thank you.

MR. FLECKNER:  Good morning, Your Honor.  Jamie Fleckner from Goodwin for the State Street Global Social -- Global Advisors Trust Company and Denise Sisk.  I'll be arguing, but I'm here with my colleague, Ben Reilly.

THE COURT:  Good morning.

MR. REILLY:  Good Morning.

THE COURT:  So there's a little bit of deja vu in all of this.  It's defendants' motion, and I would like to touch very briefly on standing, and then really more want to focus on sufficiency of the complaint.  And I think the issues raised by each defendant differ with respect to sufficiency of the complaint.  So I don't want to hear, I think, from both defendants on standing.  I really just have a few questions, so --

MS. VERGOW:  Good morning, Your Honor.  It's Meaghan VerGow appearing on behalf of the AT&T defendants.  I'm happy to take your questions on standing.  We obviously did not mean to tax the Court's patience by re-raising the issues.  There have been a handful of developments we wanted to bring to your attention.

THE COURT:  And there are plenty of -- you know, only as of, what, seven days ago, is there another court in this country that agrees with me about how to look at the issue.  And certainly there's plenty of attention in other circuits about this.

The questions I had -- specific questions I had, when last we talked about this I asked you about, as one example, a Ponzi-style annuity company that offers an annuity that will pay regularly for the next 15 years and then just plain run out

of money.  And you said, yeah, there would be Article III standing to address a situation like that.  And I'm wondering, do you stand by that answer, and how does that fit with the logic of your argument, which is, unless collapse is imminent, and you've gone so far in your latest papers as to point to a six-year statute of repose, 15 years isn't imminent by almost any measure.  It's just highly certain.

So how do you make sense of your argument that unless collapse is imminent, there's no such thing as standing, and we shouldn't care about the creditworthiness of the insurer and the notion that 15 years but an identifiable risk is good enough.

MS. VERGOW:  Your Honor, I regard that scenario as involving harm that was certainly impending.  If you know the harm is going to occur today, it's certain -- it's certainly impending and that qualifies as a future harm within the meaning of the Supreme Court's Article III precedents.

THE COURT:  What about, then, the other way around?  Supposing -- I mean, two things.  One, say I'm the annuitant, and while I plan to live a very long time, a good actuary would give different odds on that.  And so, assuming that an actuary says the guy probably doesn't have more than 14 years left in him, then the harm is not certainly impending.  I mean, isn't all of this about risk no matter what as opposed to certainties?

MS. VERGOW:  I think it's about risk in combination with the likelihood that the risk will have an effect on the individual who's bringing the suit.

So in the second scenario Your Honor described just now, in that case, I think it would be a closer case, and I'd probably argue against standing.

THE COURT:  Well, your client would want you to.

MS. VERGOW:  Well, yeah, if the estimation is that the exhaustion of assets is not likely to affect the claimant.  And that's -- you know, that's often the case with pension plans, right?  There are projections that they're not --

THE COURT:  I mean, it's all a bunch of actuaries sitting around and projecting out and looking at a population.

MS. VERGOW:  And things can change, and they often do change.  I mean, even as to multi-employer pension plans, many plans were projected to go insolvent, and then you've got the Pension Protection Act and, you know, presto chango, all of those assets have been shored up.  So I think that is one of the reasons why courts are reluctant to venture into measuring probabilities with, you know, distances that are so far out.

But, again, in your --

THE COURT:  I get good reasons for that, if we're talking about the sufficiency of allegations or how we decide these cases, but as an Article III matter -- a couple of weeks ago I was hearing from people, and this is more in the way of

editorial comment, about whether the idling of Greyhound buses over at South Station, whether somebody who likes to walk on the Greenway has standing to challenge that on the notion that maybe that pollution contributes to or deteriorates their enjoyment of their walk on the Greenway.  If that's constitutional standing, which the First Circuit has said it is, how is it that the Constitution, as opposed to the sufficiency of a claim, is not implicated if I'm holding an annuity from, let's use highly technical terms, a crappy insurance company versus a really good one?

MS. VERGOW:  Well, look, I think the person walking on the Greenway has a protected interest that's noneconomic.  And to the extent that interest has been recognized as currently protectable, then that's not, you know, a difficult connection to make.  In this context we're talking about economic interests.

THE COURT:  Right.

MS. VERGOW:  And I recognize that Your Honor -- every court to have grappled with this has recognized that it's a close question, whether they find standing or they don't find --

THE COURT:  I actually don't think it's a close question, but I'm alone in that view, I think.

MS. VERGOW:  Well, you've got, you know, a partner in crime at this point.  But if I may -- you know, again, I don't

want to tax the Court's patience, but I'll take one more run at it because I actually think the *Weyerhaeuser* decision that came out last week is instructive because the court there was really driven by this notion that in a single plan context, both the upside and the downside risk is borne by the employer. Whereas, in the pension risk transfer context, only the employee bears the risk in the court's estimation. But that's actually not correct because in the single plan pension context, the employee does bear downside risk because if the employer doesn't make it and the PBG steps in, they're still not going to get full payment of the benefit.

And if the diminishment in the value of the benefit were sufficient here to predicate standing, it would have been sufficient in the single plan context, too. If the value paradigm applied at all to this context, I think it would have led to a different result in *Thole*.

THE COURT: Yeah, all right. And I won't belabor. I think I will have occasion to write a little more on this. My take, as you know, is that *Thole* is primarily about the right to sue your employee -- employer about how your employer is managing its own money. And this instead is about the right to sue your employer when your employer buys you and is required to buy you an annuity and they do a bad job of it.

And so one has to do with is it any of your business? Or in Article III terms, do you have standing to challenge how

your employer invests his own money?  And the other is, do you have standing to challenge when your employer is obligated to buy you a very high quality financial instrument and they do a bad job of it.  So to me, these are apples and oranges, but I'm in a somewhat lonely spot on this.

Let me just ask you a couple of questions rather than belaboring this, because there's other issues that I think are tricky.  But the flip side of annuities is insurance, life insurance, and people pay more -- I once paid more for a better rated life insurance company than a lower rated life insurance company on the theory that years hence it might matter how financially strong the insurer was, even though the notional value of the life insurance policies was going to be constant.

But my plan and intention when I bought life insurance 20 years ago was to stay alive and remain so.  And the actuaries would have said I had a pretty good chance of it, for that matter.  So would I have had standing if my life insurance agent had taken my money and told me I was going to get an A rated or double A rated, whatever the -- I forget how the insurance ratings work on that -- plan, policy, if instead they had bought me something from a significantly lower rated insurance company that was a lot cheaper for them, but I'm paying the same amount; wouldn't that be an immediate injury?

MS. VERGOW:  It would be an immediate injury insofar as you paid a higher amount in premiums, and you paid out of

pocket in reliance on the representation that what you were buying was X but you really got Y.  I think that's more of a classic, you know, fraudulent inducement claim, for example. But your injury there is your premiums.  It's not whether you're actually going to get the benefit of the life insurance at the end of the day.

THE COURT:  And why would that be any different if I'm entitled to what the Secretary of Labor calls the best or the safest available annuity and somebody buys me something that's not the safest available annuity?

MS. VERGOW:  So I think the Secretary of Labor, as Your Honor, I'm sure, is aware, agrees that there is an absence of standing.

THE COURT:  Oh, yeah.  They believe there's no material difference between this -- in their words or his words, I guess, but it's the Department of Labor's words, there's no material difference between a PRT and *Foley*.  I think it's nonsense.  But they do this a lot more often than I do, so I have to take into account that I certainly have to take their views seriously.

MS. VERGOW:  I do think there is reason to question whether there's an entitlement to the safest available annuity under Interpretive Bulletin 95-1, but I'm not going to stop there --

THE COURT:  Okay.  All right.

MS. VERGOW:  -- because that's guiding a process inquiry, and that's meant to drive a conclusion whether or not the fiduciary has applied an appropriate process.  But of course, the central insight of *Thole* and other Supreme Court cases, you know, including *Spokeo* and so on, over the last few years, is that having a protectable interest at law does not necessarily give you a protectable interest under the Constitution.

THE COURT:  Yep.  All right.  I think I understand your views.

MS. VERGOW:  Thank you, Your Honor.

THE COURT:  So thank you for indulging me a little more on this.

So the next place I wanted to weigh in is really the 12(b)(6) issues and sufficiency of the complaint.  And I guess the first thing I see is, you know, the relevant regulators, be they Department of Labor and their endless symposiums with people offering differing views about the safety or lack of safety of one or another approach.  State regulators who regulate insurance products, including annuities, they all say, you know, this is a perfectly good company and we regulate them.  Or at least Department of Labor says, we didn't get any consensus at all out of our last big meeting of stakeholders, and we're doing nothing.  And the insurance regulators say, we're really good at what we do, and we're pretty sure we've

got it right.

How do I weigh any of that at 12(b)(6)?  How do I -- am I taking judicial notice of insurance regulatory thoughts?

MS. VERGOW:  No, not the thoughts, Your Honor, but certainly the fact that Athene, for example, continues to operate under the supervision of state regulatory apparatuses without any intervention, you know, any investigations, any questions about its licensing or its ability to support its obligations.  I think it's unavoidable to accept that legal backdrop simply as a matter of judicial notice.  I don't think Your Honor should be out there hunting for commentary.

THE COURT:  But I should take judicial notice that insurance regulators think Athene is A-okay?

MS. VERGOW:  I don't see how you avoid doing that.

THE COURT:  I mean, how does it fit into traditional judicial notice doctrine?

MS. VERGOW:  The Court can take account, I think, of legal context.  You know, the legal context here is that it's undisputed.  Plaintiffs do not raise questions around the fact that state insurance regulators have blessed the activities of Athene.  I think it's not disputed that Athene is highly regulated at the state insurance level.  Plaintiffs draw comparisons to the Executive Life circumstance.  But state level regulation of insurance changed substantially after those events, and I think the Department of Labor has recognized that

as well.

THE COURT:  So before Executive Life, it would have been foolhardy at best to rely on insurance regulators, but now we know they learned a great lesson, and therefore, we should take them very seriously?

MS. VERGOW:  I don't think it's the -- you know, I don't think it's the only consideration that the Court would want to take account of.  But there are a range of publicly available sources alluded to by plaintiffs or strategically admitted by plaintiffs that shed light on whether Athene is a reliable, respectable going concern.  And I think, you know, plaintiffs are now left to pick away at the margins around issues like is an Athene separate account as good a separate account as other insurance companies offer.  But I think their own complaint substantially recognizes, as Your Honor recognized in your first opinion, that many of the practices they challenge as inherently risky are in fact used by the traditional insurance companies that would have been alternatives in this case.  And, you know, the implication there is that they're perfectly acceptable under state insurance law.

THE COURT:  And how do I get there on 12(b)(6)?  In other words, I've got the folks in front of you -- I guess, for the record, to say that the plaintiffs sit in front of the defendants in this courtroom.  The folks in front of you say,

look at all this stuff.  Surely some of it is plausible that Athene is a really crummy insurer and that people have bought a load of hogwash from people who repackage insurance and financial products at an astonishing rate.  That's their pitch.

And your pitch is, oh, come on.  Let's take this step by step.  Let's look at each of the measures they come up with.  And, you know, they do things like, you know, compare with companies that may not have even been situated to be possible competitors for PRT deals.  They compare exposure to offshore reinsurance and mod-co in ways that it's unclear from the face of the complaint whether these are apples-to-apples comparisons.

You've got a whole list of things where they all sound pretty plausible to me, but how do I do that on 12(b)(6)?

MS. VERGOW:  I think there are a couple considerations I'd want Your Honor to bear in mind.  First is the absence of allegations that the kind of nitpicking plaintiffs do at the margins are considerations that a prudent fiduciary would pay attention to in making this decision.

And that actually returns me to the second point that I think is very important to bear in mind, which is that the Court is ultimately faced with the question of evaluating whether the plaintiffs have alleged enough to conclude that the fiduciaries here applied an imprudent process, that they could only have been asleep at the wheel to make the decision that they did.  And the information that the fiduciaries had

available to them at the time from the public record is part of the backdrop of how a fiduciary makes a decision.

I think it's undeniable that information in the public sphere can and should affect how a fiduciary makes its decision, including a fiduciary's awareness that Athene was a going concern without any pending investigations from regulators and so on.  And that kind of information ineluctably factors into a prudent fiduciary's decision.

And that the core question for the Court is because plaintiffs don't directly allege a problem in the process, can you conclude from the decision they made that the process must have been flawed.

THE COURT:  That there was process flaw.

MS. VERGOW:  Yeah.

THE COURT:  This is not the holding of *Cunningham*, but it's the meta holding of *Cunningham*, which is sometimes 12(b)(6) isn't a very good device for sorting out meritless claims.  So the court in *Cunningham* says, can't get there on 12(b)(6) because that one happens to be an affirmative defense.  So instead *Cunningham* says, gets past 12(b)(6) but there's nothing to stop the court from expediting discovery to focus on the substantive issues that may ultimately hold up -- may ultimately bar the claim.

I mean, does it make sense in this case to say, look, this is supposedly all about a process?  I recall -- correct me

if I'm wrong, but I recall in the first round of briefing on this, and I think it shows up in the appendices, you know, not only did State Street look at this, but they brought in Mercer as a third-party consultant.  That's exactly what one would expect a fiduciary to do.

And other than inviting the court or, what, a jury to make their own assessment about the trade-offs between different insurance companies and price and the role of price when it's a partial risk transfer, so you have to take into account the interests of the remaining beneficiaries of the defined benefit plan.  You know, who's going to second guess the outcome?  You look to the process.

So why -- wouldn't it make sense just to say, you know, it may be a terrible or a poorly supported set of claims, but 12(b)(6) isn't how you get there?

MS. VERGOW:  So, Your Honor, I want to draw a really critical distinction between the *Cornell* case that you just invoked and cases that deal with alleged breaches of fiduciary duty, and it's incredibly important.

THE COURT:  Okay.

MS. VERGOW:  The *Cornell* case involved alleged prohibited transactions.

THE COURT:  Right.  Now, as I said, that holding doesn't apply directly.

MS. VERGOW:  Right.  And the reason it's important is

because the Supreme Court has said that as to fiduciary breach claims in the *Dudenhoeffer* case, 12(b)(6) motions are an important mechanism to weed out meritless claims.  So the court has, you know, sort of regretted that it could not apply 12(b)(6) in the *Cornell* case because of the way Congress drafted the prohibited transaction provisions, but Congress did not apply the same framework to fiduciary breach claims.  And that means that the Court can and should evaluate those allegations for plausibility at the 12(b)(6) stage.  And that means that plaintiffs must not allege only things that are consistent with a potential finding of a process failure, but that really leave no ability to conclude that there could have been a prudent process applied in the particular case.

THE COURT:  And that's -- I mean, I went a long way in your direction by pointing out that plaintiffs had done a bit of a sleight of hand by ignoring the separate account in the first go-round to say, all right, you know, there's a big hole in this set of allegations.

Now, to rule in your favor, I would have to say, well, there's no big hole, but what there is is a lot of stuff where if you're moderately financially sophisticated, you might say, why are you comparing, for example, surpluses to liabilities when the insurance regulators look at risk-based capital? Seems like a really good question, but it seems like a really hard question.

I mean, assume for a minute that the district judge in front of you -- Magistrate Judge now, but it'll be both -- had no prior experience in the financial industry, which is true of many judges, are you really going to find sort of as a matter of some combination of judicial notice and general common sense that RBC is obviously superior to liabilities ratios?

I mean, how do you get there without either some expert saying here's why the one measure makes sense and the other measure doesn't, or some person saying, look, we're not going to try and persuade the court which measure makes sense. What we're going to tell you is the folks from Mercer and the folks from State Street are very experienced and very smart, and they thought that on balance it was by far the better measure.  How do I not go there?

MS. VERGOW:  Because the plaintiff -- this is yet another glaring gap in the plaintiffs' allegations.  It's plaintiffs' burden to establish that the metrics that they pull out as demonstrating problems with Athene are considered in the industry by regulators, by consultants, by major companies, by whomever, to be of consequence to this decision.

But that's notably not in their complaint because the metrics that they pull out are not the ones that insurance regulators and others are considering in evaluating the credit worthiness and financial strength of an insurance company.

THE COURT:  Okay.  I mean, essentially I'm in the

same -- I just want to make sure.  The point -- the major points I see in your argument are, if I'm trying to say these aren't apt comparators, which is what I sort of invited them to clarify in my first ruling on this, similarity of size and are they even competitors for these deals, exposure to offshore reinsurance and mod-co and how that breaks out in comparison with other insurers.  It's not immediately obvious to me why for good or ill use of modified coinsurance or reinsurance, whether it's good or bad, and whether affiliated or nonaffiliated makes much difference, whether it's on or offshore regulators; these all strike me as the kind of things that people who live in this field will have strong views about and may be in a position to testify about.

But it's really hard for me.  Again, on mod-co and reinsurance, how do I get there as a judge to compare the regulatory regime of Bermuda reinsurance to typical US-based insurance?  Say, I mean, different reporting standards, but widespread use of Bermuda reinsurance among all manner of insurance companies, so how do I weigh that?

MS. VERGOW:  That's exactly -- I think Your Honor just zeroed in on the critical piece.  As you recognized in our last outing, it's plaintiffs' burden to establish that the fiduciaries here should have selected a different alternative.  And what they haven't and can't establish is that other insurance companies that would have been capable of taking on

this pension risk transfer don't employ exactly the same practices as Athene.  And that's important because Interpretive Bulletin 95-1 expressly includes as one of the six factors whether the insurance company is capable of taking on a transaction of this size.  And many of plaintiffs' criticisms of Athene boil down to the fact that its liabilities are bigger, for example, than insurance companies.  Well, that only means that it's the type of insurance company that can take on a jumbo pension risk transfer like this.  I don't think plaintiffs ever allege, nor could they allege, that some of the comparators that they are bringing in are -- you know, would have been capable of being contenders for this transaction.

And, again, I recognize that a lot has been thrown against the wall.  But what I would encourage the Court to do in evaluating the sufficiency of plaintiffs' allegations is to bear in mind what's not in there, what are the comparators that could have taken on this transaction doing or not doing in respect of the critiques that plaintiffs offer, who would have been a viable alternative here, and are the things that plaintiffs are criticizing, are those things that a prudent fiduciary would have considered?  Because they're the types of critiques that regulators and sophisticated financial professionals and so on would consider material to a decision like this.  And that's within their knowledge, right?

You know, plaintiffs could come forward with an

expert.  I mean, now they could have a consultant who says -- and permits them to plead, we had someone take a close look at this and they have -- you know, this renowned expert has confirmed that nobody would ever make decisions when they had these sorts of red flags.  But that's not the kind of complaint that plaintiffs have brought forward.

And they have not, as they have to do, established that the critiques that they offer here would have compelled a prudent fiduciary to make a different decision.

THE COURT:  Well, they have pointed to, and this is from the last go-round, and I've now gone blank on the name of the company that purports to evaluate the cost of excess risk based on comparison of bond ratings of parent companies primarily or sometimes parent companies, sometimes not.  I found it intriguing, more than persuasive.  But they pointed -- you know, those folks do this all day long, and they say this is a terrible way to do it.  And Athene, you know, they've got -- heck, they got bar graphs.  How could they be wrong?

MS. VERGOW:  They've got bar graphs.

Well, they actually don't do this all day long.  And that's actually another really critical distinction in evaluating that report.  That company serves employer plans. They make nothing when --

THE COURT:  They're in the business of telling people, keep doing what you're doing and everything else is dangerous

and risky and liable to get you sued.  But isn't that going to be true, if we fast forward some years -- I'm sorry to use that thread, but to an actual trial in this case, if we imagine that we're going to have somebody sworn in as an expert who is going to be cross-examined on, well, you say you're an expert, but aren't you really in Dutch for one side or another of the industry?  And isn't that the same cross-examination we hear of every expert in every case that involves broader regulatory or financial competition?

MS. VERGOW:  That expert's perspective would not be probative of the sufficiency of the process that State Street applied.  It would be probative of the substantive prudence of the decision, but that's not an issue we're raising now, whether this is a decision that a prudent fiduciary could have reached irrespective of the process applied.  That's where I'd expect that expert testimony to be probative.

But right now we're trying to evaluate whether plaintiffs have alleged enough to infer that the process was problematic, even though they have no direct allegations of a problem.  And at this stage, I think it's their burden to come forward to identify the reasons why what they're alleging would be credited by an expert in the field.

THE COURT:  All right.  Let me ask you a slightly different question, but -- I mean, it's of the same ilk, but one of the things plaintiffs point to, and if we're really

reducing this to things that judges as opposed to financial experts could be expected to know or understand, plaintiffs say insurance is expensive, and it's expensive because you're paying for the availability of sufficient assets and sufficient investing acumen to protect against unknown future risks.  Be they, you know, the ability of a life insurance company to survive COVID and a spike in deaths, the ability of an annuity company to survive market downturns or wars or whatever else make unknown factors that we may face in the next 15 years or assuming longer for hopefully a significant number of these annuitants are actuarially looking at long period.

So basically they say you got this thing cheap, and it's a pretty efficient market.  So if you got it cheap, it's probably not as good.  What's wrong with that argument?

MS. VERGOW:  I think what's wrong with the argument is the difference in how the transaction is booked on AT&T's books and what it means for, you know, Athene in the long term.  So, as the Court recognized, these are long-term liabilities.  You know, there is an actuarial process to evaluate the anticipated growth of the assets over time and to compare those to the expected liabilities over time.

From AT&T's perspective, when it books the -- you know, the -- when it takes these obligations off the books, it's removing an obligation and it's also losing the assets that back the obligation.  Those assets transfer to Athene.

And there is a delta between those two because those assets have not yet appreciated to where they are expected to be in 20, 30, 40 years when they will be used to actually pay the liabilities.

THE COURT:  So the complaint says that in a traditional or typical PRT, and I'm not quite sure -- and that's a bit of an open-ended concept what typical means.  But it says essentially the norm should be that the employer seeking to transfer risk to an annuity company pays, the complaint says, more than the present value of the future liabilities, and that instead for Athena, they paid less than the present value.  Can you comment?

I mean, first of all, does that -- is that how PRT -- I would think any financial transaction in which you are taking cash in the near term in favor of long-term payments, you factor in what you can earn on the cash, not present value as computed against a nonrisk investment.  But I'm just trying to make sense of what's in front of me.

MS. VERGOW:  Your Honor, I honestly don't know the basis of that allegation.  It doesn't resonate as true for me.  I mean, what we know, and I think this is not disputed, is that in this transaction, you know, the participants were terminated from the plan, and in conjunction with that, a substantial body of assets left the plan as well to back the pension obligations for those participants.  And I think that's pretty typical.

THE COURT:  All right.  But what about more -- the broader point, then, which is if we assume a fairly efficient market, if you pay a lot less, it's probably worth a lot less.

MS. VERGOW:  I think the total answer to that is that there is a surplus in these separate accounts.  The obligations are fully covered by the assets that Athene has.  And so whatever -- you know, however the sausage was made from AT&T's books to Athene's, we know that the obligations are fully covered to the satisfaction of state insurance regulators.

And Your Honor can ignore the last part of that comment, but at the very least, I think it's undisputed in this complaint that the assets are fully covered by the separate accounts, which leads the plaintiffs to kind of complain at the margins.  Well, it's not as much of a surplus as some other insurance might offer, but, you know, the fact remains, they've got excess assets relative to the obligations, they've got a group annuity contract that requires the separate accounts to be topped up if needed.  So there's just, you know, not a risk of loss in the way they allege.

THE COURT:  Wouldn't their argument be -- and I'll let them make their own argument.  But their argument would be there may be an appearance of coverage, an appearance of assets, but that, if you will, the financial alchemy involved in producing that appearance depends on layers of nonarm's length transactions, related party transactions, transactions

that have some whiff of regulatory arbitrage in them such that while the rating, if you will, the risk ratings on the assets and the notional value of the assets appear adequate, they would say it's still Isaac Newton's universe, and you can't generate mass out of nothing.  And in this case, if you're paying less, it's got to be worth less.  It's just in a more complicated way.

And then -- and they point to a parade of horribles.  They point to, you know, nobody thought credit default swaps were a problem before AIG figured out how to leverage them into an entire business model.  Nobody thought junk bonds could all fail at once until Experian and Drexel showed us how to get those paths running in parallel.

And their argument is, look, we don't know when and how or even if Athene is going to fail.  But for a discount like that, the risk of failure in the face of unknowable future financial events, assuming they've got all the actuarial piece for benefits worked out, you still have, you know, they're betting on a six and a half percent sustainable return over time.

I mean, how do we -- why isn't that enough?  They're saying, we're not in the room, we can't see what happened.  All we know is not only was the sausage made, but it was sold really, really cheap.

MS. VERGOW:  So I think that argument boils down to a

contention that you can never go with the lowest bidder because it's necessarily going to expose you to the greatest risk.  And I don't think -- that's certainly not the position of the Department of Labor in evaluating these kinds of transactions. And here, again, I think I would look to the absence of allegations in plaintiffs' complaint, in particular the absence of any allegation that the other companies that could have taken on this pension risk transfer do not employ the very same practices that plaintiffs allege are contributing to excess risk for Athene.  Again, they're just inferring that from the price.

And, you know, you also don't have any allegation, which I think would be important, that Athene has pulled the wool over its regulator's eyes, is employing valuation methodologies that are not known to the market and not known to regulators and so on.  I mean, I think what we know is that Athene is operating in the open in plain view of state-level insurance regulators.

And, you know, plaintiffs' critique boils down to the fact that Athene, among all the other insurance companies that employ the very same practices, was the lowest bidder.

THE COURT:  All right.  Thank you.

MS. VERGOW:  And Your Honor, I'm compelled to --

THE COURT:  Anything else you'd like to address?

MS. VERGOW:  Not for me, Your Honor, though State

Street's counsel may wish to address Your Honor's questions as well.

MR. FLECKNER:  I'll be very brief.  We certainly associate ourselves with the arguments made by Ms. VerGow.

A few items.  One, there's no allegations in this complaint about an efficient market.  You know, these are very bespoke large PRT transactions as they allege.

As Ms. VerGow mentioned, there's lots of reasons why cost might be different.  They allege that Athene, for example, is a very new company.  Oftentimes new companies can do things a little more efficiently than hundred-year-old companies.  So there's a number of reasons why the cost might be different.

To Your Honor's questions about state regulators, I also think the Iowa amicus brief that we point to is instructive.  You know, if the -- for example, they explain how if the surplus gets down to 105 percent of the liabilities that the insurance regulator starts to take action, so this idea that some portion of the assets might be shown at a 6.5 percent, you know, the risky assets, they're very clear not to say that the entirety of the separate account is valued at 6.5 percent, only the risky assets are valued at 6.5 percent.

But nonetheless, as Ms. VerGow explained, and not only does the state of Iowa and joined by nine other state regulators explain in their amicus brief the steps that they would take, but the Iowa state statutes that we cite in our

brief that they don't mention at all explain those metrics as well.  So, you know, this isn't just, you know, thinking that an expert is going to come and talk about some different metric.  As the state of Iowa explains, this is essentially a challenge to Iowa and the other jurisdictions' regulation of insurance.  They're effectively saying these state laws don't capture the full risk.  These state regulators don't understand the full risk.

They'll say, though, again, that this is a fact question, and one of the things that they point to is an allegation in their complaint.  I think it's at paragraph -- I don't have it right now -- that this is a critical measure, that surplus asset -- surplus to liabilities is a critical measure, and that's really the essence of a conclusory allegation.  And it's not setting up a fact question because it's not a well pleaded fact.  It's a conclusory fact which --

THE COURT:  So how do -- I get, you know, in plenty of contexts, you know, when I've got a med-mal case in front of me, I find it pretty easy to sort out what's a conclusory allegation and what's a factual allegation.  I find it somewhat more difficult in the context of financial cases where, you know, on the one hand I was struck by, as my prior decision or report and recommendation noted, I thought the references to State Street's ownership shares in companies that it owns only through indexed products was flatly disingenuous.  But I was

also struck by the degree to which some prior knowledge of the market was helpful in spotting the fallacy.

And there is a certain point at which the Court must not serve as sort of an expert arbiter but must instead look at each complaint in terms of plain language, what is plausible, what is not plausible. It's -- I mean, it's a challenge, and different judges see things differently.

A week ago, two weeks ago, I was reversed by a different district judge on a 12(b)(6) holding where it was a close call, but the judge says, well, they've alleged it. It's, you know, it might be plausible. Just because you think it's really dumb doesn't mean we can throw it out. And so I'm left with trying to figure out how do you sharpen that line in the context of fairly complicated and not necessarily widespread financial transactions? I mean, $8 billion is a lot of money. It's hard to find good apples-to-apples comparisons for $8 billion deals.

MR. FLECKNER: So I would say, first, you can look to the statute, look to the law, and compare the allegations at paragraph 92, the new allegation about what they perceive to be a, quote, critical measure with the Iowa statutes that we cite to determine whether or not there is legal support for the allegation, that their new metrics are a, quote, critical measure.

And I think by reference to the legal landscape that

applies to Athene in its jurisdiction where it's domiciled, at least Iowa -- there's obviously the separate New York business -- but New York has similar.  All states have passed. We cite the NAIC model statute that has as an appendix the corresponding statutes in every jurisdiction that has adopted some form of the risk-based capital approach.

So I think here, from the 12(b)(6) standpoint, you know, it's not like negligence.  You know, negligence is, you know, what would a reasonable person do in the circumstance? And that's not going to be set forth in a statute.  Maybe there's some med-mal statutes or something that might have some specifics, but here we have very specific legal requirements that are passed by statute in the states.

The other thing that I would note is even if you think about -- you know, Your Honor talked in the report and recommendation about the IB 95-1 factors, and Ms. VerGow talked about the second factor, the size of the insurer, which I don't think they've pleaded, pushes them over the line.

I also think that Factor 4, which looks to the lines of business that the insurer is involved with, I don't think they've got pleadings that push Athene over the line in that respect.

They look at Factor 6, which is the availability of state guarantee associations.  They don't say there's anything different with Athene and other insurers with respect to Factor

6.

And I would argue that with respect to Factors 1 and 3, which are the factors that I think they spend the most time with in terms of these new metrics and surplus liabilities, those are captured by the risk-based capital approach that the states look to by statute and that the regulators talk about. And there's really no allegations at all about the way that this fits in with the statute.

Then, finally, you have Factor 5 that Your Honor talked at length about in the prior report and recommendation about the separate accounts. But notably, they don't say anything about the so called comparators' separate accounts structure. They don't say whether or not those are similarly -- I mean, they allege that Athene's is overfunded. They give you a metric. They don't compare that metric to any other insurers. And the NISA, which is the name of the organization that you were thinking of previously, they also entirely ignore the separate account structure.

So yes, there are actors in the market like NISA who are trying to get into the market, trying to make commentary. But I think Your Honor pointed out last time, and I think it's still very applicable today, that the Department of Labor thoroughly looked at this question, just, I would say last year, two years ago.

THE COURT: Right. And came away with a shrug.

MR. FLECKNER:  And came away with a shrug.  Nothing --

THE COURT:  Not necessarily a rule, an endorsement. Just a shrug.

MR. FLECKNER:  Just a shrug.  But all of the new allegations in the amended complaint that did not exist the first time that Your Honor looked at it, not a single one of those, as Ms. VerGow mentioned, is hidden from state regulators, is hidden from the Department of Labor, is hidden from Congress.  So we submit that there's nothing in the amended complaint that would change Your Honor's prior decision.

Thank you.

THE COURT:  Thank you.  All right.

And for plaintiffs.

MR. SMITH:  Your Honor, can I grab some water?

THE COURT:  Absolutely.  Do we have some there?  If not, I've got some in this pitcher.  Take that.

MR. SMITH:  You don't mind?

THE COURT:  Not at all.

MR. SMITH:  Good morning, Your Honor, and may it please the Court.  Cy Smith on behalf of the plaintiffs.

And I'd like to proceed in whatever way is most helpful to the Court.  But first, I want to hand up something we gave to the defendants earlier in case it is helpful to the Court, which is just a cheat sheet, if you will, that

summarizes the comparator allegations in the complaint.  On seven different metrics it gives you a reference to the paragraph number, again, to the extent that's helpful.

THE COURT:  Okay.  No -- that's -- Thank you.

MR. SMITH:  And -- Yeah.

THE COURT:  No, go ahead.

MR. SMITH:  Let me just say briefly on that, and then I want to talk about a couple of the big issues you identified with Ms. VerGow.

So we selected these metrics with the input from people with deep knowledge in the insurance industry.  They're not the plaintiffs' lawyers' ideas.  You know, that's why we put them in the complaint.  To the extent that we were required to say this is what experts believe, we could say that, it's a fact.  But, you know, that's the reason we have that in there.

I think you raised a question about, for example, mod-co.  You said, well, why is that relevant?  Okay, how is that risky?

THE COURT:  Well, or how do I compare it with other insurers?  And how do I -- how do I look at the face of the complaint and say, yes, that is plausibly a sign that the fiduciary here was, you know, asleep, drunk, or on the take.

MR. SMITH:  Sure.  And so let me just give you 30 seconds about mod-co, just to understand why that's important.  So that's the first item that's listed here.  It's the use of

affiliated reinsurance in mod-co.  So arm's length reinsurance is a situation where someone who is completely independent of the underlying or the primary insurer provides a solid financial guarantee in the event that the provider is a --

THE COURT:  How strong the reinsurers are varies in people's estimates greatly.  And there's a very competitive market for reinsurance in which price and solidity are, one hopes, correlated, but may or may not be because they often involve multiple jurisdictions, making it very hard to compare apples to apples in that market.

MR. SMITH:  Potentially.  But one of the riskiest kinds of reinsurance are situations where it's really by an affiliate.  So that the risks are correlated, right?  And so that it's not arm's length, and that if the primary insurer goes under, the affiliated reinsurer is also exposed.  So that's what affiliated reinsurance is.

Mod-co or modified coinsurance, as I've been educated, modified coinsurance is still a further variant on reinsurance where the primary insurer keeps some of the assets, right?  It doesn't --

THE COURT:  They continue to do the investment of the assets and offload only the liabilities, rather than offloading both liabilities and assets.

MR. SMITH:  Correct.  It might be highly modified in that some of the liabilities go over to the reinsurer and are

reinsured by them, some of the assets go over there.  The point is that it's modified, and therefore, it is not a full transfer of risk, right?

Depending on the terms of the agreement between the primary insurer and the reinsurer, it could be really useless.  And so that's why it is considered, and that's why we were told, and that's why we pled in the complaint that the use of mod-co and the use of affiliated reinsurance is a strong marker that there's a problem here if the underlying insurer, the primary insurer, is unable to perform.

THE COURT:  Wouldn't it be more in the nature of it's the kind of thing a responsible fiduciary would want to look into to make sure they understand what is the nature of the modification and what is the nature and creditworthiness of, if you will, the reinsurer and, I don't know, I guess the coinsurer technically.

I mean, it strikes me as the sort of thing that a person sitting on the outside would say, well, if you see that, you want to look into it before you sign off.  But is that evidence that nobody looked into it before they signed off?

MR. SMITH:  Well, first of all, we plead -- and this is why what I handed up was a list of comparator information.  We plead that if you look at New York Life and MassMutual, which we put expressly in the complaint --

THE COURT:  Do we know that they were competitors for

an $8 billion PRT?

MR. SMITH:  We don't know in this specific case. We're in the classic situation of an --

THE COURT:  Right, you're not in the room.

MR. SMITH:  We are not in the room.  And I'll talk in just a moment about why we do know and we're able to plead that they could have done this deal.

THE COURT:  Okay.

MR. SMITH:  But what we do plead is that, if you look at them, they use very little, if any, of this affiliated reinsurance in this mod-co.  And so we know that that's a big black mark against Athene when compared to the other large insurers who could have done this business.  And that I think -- that's our prima facie case.  It is a black mark. Maybe there is an explanation that could be provided eventually, but that's an issue for expert testimony and discovery and not something we should be required to plead today under Rule 8 and Rule 12.  That's our position about that.

THE COURT:  Let me take you back.  Where in the complaint do I look for an allegation that particular of your comparator companies could have done this deal?  I take it you don't know who actually bid and who actually submitted -- responded to a request for proposal or however this was put out to bid.  But where do I find that at least some of the

insurance companies you're citing were prospective competitors?

MR. SMITH:  Sure.  So if you look in the amended complaint, I would direct you at the least to paragraph 94, which identifies New York Life and/or MassMutual as other suitable providers in paragraph 192 that says --

THE COURT:  I'm going to ask you to slow down a minute.

MR. SMITH:  I'm sorry.  Yes.

THE COURT:  I want to follow the bouncing ball here.

MR. SMITH:  Okay.

THE COURT:  Okay.  So the -- so the other suitable annuity providers, I'm to read as suitable meaning not only do you like their investment model better, but suitable meaning they were situated to potentially take on this deal?

MR. SMITH:  Yes.  It's in the context of this complaint challenging this transaction.  That's why we described them as suitable.

I would also direct the Court to paragraph 192, which expressly says, and you referred to this in your questions of Ms. VerGow, expressly says that the price that would have been charged by New York Life or MassMutual would have been substantially greater.  Okay.  And that's because we know what the prices are out in the industry.  We consulted with an actuary who is familiar with those prices and was able to tell us that, in fact, you know, these comparators would have

charged a higher price.  I also want to suggest --

THE COURT:  Can I --

MR. SMITH:  Yes.

THE COURT:  I want to put a pin in it.  We don't necessarily have to address it right now, but one of the things that I am interested in hearing your views on is because this was a partial risk transfer, the fiduciary obligations of the employer in State Street may have extended not only to the transferees, if you will, or the folks who are receiving annuities, but also to the remaining beneficiaries of the defined benefit plan.

And indeed, we've seen lawsuits in which -- I'm now forgetting who was sued.  Was it Verizon was sued for buying an annuity that was too expensive?  And the theory of the suit was that you had shortchanged the plan and the existing beneficiaries by overpaying for the annuity.  So at some point I want you to address how I'm to figure in that.  I think it's going to be -- in my notes or my proposed questions, I have it closer to the end in this question of, all right, when is cost or lower -- apparently lower cost a proxy for an inferior product?

But it's a question I didn't have occasion particularly to ask defendants, but I do -- I am interested in your views on.

MR. SMITH:  Yes.  And if it's okay, I'd like to

address that in connection with the cheapness in part.

THE COURT:  Yes, that's where I have it in the outline.  It's just you've referred me to the paragraph that hits hardest on the cheapness point, so that's why I mention it.  But I don't mean to take you out of your argument.

MR. SMITH:  Okay.  And so let me just finish up on the comparative point.  We've also got paragraph 75 that says that MassMutual and New York Life have dominated the PRT market in recent years, showing that, you know, they are players in the same market.  And then, I don't want to read too much into this, but I heard Ms. VerGow say, well, these other companies, you know, would have done the PRT.  Perhaps she was simply crediting the plaintiffs' allegations.  But I think the defendants are very well aware that MassMutual and New York Life are capable of playing, you know, in this field.

And one more little piece of confirmation is the NISA study, which you may -- you may say, I don't like it in terms of its risk analysis, but what it does do is look at the large companies that are in the PRT space and identify them and compare them to one another.  The Court may not care for the analytical framework it uses for that comparison, but the idea that a huge advisor, investment advisor for defined benefit plans wouldn't be in a position to know who are the players in the field, I think we're entitled to an inference that -- you know, this is incorporated in the complaint and I think we're

entitled to an inference, these are the competitors.  So that's our basis for that.

And let me just say this about the size of the transaction, because I heard Ms. VerGow mention that, maybe you did as well.

THE COURT:  I did.

MR. SMITH:  If the question is, wow, $8 billion, is that something that two companies that have been around a lot longer than Athene, New York Life and MassMutual, is that something they could handle or would --

THE COURT:  Or would choose to bid on?

MR. SMITH:  Well, definitely choose to bid on, but I would simply make this point.  If it's a really big transaction and you're the settlor, you're the plan sponsor, and you want to do things in a very safe way, you could split it up, and you could give $2 billion to New York Life, $3 billion to MassMutual, and the remaining $3 billion to someone else.  That would be an easy and safe way of diversifying your risk, making sure that you had the safest available annuity in the language of --

THE COURT:  I mean, that's essentially the theory.  Am I remembering right who the company was that was sued for going too heavily on?  I thought it was maybe Prudential.  I'm mixing up the facts.  Was that *Lee versus Verizon* or am I -- I'm mixing things?  I saw a nod, which I took as encouragement, but

the record won't reflect it because she's sitting right behind you.

But, I mean, one of the things I'm also going to ask you to address before we're done is can't you sue anybody all the time for any one of these deals?  I mean, you know, we're seeing complaints.  You know, another judge in this court has one where the challenge is they hired Prudential and that was crazy is the gist of that allegation.

I mean, given the complexity of the setting, it's very hard for me to know what gets you over that plausibility hump given that one can reverse any one of these arguments and say, well, they say the opposite?

MR. SMITH:  Well, let me say a couple of things. First of all, it's important to note that the Prudential that does the PRT transactions is not the one that we all know and love, the one that has the, you know, multi-hundred-billion-dollar, trillion-dollar balance sheet. It's actually an outfit called something like Prudential Insurance Company of America.  The balance sheet looks very different.  Okay?  But that's not this case.  We're not here to argue about it.  It may well be that our allegations are much stronger than that one.  One of those cases was actually dismissed in another court, a non-Athene case.

What we are here to say is that Athene meets the test that you identified in the R and R.  Athene does.  Whether

other people do, different story.  Okay.  And not our -- if I may say -- yeah.

THE COURT:  I mean, your argument is there's enough that smacks of heavily layered financial arrangements.  I'm trying, you know, that the multiplicity of layers and related party transactions is such that, at least as an outsider, you're in a position to allege that no reasonable fiduciary doing their job right could have picked Athene?

MR. SMITH:  That's correct.  And we're accepting the burden imposed by the R and R, you know, as the Court outlined.  I mean, we have our disagreements with it, but we're accepting that burden.  And that's why the amended complaint takes what we really hoped and expected was a serious and substantial effort to meet those two requirements about the comparators and the separate accounts head on.

Let me mention one of those in particular.  You talked about layered transactions.  And one way of expressing that is affiliated assets.

THE COURT:  Right, which you've got this metric of growth in affiliated assets, and defendants say, why does growth matter?  If you don't know your starting point and your proportions, how does growth in absolute terms tell you anything about riskiness or nonriskiness?  How are we to make sense of that as a metric for this?  So walk me through that.

MR. SMITH:  Sure.  So any time you see a rapid change

in any metric that's associated with a big financial institution that's supposed to be in the, you know, safety business, like a life insurer, that's a reason for concern.

When the growth is in terms of affiliated assets, it's especially concerning.  The reason for that is that affiliated assets in this context refer to the private-equity-generated proprietary investments that have been spun up by Apollo, which is the parent of Athene.  And the challenge there, the problem is that instead of taking your MassMutuals and your New York Lifes, okay, which invest in Treasury bills and things of that nature, marketable securities, if your investments are in the things that your parent pushed onto you, the fact that those are, A, a big part of your portfolio, and B, are escalating very rapidly, that's a cause for concern.  And it is not seen in the context of New York Life and MassMutual.

And so that's the comparison we're making, a sharp, rapid movement in any aspect of this unless it was super safe, super nonrisky, your completely derisked types of investments, is a matter of great concern.  That's the point that we're making.

THE COURT:  All right.  And if I may, this is a slight disconnect between your chart, which I find helpful in my own notes, but when I look at paragraph 122 of your complaint, you say, as reported at year-end 2022, Athene had significant exposure to high-risk assets, including commercial mortgages,

mezzanine loans, real estate held for income, real estate held for sale, derivatives, and other invested assets.  It goes on and on.  And high-risk bonds, including RMBS and CMBS, and other loan backed and structured private credit notes.

And we've just covered in the space of three lines a huge array of classes of financial assets, some of which I kind of thought real estate held for income and real estate held for sale was the staple of the oldest version of conservative insurance company investment.  Why -- am I missing something?  I mean, it just sounds like you've listed all kinds of stuff which can be high risk, it can be low risk, but as an asset class, it doesn't necessarily scream out to me as a particularly risky asset class.

MR. SMITH:  Well, certainly, Your Honor, if you compare it to Treasury bills, Treasury securities, marketable securities, you know, like index funds, something that can be readily sold in the event of, as you --

THE COURT:  Okay.  So liquidity is certainly different as between real estate and marketable instruments.  But I thought that was the whole way you ran an insurance company is you have actuaries in one room telling you how long it is till you need to pay anything out, and you have investors in the other room who look for investments with time horizons that correspond roughly to what your future cash needs are.

I mean, I don't think anybody runs an insurance

company by buying just a whole bunch of Treasuries, but I could be wrong.  I mean, that strikes me as a version of insurance. It's more like what I thought when I was a kid, which is they hold all the money and they have all the money, and they're ready to pay it all.  If everybody, you know, dies of COVID next week, the insurance company has all our money sitting there and it pops out.  And I don't think anybody runs their insurance companies that way.

So I'm having trouble figuring out how, as a matter of asset class, I'm supposed to say that this is a plausible allegation of higher risk.

MR. SMITH:  Sure.  And, you know, it's a complaint. And at a certain point, we certainly hope and expect we'll have, you know, more granular detail.  But maybe the best way to address it is to look at paragraph 123, which follows, and says, let's look at these higher-risk asset categories, which are just identified in a shorthand way in 122, and let's look at the comparators in New York Life and MassMutual and say, how does the surplus relate to them?  The "surplus" being the theoretical amount by which your assets might exceed your liabilities in the case of an insurer.

And we see that there's just a very big difference between roughly 4 percent for Athene, 25 percent or 33 percent for MassMutual and New York Life.  So that's a sort of unbalanced way of summarizing the higher-risk categories and

saying that Athene is in much worse condition compared to the comparators.

THE COURT:  So do I have to accept as plausible -- if I go back to paragraph 122, do I have to accept as plausible that high-risk assets include commercial mortgages -- mezzanine loans, who knows -- but real estate held for income and real estate held for sale is itself a high-risk asset class?

MR. SMITH:  I think we probably should have said higher risk.  That's the way we frame it in paragraph 123, higher risk.  We also have, and I think this is partly responsive to your point, when we talk about the so-called separate account, we say that Athene does two things.  It puts less into it and it assumes a higher rate of return from it. Okay.  And that tells you that Athene has put higher-risk assets into that separate account because they believe that they can project a higher rate of return from it.  So it's not that they have the same amount but they project a higher return.  It's that they have a smaller amount and hope that they can make up the difference from those projected higher returns.

And the other thing I would say, Your Honor, is obviously not every -- we tried to list the different things in paragraph 122.  They vary.  If I look down at the last couple, structured and private credit notes, I'm not asking the Court to take judicial notice of what's been in the Wall Street

Journal and the New York Times in the last couple of months. But private credit is a completely different kettle of fish. If you're putting substantial money into private credit in your portfolio, in your general account or your separate account, that is super risky.  It's not just higher risk, it's extremely risky.  And so there's a spectrum, but these are in general higher risk.

THE COURT:  Okay.  And then -- all right.

On credit ratings, I mean, I take it this is pretty similar to what was in the original complaint in the sense that there's a widespread discussion about whether the -- how the lesser and greater of the nationally recognized rating agencies compare.  And clearly some look at instruments, the others don't, and so you're going to get rated by different rating agencies.  But in my --

MR. SMITH:  The higher credit ratings, I believe, is largely from the NISA study, and it does rely in significant part on the credit rating agencies.  I agree with that.

I want to say one quick thing about affiliated assets, because it was something that was stressed by the defendants in their motions.  There are two different things here, right? There's affiliated assets.  We talked about what those are. Then there's affiliated asset management.  Affiliated asset management is just the idea that the investment manager for the insurer happens to be associated with them, and it's not

someone they hired at arm's length.  There may well be widespread use of affiliated asset managers across different insurers, but the same is not true of the selection of affiliated assets.  And I think it's something that was mentioned in the R and R.  It's also mentioned by the defendants here.  Those are two different breeds of cat.  The affiliated assets are inherently risky.  The affiliated asset management is not necessarily.

What I'd like to do now is address the questions the Court raised about the -- what about the Department of Labor, what about Iowa, and then the question about cheapness and riskiness, if that's okay?

THE COURT:  Well, let me bear in a little closer on that because I think my questions for plaintiff differ somewhat from my plaintiff -- questions for defendants.

MR. SMITH:  Okay.

THE COURT:  I mean, do you agree that ultimately liability in this case would turn on whether or not there are identifiable process failures by the fiduciaries?

MR. SMITH:  Yes.

THE COURT:  Okay.  So all of what we're talking about now is proxy or preliminary to getting into the question of whether the fiduciary did something in their process that was -- I'm trying to be careful because it's a field in which some of the writing has managed to foul up the nomenclature.

We have this term "objectively reasonable," which actually means unreasonable but lucky as the term is used by the courts. And what I'm talking about is -- maybe I'll use the word "blatantly unreasonable" -- failure to meet, failure to read or review -- failure to hire consultants, failure to read or review materials provided by consultants.  Gosh, going back to the *Bocian* case, ignoring your consultants' recommendations in favor of blatantly self-interested efforts to maximize surpluses in a benefit plan in order to allow withdrawals, those kinds of things.  I mean, that's ultimately what we're going to have to go looking for, isn't it?

MR. SMITH:  I would say that everything you've just described is sufficient but not necessary.  Okay?

THE COURT:  So tell me what the low end of that is, because I just finished, and Judge Sorokin just finished, a long process where ultimately on both sides we concluded that there was enough to move forward at 12(b)(6), there was enough to move forward at summary judgment on at least some charges.

And then you get to the end of the day, and I was not present for the trial that Judge Sorokin presided over, but I've reviewed the findings.  I mean, pretty underwhelming in comparison with the initial allegations, and I'm mindful that that case isn't before us now.  But given the skepticism that I've expressed with respect to a number of the metrics you're using, I have doubts about whether I can exercise that

skepticism at the 12(b)(6) stage.  But it, you know, strikes me as at least a very serious prospect that if you survive 12(b)(6), a reasonable plan of discovery might involve focusing on was there a committee, did they meet, did they hire a consultant, did their ultimate decisions track reasonably well what the consultant recommended as a range of reasonable alternatives, did they ask blatantly wrong or slanted questions of the consultant in order to tip it?  But that's about it.

And do you agree that that's what we're going to be talking about?  I mean, that's what the Department of Labor or the Secretary of Labor seems to be saying.  And it strikes me -- unlike the standing issue, it strikes me as a fairly sensible assessment that courts and juries are not the folks to figure out what is the best way to invest over a 25- or 30-year time horizon.  And the only question is, did the fiduciaries follow a prudent process?

Do you agree that's what we're going to be doing?

MR. SMITH:  I agree that's certainly part of what we're going to be doing.

THE COURT:  So what's the what else?

MR. SMITH:  Well, let me just say that everything that's on this summary and everything that's pled in the complaint about Athene as of 2022 was publicly known, publicly available.  And so when we say that Athene was, you know, dead last or in the bottom couple of percentile --

THE COURT:  I mean, I'm prepared to assume that if they were dead last in 2025, they were in the running for dead last a few years earlier.  Some of the other ones I'm a little more -- Financial Times articles from 2025 --

MR. SMITH:  No, no, that's really just about standing.

THE COURT:  Okay.

MR. SMITH:  Yeah.  Everything that we have on this sheet is about comparing it to MassMutual and New York Life.

THE COURT:  Okay.

MR. SMITH:  Okay.

THE COURT:  All right.

MR. SMITH:  Let me sort of restate the thesis of the plaintiffs' case.  Okay?  Athene had been out in the market. People knew that they were cheap.  Big employers had long ago given up their defined benefit pension plans for people who are current employees.  They had frozen accruals for anybody who had a vested benefit, and they were looking for ways to do it on the cheap.  And Athene was one of the top, probably the top offeror in that space.

And so if you're an employer, a sophisticated employer like AT&T, and you want to do the most that you can to avoid a successful lawsuit against it, you're going to engage someone like State Street.

Our thesis is that the fix was in.  That's why AT&T, just a month after State Street was engaged, issued an RFP,

request for proposals, to Athene.  That's alleged in the complaint.  That's a new allegation.  Okay?  That's why they focused on Athene.

And so what the Department of Labor says is that you've got to choose the safest available annuity.  There might be more than one.

THE COURT:  Right.  I mean, if we -- I think we all read that as the safest available annuity or something not materially different.  It's not who's the number one in the race, but who's finishing with the top group as opposed to who's with the caboose end of the race.

MR. SMITH:  Right.  And that's why, for example, we're told -- and we'll talk about this more in a moment.  We're told that when you have your New York Lifes or Lives, your New York Lifes and your MassMutuals, you know, bidding to issue a general annuity -- a group annuity contract, that their bids are going to cluster in the hundred and something percent of the liabilities area.  They're not going to be exactly the same because even actuaries can vary slightly, but over many lives that can be a big number.  They're not going to be exactly the same, but they're going to cluster up there.  And any one of those would have been fine.  You're going to find that Athene bids substantially less.

We're entitled to the inference from that, that that was the main attraction here, because there's no benefit to the

employer from having super risky assets unless it also means a lower price.  Right?

And so our theory is the fix was in.  Everybody knew it was going to be Athene, and State Street is there to dress it up.  And we expect to demonstrate that through discovery.  We do.

THE COURT:  So you expect to find that State Street always recommends Athene?

MR. SMITH:  No.  We know that they have recommended other players in other situations.  And, you know, presumably we're gonna -- we're gonna hear about that.  But when you see this mismatch on the price and you see everything that was out there in the public eye as of 2022, okay, you can't be headed for Athene because, you know, it's a great name, it's -- Apollo is a great brand, you know, all of those things.

And so we expect to demonstrate that it was AT&T's expectation and hope from the outset that Athene would be the major, if not the only, one considered.  That's what we expect to demonstrate.

THE COURT:  Let me ask something else again, if we're looking down the road, does it matter, and if so, how, that this was a partial risk transfer such that there would be an impact on the remaining participants in the defined benefit plan?  And is that -- is it fair to take price into account given that there are defined benefit plan beneficiaries who

could also be affected by the decision?

MR. SMITH:  Well, a couple of things to say about that.  I think the Court mentioned it in the R and R.  At page 13, note 5 you said, the sole duty of the fiduciaries in this case is to the terminated participants.  Okay.  And we think that that --

THE COURT:  I'm wondering, though -- I have the feeling that At&T and State Street are suggesting I got that just plain wrong.

MR. SMITH:  Well, that may be.  So let's talk about that.

THE COURT:  So, assuming I did, we're back for another bite of the apple.

MR. SMITH:  If I understand it correctly, the argument is we saved money so that we could take care of the remaining participants.  Okay.  Let's remember, okay, that this is not a plan that was in extremis.  AT&T was not an employer that was in distress.  There's a mechanism under ERISA, and I've dealt with it, where you can terminate a plan.  It's called a distress termination.  This is not that, not even close.

The plan, as Ms. VerGow said, was well funded.  AT&T was well capitalized.  There was no reason, no need to save money for the other participants.  And remember, Your Honor, that AT&T had an absolute, undivided and unflagging obligation to pay those remaining participants, and they were not at risk

in any way.  So the only reason that they could have done this on the cheap was to save money for themselves, for themselves.

THE COURT:  Well, "themselves" meaning State Street would have done it to save money for AT&T.

MR. SMITH:  Yes, okay.  That's right.  Or why did AT&T engineer this thing, just to be clear about what our theory of the case is.  So I want to suggest to you that, you know, it's no justification.

I also want to say that that argument sounds a lot like an admission that there's been a breach of duty.  Because it's one thing to say we picked one of the safest available annuities.  We picked New York Life instead of MassMutual.  They were a little bit cheaper.  That's totally fine.  What you can't do is pick an objectively unsafe annuity provider for any reason, including, allegedly, to save money for the remaining plan participants.  That's prohibited.  That's prohibited.  You can't rob Peter to pay Paul under ERISA.

And the other thing I want to suggest is that this is another example of what the defendants' latest papers do where they try to draw different inferences from the facts.  We look at this and we say AT&T wanted to save money for itself, because it already had to take care of the remaining participants, and that's why they did this.

They look at it and they say, no, no, no, we had a totally innocent explanation for that.  Okay.  Well, our

inference is plausible.  It's not crazy.  I mean, the Court recognized in the R and R and just said, like, I understand what the plaintiffs are saying here.  And so --

THE COURT:  I mean, presumably nobody at AT&T says, we ought to go look at a PRT because we think it could totally foul up our balance sheet and make us look worse financially if we did that, but it might be good for some of our retirees.  Nobody's suggesting that's what they did.

On the other hand, that is always at issue in every PRT, and that's where I think ERISA has said, yeah, but Congress says PRTs are okay.

MR. SMITH:  Well, let me turn it around.  The defendants are fond of saying, like, these arguments are too -- they prove too much.  They would prove that every PRT could be undone.  Well, this would be an argument that every partial PRT could be justified because you would say, look, we've taken it off our balance sheet, and now everybody else is safer, right?  And so it's got to be sauce for the goose, sauce for the gander.

THE COURT:  I understand the point.

MR. SMITH:  Okay.

THE COURT:  All right.

MR. SMITH:  So that's our position on that.

Let me talk about Iowa and the Department of Labor and stuff like that.  I mean, I heard the Court's question.  You

said, how do I weigh this on a motion to dismiss?  This stuff's irrelevant on the motion to dismiss.  It doesn't factor into any, you know, understanding that I have ever seen articulated in a judicial opinion about, you know, why a claim like this should be dismissed.

It's an effort to inject -- another effort by the defendants to inject additional facts, including amicus briefs that were filed in a totally separate case than this one and say, look over here.  Okay?  And we, respectfully, to my brothers and sisters behind me, we say that that really is just an effort at distraction.  Okay?  You can't fit this into the 12(b)(6) or the Rule 8 analysis.

I can't exclude the possibility down the road, I suppose, that we might have some expert testimony about how state regulation is horrible and is subject to industry capture and, you know, is no protection whatsoever.  But the idea that this somehow, you know, should justify the grant of a motion to dismiss, it just doesn't compute to me.  I don't see how it works.

You know, it's funny, because the defendants actually identified three different actors they said had turned thumbs down on this theory.  The first one they identified was Congress.  Okay?  Congress has spoken.  1332(a)(9) says, we have a cause of action.

THE COURT:  I mean, how Congress speaks and how the

Supreme Court hears them have been -- you know, one can well imagine on the one hand that the folks in Congress who enacted that would have been shocked to hear the Supreme Court saying, yeah, but not here.  On the other hand, the Supreme Court has certainly the last word on the point, and their point is Congress can't create causes of action unless there's an underlying harm that is cognizable as a concrete injury within the meaning of Article III.

MR. SMITH:  Absolutely.  I'm not talking about Article III now.  I'm talking about whether on the 12(b)(6) analysis --

THE COURT:  Oh, on the 12(b)(6) analysis, Congress has said you've got some interest in the quality of the fiduciary decision making.

MR. SMITH:  Yep.  Okay.  So the next step is the states.  So there are some states that filed an amicus brief in another case.  And by the way, if the -- you know, if the Court wants to go read amicus briefs in other cases, I would commend to the Court the amicus briefs that were filed on the plaintiffs' side of the case over in the Fourth Circuit.  I'm not suggesting for a moment that that's a useful endeavor.

THE COURT:  There was a time, but it's not quite so recent, that I did read said amicus briefs.  I don't remember them at all.  But, you know, it's -- is it Will Rogers?  Where somebody stands -- if you want to know where someone stands, look at where they sit.  There's a certain predictability in

most of the views expressed from one side or another of a very large financial industry with differing segments competing with one another.

MR. SMITH:  There is one exception to that.  I mean --

THE COURT:  Something I really ought to read?

MR. SMITH:  -- from the AARP, we had a brief from the Pension Rights Center.  They're obviously interested in the protection of retirement income for individuals.

But we also had a brief from two former DOL officials who served under multiple Democratic and Republican administrations.  They filed a brief as well.  I think that's worth taking a look at.

But I guess what I would say about the state regulatory schemes, however ineffectual they may be, is that, you know, Bernie Madoff was regulated.  Every public company that is the subject of a securities fraud suit was publicly regulated by a very impressive, I am told, regulator called the Securities and Exchange Commission.

THE COURT:  You're getting a little close to the bone. The good news for me was it was appropriately referred to the New York region.

MR. SMITH:  I hadn't thought about that.  So my point is just that you could have a clean bill of health from the SEC and you could have a clean bill of health from Ottumwa, Iowa, or one of the other quad cities in Iowa, and that would not

tell you whether or not this was an effective regulatory regime or whether it was unsafe.

I'm going to talk in a moment about risk-based capital.  I mean, we're going to demonstrate that risk-based capital, number one, is the wrong metric here.

Number two, that Athene's risk-based capital was massively overstated.

And number three, that even if the number that they have proffered from these facts outside the complaint is to be considered, it's not even a very respectable number.

The last thing that Ms. VerGow mentioned was, she said, well, what about the Department of Labor and the 2024 summary, which -- report which DOL issued?  And if you read that through, which I think you did because you quoted it in the R and R, that essentially says, we're going to punt.  We haven't seen anything to tell us to get rid of 95-1.  We think that there are some important principles in there.  It certainly didn't say that we bless the use of private equity in annuitization transactions and we encourage more of that because it's good for Americans.  I mean, that's just not in there.

THE COURT:  The current secretary says that, though, essentially.

MR. SMITH:  Perhaps, perhaps, and that's impossible to fit into the 12(b)(6) analysis, also.

But what I will say about this is that, you know, Ms. VerGow said, well, it's part of the information that was available to the fiduciary at the time of the transaction. That's not correct. The 2024 report by the Department of Labor was two years after this transaction. And the amicus brief that Iowa signed on to came out in 2025. So that, absolutely -- those particular sources were not available to them.

I really think that there is -- you know, that these are attempted distractions. And I want to focus -- I'd ask the Court to focus on our factual allegations and the Rule 8 pleading standard. And I'd remind the Court that, as the Supreme Court said in *Thole*, it said there's no Article III exception for ERISA. There's also not an Article III exception --

THE COURT: An ERISA exception for 12(b)(6).

MR. SMITH: -- an ERISA exception for 12(b)(6), there isn't. There isn't. In this case, as in every other case, it provides a useful role, but it's not intended to be Mount Everest. Okay? And so you can't factor these things into it. I don't -- I don't really see the point in trying to do so.

I want to talk a little bit about the separate accounts and the risk-based capital, but are there other issues?

THE COURT: No, let's do those. And then I've got

some quite separate issues I did want to ask you about, but that would be useful.

MR. SMITH:  Okay.  Very good.

So the risk-based capital argument was originally based -- they said Athene's got a good risk-based capital level.  And this is another example of the defendants saying we don't like your metrics.  Right?  You've pled them and the facts are out there.  They're well-pleaded facts but you're wrong, a different metric should be applied.

Maybe they said it should be decided on the basis of this case from the Southern District, Robanais, R-O-B-A-N-A-I-S.  That was a case that simply cited and accepted as true on a motion to dismiss the plaintiff's allegation that risk-based capital was the right metric, not that it was the best one, and not that it could have established here or anywhere a standard for this case.

But we -- I think it's important to look at paragraph 105 of the complaint.  Even if you were to say, well, I want to give that some consideration, paragraph 105 says that Athene's risk-based capital was greatly inflated due to its extensive use of what we've been talking about before, the modified coinsurance or the mod-co.

And then the last thing I want to tell you, and I think I forecast this, at the appropriate time, we'll be in a position to present expert testimony that even if Athene's

grossly inflated RBC ratio or RBC number was taken at face value, it was still not a safe choice relative to its peers, that it was not at a high enough level compared to its peers that it should be accepted.

Okay.  What would be helpful for you to hear about in terms of the separate account, if anything?

THE COURT:  I'm a bit at a loss.  I mean, I think I understand the parties' respective arguments, and as my comments may have indicated, the challenge for me is figuring out what to make of those arguments and how to square them with my responsibilities under 12(b)(6).

I can divert you to something utterly unrelated.  In initially ruling -- I think you're right about this -- in finding that plaintiffs' efforts, which I spoke of quite unkindly and mostly meant it, to avoid discussing the separate account meant that I felt it was necessary to dismiss the initial complaint under 12(b)(6), that meant that I did not have to reach specifically this question of whether there were sufficient allegations with respect to either the individually named defendants or to the questions of monitoring or various theories of derivative or cofiduciary liabilities.

So if assuming I have to reach those, I mean, don't they have a point that there's nothing in this complaint that says here's what this or that individual did that they shouldn't have done?

MR. SMITH: So first, to get there, you would have to still be in the same position as to AT&T's role as fiduciary. Do you want me to address that at all or no?

THE COURT: I mean, if you've got something new to say. I mean, I'm concerned that we're going to go round and round, on the one hand, my view that there's at least a risk that it's enough in any case to allege that the settlor could have backed out of a deal, and therefore, is a cofiduciary in some respect.

This is essentially -- your view is you can't delegate away all of your fiduciary responsibilities. And I think, as I understand your argument, if you do delegate it away in such a way that you've actually gamed the system and picked an acting fiduciary that has essentially predetermined the outcomes, that doesn't relieve you of your fiduciary responsibilities in the selection of an annuity provider. Do I understand your argument?

MR. SMITH: I agree with that. And I would add two --

THE COURT: I'm not asking -- I'm just trying to make sure I under -- is that the gist of your argument or is there -- it sounds like there's more you'd like to add.

MR. SMITH: That is part of it. Let me tell you the additional parts. These are additional allegations in the amended complaint. Because, as I said, we took the Court's, you know, instructions to heart.

So the first thing that's different, it's the smaller of the two, but it's still a significant fact; that's the issuance of the RFP to Athene by AT&T just a month or so after State Street had been engaged, and you know, well in advance of the decision to annuitize with Athene.

THE COURT:  And what am I to make of that?  How does that cut?  I mean, it doesn't make them a service provider for purposes of prohibited transactions, I don't think.

MR. SMITH:  Well, the test is under 29 USC 1002(21)(A).  That's the definition of fiduciary.  And that provision says it's any exercise of, quote, discretionary authority, unquote, or no discretion required, or responsibility over plan management, plan assets or plan administration.

And our contention is that both State Street and AT&T were fiduciaries, and that one -- and that AT&T, by serving in multiple roles in this transaction as a recommender of Athene, as the person who issued the RFP.  And then let me come to the second new thing, which is expressly put in the complaint.  We say in the complaint that AT&T, of course, had the ability to call things off.  AT&T could have said at any time, you know what?  We've been thinking about this annuitization thing, but our retirees are too important to us.  We're not going to do it.  That is not the exercise of fiduciary discretion, okay?

THE COURT:  That's a settlor rule.

MR. SMITH:  That is a settlor rule.  But I'll tell you something, that is the exercise of discretion; that is, the allegation in the complaint that AT&T retained the ability to veto any insurance provider, any insurer that was not Athene or someone like it.  And what I mean by that is that if State Street had come back and said, MassMutual looks good or New York Life looks good, AT&T had the ability to say no to that.  That's different from canceling the transaction.  It's a veto power.

And what I would suggest to the Court is that while State Street could propose, only AT&T could dispose, right?  And by making State Street essentially a recommender or a nominator whose concurrence by AT&T was required because they could have been in the position -- I don't know if you're a baseball fan.  They could have been in the position of the pitcher who shakes off every pitch that's suggested or called by the catcher and says, I'm going to throw the spitter, okay?  That's what I'm going to do.  AT&T had that power.  And that, I suggest, is different from the ability to call things off altogether.  That makes you an additional fiduciary, not the only one, but a fiduciary.

And in terms of what's alleged in the complaint -- now we're going to move to the derivative part, unless the Court has questions about that.

In terms of the derivative part, I think it's Count

2 -- is that right -- Counts 1 and 2.  We say in there what the complaint pleads in great detail, that all of the facts about Athene were known and that AT&T had the intent to get something on the cheap and that it didn't really care whether it was risky or not.  So those are intentional acts.  Everything was out there.  AT&T had all the information that State Street had and then some.

In fact, if I had to guess, I would say that AT&T did some work in advance of going out to State Street.  I don't know that.  That's the sort of thing that discovery will disclose.  So from a derivative standpoint, both at the outset and as the process progressed, AT&T knew all the facts and had liability to the same extent as fiduciary.  Again, being the fiduciary on this deal is not binary.  It's not a question of is it going to be State Street or is it going to be AT&T?  Both of them could be fiduciaries.

THE COURT:  All right.  So what about individuals?

MR. SMITH:  We allege individuals who were involved, you know, in this --

THE COURT:  Meaning they were on a committee.

MR. SMITH:  Who are on a committee.

THE COURT:  But there is literally no allegation -- other than one guy who signed something, there's no allegation that any given individual did any actual act.  So how do I find that there has been a plausible allegation that they violated

any of the statutory bases you propose for liability?

MR. SMITH:  I'll just say this, and the Court can obviously give me its reaction, AT&T cannot act except through its authorized agents.  It forms committees.  The committees are staffed by individuals.  The information that's in the complaint was known to AT&T only through those individuals and only through those committees.  So they, in acting as a committee, exercised fiduciary responsibility.  That's all there is.

THE COURT:  I mean, what a -- what if one member of the committee was sick on the important days?  Are they still liable?

MR. SMITH:  I think if you're sick and you've got like a super consequential decision to make, you call in sick and say, we need to table this until the next time.

THE COURT:  If there's a quorum, I mean, at least our Senate and Congress don't work on that principle.  I'm just wondering, how do I -- actually, can I ask you just a blunt question, which is, why do you want these guys in as individuals?

MR. SMITH:  It's not -- Your Honor, that's not the particular hill that we seek to die on.

THE COURT:  No, no, I -- okay.  That may partially answer it, but it's actually a genuine question.  It's not a rhetorical question.

MR. SMITH:  I'm Sorry.  So one answer might be --

THE COURT:  I mean, do you get different leverage? Does discovery look different?  Presumably, if there's a pocket that's going to come up with the hundreds of millions of dollars that you say is at stake in this, I'm not guessing it's any of these individuals, and I'm guessing that these individuals have D&O policies of some sort that protect them. So -- so if -- I've never sat in your seat, but if I'm looking to sue people in connection with a big financial --

MR. SMITH:  First --

THE COURT:  -- transaction, the decision to charge individually is usually going to turn on issue -- I mean, I'm not used to looking at that question in quite the same light as somebody who's representing a putative class.  So I'm curious what your thinking is.

MR. SMITH:  Sure.  Let me give you the legal answer and then the practical answer.  The legal answer is if you look at 29 USC Section 1109, which addresses fiduciary duty, it does speak of personal liability.  It says "personally."  The practical answer is, as you just suggested, there may well be, and in my experience there typically are, D&O policies or ERISA -- tailored ERISA policies that cover individuals.  And I don't know that for sure, but we didn't name it -- we didn't name the individuals for sport.  We thought that that might become relevant, and we knew that they sat on these committees.

We didn't choose them at random.  So there may well be consequences to having the individuals in the case.  And I don't know that for sure today, but I do know that, as I said, ERISA 1109 says, you know, you might be part of a larger assemblage, but you do have personal liability.  There's no, like, there's this concept of fiduciary shields in personal jurisdiction litigation.  That's not how ERISA approaches it. It's not.

THE COURT:  All right.  No, I mean, I'm certainly familiar with that in other kinds of ERISA litigation, where particularly closely held companies were very much talking about the individuals.  Here I was just trying to get a handle on it.

MR. SMITH:  Sure.  Unless my colleagues have more to add, I think that was our reasoning there.

THE COURT:  All right.  All right.  I think I'm set. I mean, I'll say this, I'm out on a limb on Article III standing.  I still think I'm right.  And that's -- it's very hard to dissuade me of that, as Ms. VerGow knows.  But I note that when you repleaded this thing, you've repleaded an awful lot of the language that I tend to think is completely irrelevant, which is, are you better off with a defined benefit plan or with an annuity when, at least as I read it, the only justiciable case or controversy is whether or not a fiduciary failed in their obligation to pick a good annuity rather than a

crummy annuity?  I'm just curious, are you prepared to defend this thing on appeal?  Because, you know, this could be headed in that direction.

MR. SMITH:  So, first of all, the stuff that we replead -- and I hope we said this in our papers -- was not intended as disrespect to the Court.  It was to make sure that --

THE COURT:  Reserve your issues, all right.

MR. SMITH:  -- you know, waived any argument.

THE COURT:  I'm not worried about disrespect.  I'm just thinking about where this thing goes.

MR. SMITH:  And I will tell you, you know, we do believe that the question of are you better off today, as someone once said, that that is the injury question.  And that even though PRTs, annuitizations are legally acceptable, the question of injury is separate from that.  You could have a situation where you had Article III injury but a terrible claim on the merits, right?

THE COURT:  I mean, isn't that what I said last time?

MR. SMITH:  I understand that, and I'm --

THE COURT:  I mean, I'm toying with you there, but that was essentially my ruling.

MR. SMITH:  Yes, yes.  Yeah, no, I get it.  And I apologize for repeating myself.  But that's why it's in there, to make sure there's no waiver.  And I get it, you can't waive

standing, et cetera, et cetera, but that's the argument there.

THE COURT:  All right.  Thank you very much.  I do have a couple of questions for defendants, and we'll give them --

MR. SMITH:  Sure.  Do you mind if I get some more water?

THE COURT:  Please.

My clerk has stepped out, so I'm going to offer --

MR. SMITH:  Your Honor, I want to point out that defendants have big pitchers of water.

MS. VerGow:  They're empty.

MR. FLECKNER:  They're empty.

THE COURT:  Thanks.

MS. VERGOW:  Your Honor, I'd be very happy to answer your questions.  First, there were a couple points I wanted to make, but they're not long ones.

THE COURT:  Well, let me -- I'm just trying to figure out -- I want to make sure I'm asking -- so this argument that -- Mr. Smith's argument that essentially if AT&T -- you know, I ridiculed it a bit as well.  You know, if you could decide not to go through with it, that's not enough to make you a cofiduciary, but Mr. Smith has adverted to actually a rather nice analogy, which is, you know, the pitcher who shakes off a bunch of pitches until he gets the pitch he has in mind, you can't really say that the catcher's calling the pitch at that

point.

And my question is, isn't there a point there?  In other words, if State Street had gone out and said, we've done a search and we've looked at this, and the only carriers we think meet Department of Labor standards are going to charge you something like present value of $8 billion or 8 billion in assets -- I forget where our comparison lies.  But it's going to -- you're not going to save any money.  It's not going to help your balance sheet.  The only thing it does is shifts liabilities in such a way that it's really not going to help you at all.  Do we think, you know, AT&T was not irrevocably committed to going through with this just because State Street proposed a transaction to them, were they?

MS. VERGOW:  Yeah.  So I want to understand the hypothetical.  So if State Street had come forward and said, we can't in good conscience recommend anybody, and --

THE COURT:  Oh, no.  They came back and said, we found five people, but they're all pretty expensive and by the time you're done with this, it's not going to do you anything for your balance sheet or any of the things you might have been hoping for, but here's who we think meet the ERISA standards for quality of annuity, couldn't AT&T, and indeed, isn't it entirely plausible to suppose, that AT&T would have said, well, in that case, never mind, we'll pay you your fee, but it may not be worth all the trouble?

MS. VERGOW:  I think if AT&T said never mind in that scenario, it would be acting as a settlor in deciding not to move forward.

THE COURT:  Right, it's choosing not to settle.  But it's true what we know that's different about my hypothetic -- and that's where I had assumed that, you know, it's a settlor function whether to do a PRT or not, but that at some point, I think plaintiffs' suggestion is, if it is implicitly that you hire somebody to do a PRT or to recommend an appropriate annuity company for your PRT on the assumption that unless you find somebody that's going to ultimately save us some money, we may not go through with it, at that point it's another variant on plaintiffs' theory -- or it's a refinement on what I took to be plaintiffs' theory from the outset, which is the way State Street gets business in the door is by holding out if not a direct, then an indirect promise that if you come to us, you're going to -- we're going to be able to recommend things that will save you, the employer, money.  So come to us and you'll get, you know, fiduciary services and the insulation from liability.  And we have an incentive in making sure that whenever we do this, we are offering products that will make it likely that future employers will keep coming to us because they do save money by doing these deals.

MS. VERGOW:  So there's a lot there.  I think there's a really easy, straightforward answer, and then I want to go a

little deeper.

THE COURT:  All right.

MS. VERGOW:  The really easy, straightforward answer is that the fiduciary definition language that Mr. Smith directed you to requires the exercise of authority for fiduciary responsibility to attach.  So in a circumstance like the one where we have here, where plaintiffs are alleging only inaction, that's not an exercise of fiduciary responsibility.

Taking a step back, I think I heard in Mr. Smith's presentation, you know, the central thesis in his case is that "the fix was in."  And in support of that contention, he points to an allegation that AT&T issued an RFP to Athene.  But I want the Court -- I encourage the Court to focus once again on what's missing from that allegation, which is there is no allegation, and plaintiff could not allege consistent with Rule 11 that an RFP did not issue to other companies as well, right?

I think plaintiffs are urging the inference that an RFP issued only to Athene and that meant that the result here was foreordained.  But they do not and could not allege that an RFP did not broadly issue to other providers who could have been capable of taking on the transaction, and I think that's incredibly important here.

THE COURT:  All right.  Can you take me back, though, to -- at least I may have overstated, but I understood plaintiffs' "fix was in" comment to refer not only to that

particular RFP but to the notion that AT&T was not going to hire any fiduciary -- delegated fiduciary to propose transactions and to solicit bids and so forth, unless they knew and expected that they would save a bunch of money by doing this kind of deal.

MS. VERGOW: So I think, respectfully, there's no factual allegation to support that inference. I think that sort of speculation that AT&T's motives must have been pure -- impure all along the way --

THE COURT: Well, I don't know impure. Saving money is something employers do. I mean, that is inherently a conflict of interest that burdens, if you will, every settlor decision. I mean, presumably we wouldn't have cordoned off as a settlor decision the notion that you may save a lot of money by entering into a PRT. So then the question is, are you motivated to save more money by entering into a PRT and picking a substandard annuity? At least that would strike me as the --

MS. VERGOW: The connective tissue there is State Street, right? So State Street made the decision. And I take it, if I'm understanding the theory, AT&T would have picked State Street and would have breached its duties picking State Street because it would have known and expected that State Street would get the cheapest possible option. I think that needs to be grounded in fact, first of all.

But we also know from the other litigation, including

the litigation against -- involving the choice of Prudential that was dismissed recently, that State Street doesn't only recommend Athene, right?  State Street is in the business of serving as an independent fiduciary, and it wouldn't last very long if it didn't in fact exercise fiduciary judgment but instead betrayed the interests of a fiduciary.  I think that's just a far cry from -- it's a lot to infer in the absence of plausibly alleged facts.

You know, Your Honor had some questions about derivative liability I'll address very briefly.  I think Mr. Smith reinforced the seriousness of bringing individuals into the litigation by noting that his purpose is to attach personal liability to them, I think in, you know, recognizing that there's a serious need for actual allegations about the individuals.

But I want to -- I want to take a step back because I do want to keep the focus on what I think is fundamentally the question in front of the Court, which is whether plaintiffs have alleged that there were other options available to AT&T and by -- with the help of an independent fiduciary that could have, A, served this plan, and B, that employed materially different processes or had materially different risks.

And with respect on sort of point the first, I think the allegations in the complaint that Mr. Smith directed you to are very thin on facts supporting the conclusion that New York

Life and MassMutual would have been capable of taking on an $8 billion transaction.

But more important is the absence of allegations with respect to what other candidates -- the practices of other candidates as they concern the key risks that plaintiffs allege.  And here I want to focus the Court's attention on two things in particular.  One is that plaintiffs in paragraph 122 of their complaint, as Your Honor observed, allege a litany of higher-risk assets that they suggest supported the conclusion that Athene was employing unusually risky practices.

But what is not in the complaint is an allegation that the other candidates to provide this transaction didn't also invest in those assets.  There's nothing in the complaint about whether and to what extent other potential insurance -- annuity providers invest in those assets.

The closest plaintiffs come is their paragraph 123 where they allege -- they look at the percentage of assets relative to surplus, but that doesn't, in fact, tell you whether and to what extent the other insurance company candidates use exactly the same kind of assets that Athene did.

The other, and the final fact that I want to focus the Court's attention on, is the use of separate accounts.  And as I take it, plaintiffs have two critiques of the use of separate accounts here.  One is, you know, the surplus that the Athene separate accounts have; that to me is a wash.  That's a

concession that Athene's separate accounts are fully funded and so are the others, and that to me breaks out evenly.

The second critique that they have of the Athene separate accounts is that they commingle the assets of all of the group annuity contracts that they serve.  So everything is protected from the general accounts, but the services provided under the group annuity contract share a separate account.

But what's missing?  What's missing is an allegation that other insurance providers don't employ the exact same process.  And indeed I would question the safety of an insurance company that chose not to pool those assets and instead to undertake the serious liquidity risks that would be to serve, you know, distinct plans based on a smaller pool of assets without taking advantage of the scale that insurance companies could provide.

Which leads me to my final point, and I said I was at my final one, but this really is the last one.  AT&T is not in the business of running pension plans.  That's not what AT&T does.  It is what Athene does.  And it's reasonable for a company like AT&T to look for outside help in order to manage pension plan risk.  That's what it did in this case.  That's what Congress has authorized, and I think plaintiffs' complaint, the thesis of this complaint would open up to question every single pension risk transfer around.

THE COURT:  Before you sit down, you may have thought

that was your last point, but I'm interested in your response on -- plaintiffs say that in this case because there's no challenge to the solvency of the defined benefit plan that the mere fact that savings on the annuities would have in the near term inured to the benefit of the existing defined benefit plan, another cheaper annuity, more assets available for investment for the defined benefit plan.  Plaintiffs' point is, A, unless the defined benefits plan is otherwise at risk, why is anybody looking for cost savings?  And B, I suppose along with it -- plaintiffs didn't say this -- but if it's not at risk, isn't that really about putting more money in AT&T's pocket since AT&T only has to fund its defined benefits plan in accordance with an actuarial estimate of its future liabilities?

So don't they have a point there that this is different from some of the, say, the multi-employer settings where you get into these closer questions about what's a good enough annuity considering you've got folks in and out of a failing multi-employer plan who may or may not be put at risk by either side of a PRT.

MS. VERGOW:  So starting with the last point, AT&T absolutely owes a duty to the participants in the plan.  And, for example --

THE COURT:  Right.  So I guess if I can phrase it, because this is the point which I had suggested that perhaps I

got wrong, is that duty divided or -- do they have a divided duty of loyalty between the annuitants who will -- the people who are going to receive annuities and the defined benefit plan?  Or is it an absolute duty as I suggested in my initial R and R?

MS. VERGOW:  I think it's coterminous, if I'd have to think -- you know, before the transaction culminates, everybody is a participant in the plan.  And AT&T owes duties to every participant in the plan.

THE COURT:  Right.  Once they decide to do a PRT, they are terminating their fiduciary obligation to the people who are being cut out of the defined benefit plan, subject to one last fiduciary act, which is to pick a very high quality annuity for the people who are otherwise being cut loose.

MS. VERGOW:  That's right.  They owe, but -- and I'm not sure if we're saying a different thing.  We may be saying exactly the same thing.  AT&T owes a duty to every participant in the plan, the departing participants, the current participants.

THE COURT:  Well, but they're different duties.

MS. VERGOW:  They're the same duties.

THE COURT:  No, for the existing plan members under *Thole*, they owe some obligation to invest prudently, and as a company, whether they invest prudently or not, to cover the benefits that they're entitled to.

MS. VERGOW:  And they have to ensure, for example, that the plan is adequately funded.

THE COURT:  Right.  But that's -- whereas, their responsibility for the departing implies more agency.  The folks being voted off the island is more narrowly defined.  The responsibility for those folks is to pick a really good annuity, and that's their last fiduciary responsibility for these people is, if you're going to kick them off the island, you have to put them in a decent lifeboat.

MS. VERGOW:  That's correct.  But those two duties are interrelated in the following sense, because what you send the people off the island with affects the people who are in the plan.

THE COURT:  Well, does it?

MS. VERGOW:  So when you're taking plan assets and moving it to the annuity provider here, Athene, you're depriving the participants in the plan of those assets.  And you have to ensure that you're, you know, leaving them with enough, and it needs to make sense for the people who remain and the people who go.  And that's because this is all done with plan assets.

THE COURT:  Right -- well, I'm having some difficulty.  I'm still wrestling with the question of when you're picking the annuity provider, can you -- is it your position that you can say, you know, I think these other comparators would have

been better.  You know, Mercer has given us a list and says there are three winners, and there's some also-rans, and the best of the also-rans was Athene, are you suggesting that State Street or, for that matter, AT&T could say, all right, we're going with an also-ran?  It's materially inferior to the first group of finishers, but we have to go with an also-ran because we need to save money on behalf of our other beneficiaries.  You're not saying that, are you?

MS. VERGOW:  No, I'm not saying -- I think IB 95-1 precludes that.  I mean, it's a fiduciary act, which is precisely why there's an independent fiduciary appointed.

THE COURT:  Okay.  So you do agree that when selecting the annuity provider, the fiduciary is guided by an undivided obligation to find -- leaving aside what best available or safest available means -- but the fiduciary can't say I'm going to deviate from whatever that standard is based on my obligations to others to whom I also owe a fiduciary duty.  You do agree with that?

MS. VERGOW:  No, and that's what I meant by coterminous.  And this is in part why you have -- why an independent fiduciary can be useful here.  Because AT&T at all times owes duties to the remaining plan participants, and the independent fiduciary has the ability to exclusively consider, you know, what is most suitable for that, you know, the folks who are --

THE COURT:  So you agree, though, that the designated fiduciary has to exclusively consider the quality of the annuity being produced, being purchased on behalf of the people leaving the plan.

MS. VERGOW:  Right.  I think the responsible fiduciary could not make a decision that ignored the process directions in 95-1 for the reason that it would be better for the remaining plan participants.

THE COURT:  Okay.  Thank you.  That's helpful.

So there were -- you said there were two other points you wanted to address.

MS. VERGOW:  I made them.

THE COURT:  Oh.

MS. VERGOW:  You may not have seen -- you may not have heard them, but I made them.

THE COURT:  Okay.

MS. VERGOW:  Thank you, Your Honor.  I assume State Street counsel may have a few words.

THE COURT:  All right.

Yep.  Mr. Fleckner, you had more?

MR. FLECKNER:  Yeah, just a few additional items, Your Honor.  First, you had asked a question about individuals, and I think the focus was on the AT&T individuals.  There's also one State Street affiliated defendant who's an individual, Denise Sisk.  She doesn't serve on a committee.  She's a

corporate employee or officer of State Street.  I think she stands in a different position.

Secondly --

THE COURT:  And I haven't focused as much, but maybe you can tell me off the top of your head.  I don't recall any particularized allegations identifying Ms. Sisk's actions, but am I missing something?

MR. FLECKNER:  No.  And we actually just confirmed that while we were sitting here.  She's identified in paragraph 39 as an individual defendant in her role, but then there's no specific allegation in the text of the complaint specific to her.

Secondly, and I'll differ with my colleague, Ms. VerGow, just slightly, State Street Global Advisors was hired to be an independent fiduciary for all plan participants at the time that it was hired, so both the people who are going to be in the plan and the people who might be subject to the PRT.  We know that from the commitment agreement, which is at docket 78-3 at ECF page 6 of 21.  I know Your Honor expressed some skepticism with relying on that document last time.  I'll just note again that it's referred to repeatedly in the complaint at paragraphs -- and this is the amended complaint, at paragraphs 11, 38, and 184.  In fact, in paragraph 184 they add even additional allegations.

THE COURT:  Take me back slowly.  11.

MR. FLECKNER: 38 and 184. It's referenced explicitly --

THE COURT: Are the references to the document that you say is appropriately treated as incorporated by reference in the complaint?

MR. FLECKNER: Correct, correct. And that document identifies both State Street's use of Mercer, but it, also, at ECF page 6 of 21, identifies that State Street was hired to represent the interests of the plan and all its participants and beneficiaries in connection with the negotiation of the commitment agreement.

THE COURT: Well, let me take you, then, through the same -- perhaps I can ask the questions more efficiently than I -- than I did with Ms. VerGow, but -- Vir-go or Ver-gow?

MS. VERGOW: Ver-gow.

THE COURT: VerGow, I apologize.

Assuming that to be the case and assuming that to be cognizable in terms of the complaint, is it your view that that implies any difference in the fiduciary standard by which State Street should be judged with respect to its selection of an annuity?

MR. FLECKNER: No.

THE COURT: Okay.

MR. FLECKNER: And the reason is a few-fold. One is fiduciaries of lots of plans, including the Natixis plan of

which you referred earlier, that I was involved in that litigation. Different participants in any plan might have different obligations or interests. So take, for example, a situation where fees are assessed on an asset basis, where employees with low balances pay a low amount, employees with high balances pay a high amount. One fiduciary will have oversight as to all of those participants and will have to make trade-offs.

And so I think the fact that SSGA is retained to be an independent fiduciary for all the participants just adds another level of those different trade-offs. And I think that goes to Your Honor's earlier point that even under IB 95-1, I think there's a recognition that there may not be one particular safest annuity, the one that you might remember as a young child of just all the money sitting there in cash, that the complexities of the financial markets are such that there may be -- and the differences in insurers, there may be multiple that all meet that criteria. And the obligation is to pick from the pack.

And the fact that SSGA has obligations to all participants would be a factor as it thinks about the pack. It would certainly have to pick from that pack of safe annuities. It can't go downstream. And I think ultimately that's the failure that continues to exist in the amended complaint, that there's simply, as Your Honor recognized, there's no

allegations whatsoever about the process employed by SSGA as a professional independent fiduciary.  And all the plaintiffs are asking you to do is to draw the inference from the selection of Athene that that process must have somehow been materially deficient or deficient such that it was imprudent or disloyal.  And I think we've argued that they have not established that given the attributes they point to, that Athene falls into that category.

And the idea that State Street could be hired because it has a reputation of helping employers get the cheapest or go downstream at whatever the cost, it would really go to the heart of that business as an independent fiduciary.  And I think it's just simply not plausible a plaintiff could --

THE COURT:  I mean, it was -- is it plausible that a guy named Madoff would hire a small, unknown accounting firm out in a strip mall?  Depends on what you're looking for in an accounting firm.  The argument -- I get that people don't like hearing that said of companies with their names on the tops of buildings, but that is -- I mean, one question we've got to grapple with is, you know, if the reputation were known and there were evidence that there was such a known reputation, that might weigh into it.  But there certainly can be arguments that a selection of a service provider was warped by interest in the outcome, so that's not inherently implausible.  Whether it's adequately pleaded here is a different question.

MR. FLECKNER:  I would certainly push back on the characterization of State Street Global Advisors Trust Company as a strip mall accountant.  But to your point that's relevant here, although I would argue that that's very relevant as my client might agree with me, that is certainly not pleaded here.  There is no allegation here that State --

THE COURT:  State Street was known to have such a reputation or that State Street was known to be demonstrably unsuited to the task that they take on.  There's no allegation of that in the complaint is your point; is that right?

MR. FLECKNER:  Correct.  There's the same disloyalty arguments that they allege that Your Honor rejected and that they haven't reasserted except for preservation purposes.  So they have these sort of general allegations that you identified as meretricious involving stockholdings of funds and things of that nature.

But in terms of its reputation as an independent fiduciary, there's no allegation, for example, that it only selects Athene or that it only selects the cheapest.  It's a well-known independent fiduciary, one of the leaders in the space.  It chooses lots of different annuity providers for different contexts.

There's no allegation, by the way, the complaint alleges that State Street did in fact look at multiple annuity providers.  And that's a new allegation in the complaint this

time around.  I'll get you the paragraph number.  Paragraph 176 says a new allegation that SSGA Trust Company evaluated multiple candidates for the PRT.  Not once do they identify New York Life, MassMutual as candidates that were evaluated for this PRT.

So I just think that there's no allegations, no plausible allegations that SSGA Trust Company was reputationally putting itself out in the market as somebody that would always hire the cheapest, regardless of safety, that that's why it was selected here or that's in fact what it did.  And just like in the Natixis case, I just don't feel -- I mean, I understand that you're --

THE COURT:  These are apples and oranges.  All I'm -- I think I want to stay away -- I'm the one who opened the door to that particular intermixing.  It was really just a generalized comment about the limitations and value of 12(b)(6) evaluations when it's such an abstract enterprise, and often concrete information makes these decisions much easier than deciding them in the abstract.

MR. FLECKNER:  I'll stay out of the room and I'll rest on everything you said, unless there's other questions.

THE COURT:  No.

MR. FLECKNER:  Thank you, Your Honor.

THE COURT:  I think we're set here.

MR. SMITH:  Can I be heard very briefly?

THE COURT:  Very briefly.  I've got a criminal matter with a defendant being brought up in the prisoner elevator within a matter of minutes.

MR. SMITH:  Understood.  Okay.  So, first of all, with respect to the trade-off and the need to have fiduciary duties to both the remaining and the terminated plan participants, I just want to tell the Court sort of how ERISA works.  Maybe you already know this.  Because Ms. VerGow said we got to make sure there's enough assets remaining in the plan to take care of --

THE COURT:  Yeah, I mean, I think I get it.  I have seen cases -- am I right, this has come up most often with collapsing multiple employer plans where you've got really hard choices to make about do you take on more risk in the annuity provider in order to get people higher benefits or less risk?  It becomes a very tricky set of balances when there are insufficient assets.

And I took your point to be, if this is all about can AT&T put more assets on their balance sheet, nothing in that weighs on or diminishes the obligation to the people who are going to receive the annuity.

And ultimately, I heard both Ms. VerGow and Mr. Fleckner agree that in this case we're looking at a duty single to select an appropriately safe annuity with respect to the people who are going to be receiving annuity payments.  So I think --

MR. SMITH: I heard that, also. I just wanted to tell the Court that the way it works for a single employer plan is that every year the actuary does a valuation of the plan's liabilities. And so employers, plan sponsors every year have to put sometimes additional assets in. They're called, you know, employer contributions.

THE COURT: Right.

MR. SMITH: So if they look at it and said, well, we're putting too many assets out the door, you know, for this annuitization, they still have the legal obligation under ERISA to fully fund the plan or to fund it to the level required under ERISA. I just wanted you to know that's how that works.

THE COURT: That's helpful.

MR. SMITH: The second thing I wanted to tell you was that with respect to the separate account, I think that the parties have sort of converged. Okay? The separate account is out there. We allege in the complaint that when you add the separate account to everything else, there's only $2 billion in surplus. There's $143 billion in liabilities, okay, across everything, separate account, general account, all liabilities. And we allege that even after you count that separate account, that's just a tiny, tiny fraction. It's a tick over 1 percent.

THE COURT: No, I understand. Your point is to look at the absolute dollars of the liabilities with that as a point of comparison, and I'm left to figure out is that the right

comparison, how does that compare to RBC, and trying to figure out whether that's something I can or should decide at the 12(b)(6) stage.

MR. SMITH:  And the other thing I want to say is we allege in the complaint that that $879 million or that $2 million is composed of super risky assets whose values are overstated.

THE COURT:  I think I get the core argument.

MR. SMITH:  Thank you.

THE COURT:  As always, it's a pleasure to hear from such well prepared and knowledgeable counsel, particularly in a case where I suppose I may underestimate how often I am in dire need of such help, but this is clearly such a case.  So I very much appreciate help on a case that has its challenges.

So thank you all.  We'll be in recess.

THE CLERK:  All rise.

(Recording ends at 12:50:46)

CERTIFICATE OF OFFICIAL REPORTER


I, Linda Walsh, Registered Professional Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the audio-recorded proceedings held in the above-entitled matter, to the best of my skill and ability.

Dated this 10th day of April, 2026.



/s/ Linda Walsh
Linda Walsh, RPR, CRR
Official Court Reporter